Christopher G. Kelly
Christelette A. Hoey
HOLLAND & KNIGHT LLP
195 Broadway, Floor 24
New York, NY 10007-3189
(212) 513-3200



**JUDGE COTE**

ATTORNEYS FOR PLAINTIFF
CREDITEK LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**'07 CIV 9322**

------------------------------------------------------------------- X

CREDITEK LLC,                                              :     07 Civ. _____

                   Plaintiff,                    :

       -against-                                       :     **COMPLAINT**

NORTH GENERAL HOSPITAL,                                    :

               Defendant.                    :

------------------------------------------------------------------- X

      Plaintiff Creditek LLC ("Creditek" or "Plaintiff"), through its attorneys, Holland & Knight LLP, by way of Complaint against defendant North General Hospital ("NGH" or "Defendant"), alleges as follows:

<u>**NATURE OF THE DISPUTE**</u>

      1.    This is an action for a money judgment in an amount to be determined at trial, but not less than US $1,050,164.32, together with interest and reasonable attorneys' fees and costs, arising out of Defendant's material breach of an Outsourcing Agreement ("Agreement") entered into between Creditek and Defendant on or about February 9, 2006. A copy of the Agreement as executed by the parties is annexed hereto as Exhibit 1.

## PARTIES

2.      Creditek is a New Jersey corporation with its principal place of business located at 9 Sylvan Way, Suite 165, Parsippany, NJ 07054.  Creditek is in the business of, *inter alia*, assisting clients in the management, collection and resolution of client accounts receivable.

3.      Upon information and belief, NGH is a New York not-for-profit corporation and hospital with its principal place of business located at 1879 Madison Avenue, New York, New York 10035.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

5.      Venue is properly laid in this District pursuant to 28 U.S.C. § 1391(a), as Defendant does business and resides in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Southern District of New York.

## FACTUAL BACKGROUND

**The Agreement**

6.      Creditek and Defendant entered into the Agreement, whereby Creditek agreed to provide certain outsourcing services to Defendant and arising from or related to NGH's patient accounts receivable (the "Services").

7.      The outsourcing services provided to NGH by Creditek pursuant to the Agreement included, but were not limited to, providing Defendant with invoicing appropriate patients and/or third-party payers for all outpatient accounts, including any necessary follow-up thereto; analyzing and correcting patient accounts, including updating demographic, insurance,

and clinical information, as required; entering and retaining notes related to all accounts; reporting to Defendant with respect to the current status of all accounts; and providing and training staff required to perform the outsourcing services. See Agreement, Exhibit A.

8.      Pursuant to the Agreement, Creditek was to be compensated for its services by payment of 15.1% of cash receipts Defendant received from Backlog Accounts Receivable, as defined under the Agreement, and 5.65% of cash receipts Defendant received from Ongoing Accounts, as defined under the Agreement ("Fees"). See Agreement, Exhibit C.

9.      Pursuant to the Agreement, "[i]n consideration of [Creditek] providing the Services, [NGH] shall pay to [Creditek] the Fees." Agreement, § 11.1. The Agreement essentially defines the Fees as "Backlog Accounts Receivable" and "Ongoing Accounts" created by Defendant for its provision of health services to its patients. See Agreement, § 1.1 and Exhibit C.

10.     Pursuant to the Agreement, NGH agreed to pay Creditek's Fees within thirty (30) days of Defendant's receipt of an invoice from Creditek for the invoiced amounts. See Agreement, §§ 12.1, 12.2.

11.     Pursuant to the Agreement, NGH explicitly agreed, *inter alia*, to provide Creditek with a daily, electronic referral file that summarized all transactions impacting patients' accounts (the "File"). See Agreement, §§ 1.1, 4.2(c), and Exhibit D(7).

**Creditek's Performance Pursuant to the Agreement**

12.     Creditek provided outsourcing services to NGH pursuant to the Agreement during the 16-month period of March, 2006 through July, 2007.

13.     From March, 2006 to present, NGH has received and continues to receive monies from its accounts receivable and that are otherwise subject to Fees due Creditek under the

3

Agreement.  In particular, from March, 2006 through July, 2007, NGH received US $3.3 million from collections on the Backlog Accounts Receivable and US $16.1 million from collections on the Ongoing Accounts that are subject to Fees due Creditek under the Agreement.

**NGH's Failures to Pay Amounts Due Under the Agreement**

14.    From the commencement of Creditek's invoices in April, 2006, to February, 2007, Defendant failed to make timely and complete payments for invoiced Services under the Agreement.

15.    On or about December 20, 2006, and in an effort to avoid payment for the Services, Defendant raised, for the first time, an objection to the percentage due Creditek in Fees for the Backlog Accounts Receivable, and demanded an unilateral reduction in percentage on all accounts worked by Creditek for the Ongoing Accounts.

16.    At no point did Defendant ever pay, in full, undisputed amounts otherwise due Creditek under the Agreement.

17.    On or before February, 2007, Creditek advised Defendant that Creditek would stop providing the Services unless Defendant paid the amounts past due under the Agreement.

18.    On or about February 5, 2007, Creditek sent Defendant a Default Notice for nonpayment of invoices under the Agreement, which noticed that Defendant had overdue invoices dating back to May 2006, and its overdue bill totaled approximately US $714,965, including accrued interest of US $17,289.

19.    No timely objection under the Agreement to the February 5, 2007 Default Notice, or amounts owed, was ever received by Creditek.

20.    On or about February 21, 2007, Creditek sent Defendant a Termination Notice for an outstanding, past-due balance under the Agreement, which noticed that Defendant had an

overdue balance of approximately US $1,075,985, including accrued interest of US $21,343 and termination fees of US $96,000.

21.    No timely objection under the Agreement to the February 21, 2007 Termination Notice, or amounts owed, was ever received by Creditek.

22.    On or about March 2, 2007, after receiving a check from NGH for $59,351.97, which was returned for insufficient funds, Creditek received a replacement check from Defendant in the amount of US $59,351.97.

23.    On or about March 5, 2007, Creditek sent Defendant a notice of default and potential termination, to take effect as of March 22, 2007, on grounds that NGH had an overdue balance of approximately US $911,139.49, including interest.

24.    Based upon NGH's repeated representations that it would pay Creditek, Creditek continued to perform services throughout July, 2007.

25.    On August 1, 2007, Creditek's parent company, Genpact Limited ("Genpact"), wrote NGH demanding NGH immediately settle the amounts due and owing Creditek, which totaled US $1,050,164.32. No response to that letter has ever been received by Creditek or Genpact. A copy of that letter is annexed hereto as Exhibit 2.

26.    Despite Defendant's failure and refusal to pay Creditek the Fees owed, up to and including July, 2007, Creditek, in good faith, continued to provide Defendant with the Services due under the Agreement because it believed Defendant would pay all outstanding amounts owed thereunder.

27.    Despite repeated demands by Creditek, Defendant has failed and refused to make any further payments due and owing from Defendant to Creditek for the outsourcing services provided.

**NGH's Failures to Perform Under the Agreement**

28.     Pursuant to the Agreement, NGH agreed to cooperate to ensure Creditek could efficiently and effectively perform the Services.  Critical to this cooperation was, *inter alia*, NGH providing Creditek with the patient account data in an electronic format, referred to as the "File," as defined under the Agreement.  See Agreement, §§ 1.1, 4.2(c), and Exhibit D(7).

29.     Pursuant to the Agreement, Creditek was to receive the File from Defendant on a daily basis and in an electronic format.  See Agreement, §§ 1.1, 4.2(c), and Exhibit D(7).

30.     From the execution of the Agreement in or about February, 2006, Creditek never received electronic data in the format the parties agreed would constitute the File.  As a result, Creditek was forced to spend additional time and manpower not originally contemplated by the Agreement to provide services that were otherwise capable of being performed more efficiently had the File been supplied in the format NGH obligated itself to supply under the Agreement.

31.     Throughout April, May, and June, 2006, and based upon NGH's continued representations that it would supply the File, Creditek attempted to work with Defendant to create a sufficient referral file.

32.     On or about June 6, 2006, Creditek approved the specifications for the File that Defendant promised to provide through its subcontractor, McKesson HBOC, Inc. ("HBOC").

33.     On or about June 23, 2006, Creditek learned NGH had not yet approved HBOC's download program.  A copy of that June 23, 2006 communication is annexed hereto as Exhibit 3.

34.     On or about July 6, 2006, HBOC sent Defendant an email advising of HBOC's willingness to test the download and requesting approval of its contents.  A copy of that July 6, 2006 email is annexed hereto as Exhibit 4.

35.    On or about July 11, 2006, HBOC sent a second notice to Defendant advising of HBOC's willingness to test the download and requesting approval of its contents. A copy of that July 11, 2006 email is annexed hereto as Exhibit 5.

36.    Throughout October, November, and December, 2006, Creditek continued to work with Defendant to create a sufficient referral file.

37.    On March 8, 2007, Creditek sent Defendant a letter advising that Creditek had not yet received the File as required under the Agreement, thereby substantially increasing Creditek's costs to perform thereunder.

38.    On or about March 11, 2007, Creditek advised Defendant's Board of Directors (the "Board") and CEO that Defendant had failed to provide the File, which in turn hindered Creditek's efforts to accurately correct and re-bill unpaid or rejected claims. Creditek also advised the Board and CEO that Defendant owed Creditek an outstanding balance of almost US $1 million in unpaid invoices. A copy of that March 11, 2007 email is annexed hereto as Exhibit 6.

39.    Despite repeated demands by Creditek, Defendant never provided Creditek with a functioning daily electronic referral file, as required under the Agreement, for Creditek to perform its obligations with optimal efficiency thereunder.

40.    Despite Defendant's failure and refusal to provide Creditek with the File, up to and including July, 2007, Creditek, in good faith, continued to provide Defendant with the Services due under the Agreement because it believed Defendant would honor its obligations to provide the File as required thereunder.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

41.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 40 of this Complaint as though fully set forth herein.

42.    The Agreement entered into between Creditek and Defendant, whereby Creditek agreed to provide revenue-cycle outsourcing services to Defendant in connection with patient billing, in exchange for the payment of Fees, is a valid and enforceable contract.

43.    Defendant has materially breached the Agreement by failing to pay Creditek pursuant to the terms of the Agreement.

44.    Defendant has materially breached the Agreement by failing to provide Creditek with the information needed to optimize Creditek's potential Fees under the Agreement.

45.    As a direct and proximate result of Defendant's material breach of the Agreement, Creditek has sustained damages in an amount to be determined at trial, but not less than US $1,050,164.32, together with interest, costs and attorneys' fees.

46.    Creditek has fully performed all of its obligations under the Agreement.

## SECOND CAUSE OF ACTION
### (Quantum Meruit)

47.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 46 of this Complaint as though fully set forth herein.

48.    Creditek has performed outsourcing services for Defendant in good faith, at the request, and for the benefit, of Defendant.

49.    Defendant has accepted these services.

50.    Creditek had a reasonable expectation to be compensated for the services rendered to Defendant.

51.    The fair and reasonable value of the outsourcing services rendered by Creditek to Defendant for which payment has not been made shall be determined at trial, but is not less than US $1,050,164.32.

52.    By reason of the foregoing, Creditek has sustained damages in an amount to be determined at trial, but not less than US $1,050,164.32, together with interest, costs, and reasonable attorneys' fees.

## THIRD CAUSE OF ACTION
### (Negligent Misrepresentation)

53.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 52 of this Complaint as though fully set forth herein.

54.    Defendant had a duty not to make any misrepresentations to Creditek regarding production of the File.

55.    Defendant represented to Creditek that Defendant could and would produce the File to ensure Creditek could efficiently and effectively perform its obligations under the Agreement.

56.    Defendant's representations to Creditek regarding production of the File were untrue.

57.    Defendant should have known that the representations to Creditek regarding production of the File were untrue when Defendant made them.

58.    At the time Defendant represented to Creditek that it could and would produce the File, Defendant knew Creditek would rely upon the representations in making its decision to continue providing the Services to Defendant.

59.    Creditek did, in fact, rely upon the representations Defendant made to Creditek regarding production of the File and provided Defendant with the Services.  When Creditek

continued to provide Defendant with the Services, Creditek was under the belief that Defendant would provide Creditek with the File to ensure Creditek could efficiently and effectively perform its obligations under the Agreement.

60.    Creditek reasonably and justifiably relied upon Defendant's representations regarding production of the File.

61.    By reason of the foregoing, Creditek has sustained damages in an amount to be determined at trial, together with interest, costs, and reasonable attorneys' fees.

WHEREFORE, plaintiff Creditek LLC demands judgment and relief against Defendant as follows:

A.    On the First Cause of Action, imposing liability upon Defendant and awarding Plaintiff an amount to be determined at trial, but not less than US $1,050,164.32, together with interest, costs and attorneys' fees;

B.    On the Second Cause of Action, imposing liability upon Defendant and awarding Plaintiff an amount to be determined at trial, but not less than US $1,050,164.32, together with interest, costs and attorneys' fees;

C.    On the Third Cause of Action, imposing liability upon Defendant and awarding Plaintiff an amount to be determined at trial, together with interest, costs and attorneys' fees; and

D.    Granting Plaintiff such further and other relief as the Court deems just and proper.

Dated: New York, New York
       October 17, 2007

                                    HOLLAND & KNIGHT LLP

                          By:    _____
                                    Christopher G. Kelly
                                    Christelette A. Hoey
                                    195 Broadway, Floor 24
                                    New York, New York 10007
                                    (212) 513-3200

                                    Attorneys for Plaintiff
                                    Creditek LLC

# 4793362_v7

11

# EXHIBIT

# 1

# OUTSOURCING AGREEMENT

**dated as of** _____

**by and between**

**North General Hospital**

**and**

**Creditek LLC**

This **OUTSOURCING AGREEMENT** ("Agreement"), dated as of _____ (the "Agreement Date"), is by and between Creditek LLC ("OUTSOURCER"), having its principal place of business at 9 Sylvan Way, Suite 165, Parsippany, NJ 07054, and North General Hospital, having its principal place of business at 1879 Madison Avenue, New York, NY 10035 ("CLIENT").

WITNESSETH:

WHEREAS, the purpose of this Agreement is to establish the general terms and conditions applicable to OUTSOURCER's provision of revenue cycle outsourcing services (as described herein) to CLIENT for which CLIENT and OUTSOURCER desire to enter into this Agreement; and

WHEREAS, OUTSOURCER desires to provide to CLIENT, and CLIENT desires to obtain from OUTSOURCER, the revenue cycle outsourcing services described in this Agreement on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, for and in consideration of the agreements set forth below, CLIENT and OUTSOURCER agree as follows:

### ARTICLE I          DEFINITIONS AND CONSTRUCTION

**Section 1.1    Definitions.**

The following defined terms used in this Agreement shall have the meanings specified below:

"Abandoned Call" shall mean a call where caller has hung up after being placed on hold by an automated or manual OUTSOURCER system.

"Account" means the right to payment for services rendered or to be rendered to Patients.

"Accounts Receivable" or "A/R" means the aggregate of all Open Accounts for CLIENT's hospital outpatient and diagnostic and treatment center services, valued at Charge amounts.

"Affiliate" shall mean, with respect to a Party, any entity controlling, controlled by or under common control with, such Party.  The terms "control", "controlling" and "controlled", as used in this definition, shall mean the legal, beneficial or equitable ownership, direct or indirect, of more than 50 percent of the aggregate of the voting equity interests in such entity.

"Agreement Date" shall have the meaning set forth in the introduction.

"Allowances" shall mean the reserve that represents the difference between the gross value of the Accounts Receivable and the anticipated cash value of the Net Accounts Receivable.

**Error! Unknown document property name.**

"Assumptions" shall mean the information set forth in Exhibit F.

"ASA" or "Average Speed to Answer" shall mean the time it takes for a patient phone call to be answered by OUTSOURCER after the call is connected to the OUTSOURCER system.

"Backlog Accounts Receivable" shall mean all Accounts Receivable greater than 30 days old from the date of service as of the Go Live Date.

"Blocked Call" shall mean a call to OUTSOURCER where caller gets a busy signal and cannot connect to OUTSOURCER system.

"Cash Receipts", as used herein, includes, without limitation, all payments received, transferred in or posted to, regardless of source and without exception, which apply to the Accounts, whether by cash, check, wire transfer, credit card, receipt by CLIENT, CLIENT's bank, lender, agent, or lock box, or payment off-set with or by a Third Party Payer.

"Change in Scope of Service(s)" shall mean any service that is requested by CLIENT in writing and:  (a) outside the scope of the Required Services, and (b) requires staffing, technology, software changes, or other resources in addition to or different than those required for performance of the Required Services.

"Change in Scope of Service Levels" shall mean any service levels established by OUTSOURCER and CLIENT in connection with the Change in Scope of Services.

"Change Order" shall have the meaning set forth in Section 3.2.

"Charge" shall mean the invoice value of an Account at CLIENT's non-discounted pricing (i.e., gross revenue before contractual allowable).

"Claim" shall mean any civil, criminal, administrative or investigative action or proceeding against a Party.

"CLIENT Agents" shall mean the agents, subcontractors and representatives of CLIENT.

"CLIENT Collection Agency" shall mean a third party collection agency hired by CLIENT.

"CLIENT Contract Executive" shall have the meaning set forth in Section 4.1.

"CLIENT Data" shall mean all data and information submitted to OUTSOURCER or OUTSOURCER Agents in tangible form (including electronic form) by CLIENT or CLIENT's agents or obtained, developed or produced by OUTSOURCER or OUTSOURCER Agents on behalf of CLIENT.

"CLIENT Event of Default" shall have the meaning set forth in Section 17.1(a)(ii).

"CLIENT Intellectual Property" shall have the meaning set forth in Section 8.2.

"CLIENT Service Location" shall mean CLIENT's facility located at 1879 Madison Avenue, New York, New York 10035 and any other outpatient facilities owned, operated, or managed by CLIENT.

"CLIENT Required Services" shall have the meaning set forth on Exhibit D.

"Closed Account" shall mean a zero balance Account.

"Confidential Information" shall mean the terms and conditions of this Agreement and all information, data (including CLIENT Data regarding CLIENT's patients, referral sources, professional staff, employees, finances, payors or other business-related matters) knowledge and know-how (in whatever form and however communicated) relating directly or indirectly to the disclosing Party (or to its Affiliates or contractors, or to its or their businesses, operations, properties, products, markets or financial positions) that is delivered or disclosed by such Party or any of its officers, directors, partners, members, employees, agents, Affiliates or shareholders to the other Party in writing, electronically, orally or through visual means, or that such Party learns or obtains orally, through observation or analyses, interpretations, compilations, studies or evaluations of such information, data, knowledge or know-how.

"Contract Year" shall mean each 12-month period commencing on the Go Live Date during the Term.

"Date of Service" shall mean the date in which a Patient has been examined and/or treated at North General Hospital or at any if its facilities.

"Days Revenue Outstanding (DRO)" shall have the meaning set forth on Exhibit B.

"Default Cure Period" shall mean the cure periods set forth on Exhibit E.

"Default Notice" shall have the meaning set forth in Section 17.1(a)(i).

"Delinquent Account" shall mean an Account which remains unpaid in part or in full until the earlier to occur of (i) the date on which OUTSOURCER's reasonable billing and follow-up efforts (as outlined in Exhibit A) have been expended, or (ii) the date which is 12 months after the Account's date of service.

"Event of Default" shall mean, with respect to OUTSOURCER, an OUTSOURCER Event of Default and, with respect to CLIENT, a CLIENT Event of Default.

**Error! Unknown document property name.**

"Fees" shall mean the fees for the Services as described on Exhibit C and any other amounts payable by CLIENT to OUTSOURCER pursuant to this Agreement in respect of the Services provided hereunder.

"Force Majeure Event" shall have the meaning set forth in Section 10.2.

"Go Live Date" shall mean the date when OUTSOURCER receives the first Referral File from CLIENT.

"HIS System" shall mean CLIENT's McKesson STAR hospital information system, the functional replacement of such system, or its then-current patient accounting system in use.

"HIPAA" has the meaning set forth in Section 3.3.

"Management Committee" shall have the meaning set forth in Section 7.1.

"Net Accounts Receivable" shall mean the aggregate expected cash value of all Accounts.

"Net Revenue" shall mean the anticipated cash value of Charges (net of CLIENT and Patient adjustments and write-offs and Third Party Payer contractual discounts, adjustments and write-offs).

"New Accounts" shall mean all Accounts billed for the first time after the Go Live Date.

"Ongoing Accounts" shall mean all New Accounts as well as all Accounts billed for the first time during the 30 days preceding the Go Live Date.

"Open Account" shall mean an Account with a balance other than zero

"OUTSOURCER Agents" shall mean the agents, subcontractors, suppliers and representatives of OUTSOURCER.

"OUTSOURCER Collection Agency" shall mean OUTSOURCER's agents responsible for sending out follow-up letters to Patients with respect to Open Accounts.

"OUTSOURCER Contract Executive" shall have the meaning set forth in Section 6.1.

"OUTSOURCER Event of Default" shall have the meaning set forth in Section 17.1(a)(i).

"OUTSOURCER Intellectual Property" shall have the meaning set forth in Section 8.1.

"OUTSOURCER Required Services" shall mean the OUTSOURCER services described in Exhibit A

**Error! Unknown document property name.**

"OUTSOURCER Service Location" shall mean any OUTSOURCER processing center.

"OUTSOURCER's System" shall mean OUTSOURCER's MaxPro, C-RMS, Medical Manager and/or imaging systems, or their functional replacements.

"Parties" shall mean CLIENT and OUTSOURCER, collectively.

"Party" shall mean either CLIENT or OUTSOURCER, as the case may be.

"Patient" shall mean a patient who receives outpatient services from CLIENT (at CLIENT's Service Location).

"Physician" shall mean any physician working for or associated with North General Hospital or its Affiliates.

"Pre-Termination Accounts" shall have the meaning set forth in Section 17.2(b).

"Prime Rate" shall mean the United States of America prime rate as recorded in the New York edition of the Wall Street Journal the day of a receipt or payment, as the case may be.

"Project Staff" shall mean the personnel of OUTSOURCER who provide the Services.

"Referral File" shall mean the daily electronic file submitted by CLIENT to OUTSOURCER, which, at a minimum, will provide the details of all outpatient transactions posted to the HIS on the preceding day, as well as all cumulative activity for all Open outpatient Accounts.

"Required Services" shall mean the services described on Exhibit A as such services apply to OUTSOURCER and as described on Exhibit D when such services apply to CLIENT.

"Self Pay" shall mean an Account where the Patient is responsible for the open balance.

"Service Levels" shall mean those performance standards set forth on Exhibit B and the performance standards established by OUTSOURCER and CLIENT in connection with any Change in Scope of Services.

"Service Location" shall mean the CLIENT Service Location, the OUTSOURCER Service Location or any Additional OUTSOURCER Service Location.

"Services" shall mean the Required Services and the Change in Scope of Services, collectively.

"Standard Reports" shall mean those reports listed on Exhibit A

"Systems" shall mean the CLIENT's HIS System or OUTSOURCER's System and/or their functional replacements.

"Term" shall have the meaning set forth in Section 2.1.

"Termination Date" shall mean the date when OUTSOURCER ceases to provide Services under this Agreement.

"Third Party Payers" shall mean third party payers, including Medicare, Medicaid, commercial insurance carriers, Worker's Compensation, auto, health maintenance organizations and preferred provider organizations.

**Section 1.2    References; Exhibits.**

In this Agreement: (i) the Exhibits shall be incorporated into and deemed part of this Agreement and all references to this Agreement shall include the Exhibits; (ii) references to any law or regulation shall mean references to the law or regulation in changed or supplemented form or to a newly adopted law or regulation replacing a previous law or regulation; and (iii) references to the word "including" or the phrase "e.g." in this Agreement shall mean "including, without limitation".

The following are the Exhibits to this Agreement:

| Exhibit | Description |
|---------|-------------|
| A | Required Outsourcer Services |
| B | Service Levels |
| C | Fees |
| D | Required Client Services |
| E | Events of Default and Cure Periods |
| F | Significant Assumptions |
| G | Business Associate Addendum |

**Section 1.3    Headings.**

The article and section headings and the table of contents are for reference and convenience only and shall not be considered in the interpretation of this Agreement.

**ARTICLE II        TERM**

**Section 2.1    Term.**

The term of this Agreement (the "Term") shall be from the Agreement Date through the date which is two (2) years after the Go Live Date (such date, the "Expiration Date"), unless terminated earlier pursuant to Article XVII.  This Agreement will automatically be extended for additional renewal terms of twelve (12) months each unless OUTSOURCER or CLIENT gives written notice to the other at least 360 days prior to the commencement of a renewal term.

**Error! Unknown document property name.**

### ARTICLE III          SERVICES

**Section 3.1      Generally.**

OUTSOURCER shall be responsible for providing to CLIENT the OUTSOURCER Required Services, subject to the Service Levels specified on Exhibit B, CLIENT's policies and procedures, and such additional Change in Scope of Services that may be from time to time mutually agreed upon in writing by the Parties in the manner set forth in Section 3.2. CLIENT shall be responsible for providing OUTSOURCER the CLIENT Required Services.  The Parties agree that the Go Live Date shall be no later than March 1, 2006.  The Parties have mutually agreed upon a transition schedule (attached hereto as Exhibit A) for when each Party shall begin providing Required Services hereunder (including any pre-Go Live Date activities), and each Party shall make all reasonable efforts necessary to comply with such schedule.

**Section 3.2      Change in Scope of Services.**

CLIENT may from time to time during the Term request (1) ongoing additions or changes to the scope of the individual component tasks included in the OUTSOURCER Required Services and/or (2) new or additional services, collectively a "Change in Scope of Services", Within 15 business days of receipt of such a request from CLIENT, if OUTSOURCER elects to perform such Change in Scope of Services, OUTSOURCER shall provide CLIENT with (1) a written description of the work OUTSOURCER anticipates performing in connection with such Change in Scope of Service, (2) a schedule for commencing and completing the Change in Scope of Service, (3) (a) the price for such Change in Scope of Service, if CLIENT has requested a fixed price for such Change in Scope of Service, or (b) an estimate of the time, resources and prices for such Change in Scope of Service, if CLIENT has requested a time and materials quotation for such Change in Scope of Service, and (4) when appropriate, the resources necessary to provide the Change in Scope of Service.  OUTSOURCER shall not begin performing any Change in Scope of Service until CLIENT Contract Executive has provided OUTSOURCER with written authorization to perform the Change in Scope of Service from the CLIENT Contract Executive.  The document (the "Change Order") evidencing each agreed upon Change in Scope of Service shall reference Exhibit A and be deemed an amendment thereto.  During the Term, OUTSOURCER's time and materials rates applicable to Changes in Scope of Services requested by CLIENT hereunder shall be mutually agreed upon by the Parties in writing.

**Section 3.3      Legal and Regulatory Compliance.**

(a)      OUTSOURCER represents, warrants and covenants that, throughout the Term, OUTSOURCER shall provide its Services in accordance with (A) all applicable present and future federal, state and local laws, rules, regulations and agency guidelines including, without limitation: (i) laws, rules, regulations and guidelines regarding billing, collection and payment for medical and other health care services, (ii) the Health Insurance Portability and Accountability Act of 1996 and its related regulations ("HIPAA"); (iii) any applicable laws relating to the confidentiality of

CLIENT's patients; and (iv) the Fair Debt Collection Practices Act and its related regulations and (B) present and future rules, regulations and guidelines of all applicable third party payors. Without limiting the foregoing sentence, OUTSOURCER further represents, warrants and covenants that it will comply with all present and future HIPAA standards applicable to electronic transactions performed by OUTSOURCER on CLIENT's behalf, including electronic claims submissions.

(b)     Without limiting the foregoing paragraph, the Parties agree to comply with all federal, state and local laws, rules, and regulations regarding the security, integrity and confidentiality of patient health information and any subsequent amendments thereto, including any regulations, standards or rules promulgated under HIPAA. Additionally, OUTSOURCER hereby agrees to all of the terms and conditions set forth in the Business Associate Addendum attached hereto as Exhibit G, which Addendum will be executed and delivered by the Parties on the Agreement Date.

(c)     OUTSOURCER shall cooperate with the compliance efforts of CLIENT to ensure both Parties' compliance with all applicable federal and state laws, rules and regulations and with all applicable rules and guidelines of third party payors. OUTSOURCER will provide CLIENT with a copy of its current compliance program prior to the Agreement Date (and will subsequently provide CLIENT with any amendments to the program), and shall do the following:

(i)     If OUTSOURCER finds evidence of erroneous or improper claims (whether due to the conduct of OUTSOURCER, CLIENT or their agents), OUTSOURCER shall refrain from the submission of such claims and promptly (within ten (10) days) notify CLIENT. OUTSOURCER shall provide CLIENT with all claim specific information and shall identify all evidence of the erroneous or improper claim.

(ii)     OUTSOURCER shall identify and research any overpayments made to CLIENT and shall notify CLIENT once the overpayment has been validated. This information shall be provided weekly to CLIENT.

(iii)     OUTSOURCER shall process claims and (upon direction by CLIENT) bill for CLIENT's services only on the basis of accurate and appropriate documentation. Unless otherwise directed by CLIENT, all claims will be sent to payors using CLIENT's HIS System. OUTSOURCER shall not use "defaults" or engage in any similar practice that provides or creates missing billing or coding information based on assumed practices or other inappropriate criteria. OUTSOURCER shall employ only individuals who have appropriate training or experience to be able to review CLIENT bills and render the Services hereunder. OUTSOURCER shall seek clarification from CLIENT in all instances for any ambiguous, conflicting, missing, or insufficient documentation received from CLIENT.

(iv)     OUTSOURCER shall comply with all applicable billing, coding and collection policies of CLIENT. Without limiting the foregoing, if CLIENT has designated a certain billing, diagnosis or treatment code, then OUTSOURCER shall

not change such codes on any claims submitted on behalf of CLIENT without the prior written authorization of CLIENT.

(d)    In the event that a change in applicable federal, state or local laws, rules or regulations increases OUTSOURCER's cost of providing Services hereunder by more than ten percent (10%), then (i) OUTSOURCER shall provide written notice to CLIENT along with sufficient back-up documentation which demonstrates the increase in OUTSOURCER's costs, (ii) the Parties will negotiate a reasonable increase in the Fees to compensate OUTSOURCER for the increase in its costs, provided that any increase will be subject to mutual written agreement of the Parties, and (iii) if the Parties cannot agree upon an increase in Fees within ninety (90) days of OUTSOURCER's initial notice, then either Party may terminate this Agreement without cause or penalty (in which case, CLIENT shall not be required to pay OUTSOURCER's severance costs as provided in Section 21.21).

### Section 3.4    Compliance With Disclosure Law.

To the extent applicable under Section 1861(v)(1)(i) of the Social Security Act, as amended, OUTSOURCER agrees that, upon request made in accordance with applicable law and regulations, the Comptroller General of the United States, the United States Department of Health and Human Services and the duly authorized representatives of the foregoing shall be given access by OUTSOURCER to the following records from the date of this Agreement until the expiration of four (4) years after the furnishing of the Services under this Agreement:  this Agreement, and all books, documents and records of OUTSOURCER and its subcontractors that are necessary to verify the nature and extent of the costs to CLIENT of Services rendered hereunder.  Furthermore, in the event that any request for OUTSOURCER's books, documents and records is made pursuant to this section, OUTSOURCER shall promptly give notice of such request to CLIENT and shall promptly provide CLIENT with a copy of such request and each book, document and record made available to the persons and agencies listed above.  This provision shall survive termination or expiration of this Agreement.

### Section 3.5    Non-Solicitation.

Except as otherwise expressly provided in this Agreement or with OUTSOURCER's prior written consent, during the Term and for two years after termination or expiration of this Agreement, CLIENT agrees not to solicit or hire any of OUTSOURCER's or its Affiliates' and contractors' employees that become known to CLIENT as a result of the Services provided under this Agreement.  Except as otherwise expressly provided in this Agreement or with CLIENT's prior written consent, during the Term and for two years after termination or expiration of this Agreement, OUTSOURCER agrees not to solicit or hire any of CLIENT's or its Affiliates' employees that become known to OUTSOURCER as a result of providing the Services under this Agreement.  Notwithstanding the foregoing either Party may at any time hire any contractor, partner, employee or agent of the other Party that responds to a general solicitation to the public.

## ARTICLE IV   CLIENT RESPONSIBILITIES

In addition to any specific obligations for which CLIENT is given responsibility in this Agreement, CLIENT shall perform the following responsibilities during the Term.

### Section 4.1    CLIENT Contract Executive.

CLIENT shall appoint one or more individuals (each the "CLIENT Contract Executive") who from the Agreement Date shall serve as the primary CLIENT representatives. The CLIENT Contract Executives shall (1) have overall responsibility for managing and coordinating the performance of CLIENT's obligations under this Agreement, (2) be authorized to act for and on behalf of CLIENT with respect to all matters relating to this Agreement, (3) define and communicate the CLIENT's business priorities to OUTSOURCER, (4) make timely decisions that would impact the OUTSOURCER's ability to perform under this Agreement; and (5) facilitate the implementation of this Agreement throughout CLIENT's entire organization. OUTSOURCER may rely upon the representations and agreements of a CLIENT Contract Executive as lawfully binding on the CLIENT; provided, however, a CLIENT Contract Executive shall not have the authority to enter into written agreements to modify or supersede this Agreement.  CLIENT reserves the right to change the individual(s) appointed as CLIENT Contract Executives from time to time upon notice to OUTSOURCER.

### Section 4.2    CLIENT Rights and Obligations.

(a)    With respect to activities or services not expressly delegated to OUTSOURCER hereunder, CLIENT reserves the right to engage in such activities and/or to engage third parties to provide such services to CLIENT.

(b)    CLIENT shall promptly notify OUTSOURCER of any and all notices received by CLIENT or CLIENT Agents from a Patient and/or Third Party Payer regarding an outstanding invoice in respect of an Account, or regarding OUTSOURCER's billing efforts regarding any outstanding invoice.  OUTSOURCER agrees to promptly notify CLIENT of any and all notices received by OUTSOURCER or OUTSOURCER's Agents from a Patient and/or Third Party Payer regarding billing disputes, patient complaints or pending or threatened audits regarding CLIENT as soon as OUTSOURCER becomes aware of them.  CLIENT reserves the right to direct CLIENT's response to any such disputes, complaints and audits, and OUTSOURCER shall promptly provide CLIENT with a copy of all related documents and correspondence and an opportunity to participate in all proceedings or discussions.

(c)    CLIENT shall reasonably cooperate with OUTSOURCER so OUTSOURCER can efficiently and effectively perform the Services.

(d)    All collections for CLIENT's health care services shall be deposited in bank accounts established by CLIENT from time to time.  Such accounts shall be established in the name of CLIENT, and CLIENT shall have sole signature authority over such accounts.  Authorized signers on such account(s) shall be designated

and approved by Client. OUTSOURCER will have no ownership rights in, or signature authority with respect to, such bank account(s) nor shall OUTSOURCER have authority to negotiate or assert ownership rights in and/or to checks made payable to CLIENT. Any collections for CLIENT's health care services shall not be subject to set-off, abatement, reduction, or counterclaim by OUTSOURCER for any reason. OUTSOURCER's sole authority with respect to CLIENT's bank account(s) shall be to access information relating to the deposits made to such account. In the event that any payments or remittances for CLIENT's health care services are sent to or received by OUTSOURCER, then OUTSOURCER shall forward such payments or remittances to CLIENT's bank account(s) within five (5) business days from OUTSOURCER's receipt of such payments or remittances. CLIENT shall execute any instruments as may be required to authorize OUTSOURCER to obtain information from CLIENT's bank account(s) necessary to provide the Services hereunder.

**ARTICLE V        SERVICE LEVELS.**

**Section 5.1    Service Levels.**

As of the Go Live Date, OUTSOURCER shall perform the Services in accordance with generally accepted industry standards and with the specifications and representations made in this Agreement, including the Service Levels set forth in Exhibit B.

**Section 5.2    Adjustment of Service Levels.**

Either Party may, at any time upon notice to the other Party, initiate negotiations to review and, upon agreement by the Management Committee, adjust any Service Level which such Party in good faith believes is inappropriate at the time. Any decision by the Management Committee to adjust any Service Level must be made by a vote that includes the affirmative vote of at least one representative of each Party. Notwithstanding the foregoing, the Parties agree that any adjustments to the Service Levels shall not materially reduce or adversely affect the Services or the quality of OUTSOURCER's performance hereunder.

**Section 5.3    Reports.**

At no additional cost to CLIENT, OUTSOURCER shall provide custom reports, as required by CLIENT, and Standard Reports as described on Exhibit A.

**Section 5.4    Root-Cause Analysis.**

Within five days of receipt of a notice from CLIENT with respect to OUTSOURCER's failure to provide the Services in accordance with the Service Levels, OUTSOURCER shall: (1) initiate a root-cause analysis to identify the cause of such failure and investigate the decline in performance, (2) develop a plan acceptable to CLIENT to correct such failure, (3) provide CLIENT Contract Executive with a report detailing the cause of and procedure for correcting the failure with an action plan and implementation schedule; (4) provide CLIENT with satisfactory assurance that such

**Error! Unknown document property name.**

failure will not recur after the procedure has been completed, (5) subject to Section 17.1(a), have 30 days to cure Service Level deficiencies unless otherwise specified in Exhibit E; and (6) OUTSOURCER will provide CLIENT with applicable Service Level credits in accordance with Exhibit B.

### Section 5.5    Measurement and Monitoring Tools.

OUTSOURCER shall implement the necessary measurement and monitoring tools and procedures required to measure and report OUTSOURCER's performance against the applicable Service Levels.  Such measurement and monitoring shall permit reporting at a level of detail sufficient to verify compliance with the Service Levels and shall be subject to audit by CLIENT upon request.  Additionally, OUTSOURCER shall provide CLIENT with monthly reports regarding its performance against the applicable Service Levels.

### ARTICLE VI          PROJECT TEAM.

### Section 6.1    OUTSOURCER Contract Executive.

OUTSOURCER shall appoint an individual (the "OUTSOURCER Contract Executive"), and designate his/her backup, who from the Agreement Date shall serve as the primary OUTSOURCER representative.  The initial OUTSOURCER Contract Executive shall be:  Brian Snedeker (with Adrienne Hurtt as a back-up), and any replacements of the OUTSOURCER Contract Executive or his/her back-up shall require the prior written approval of CLIENT.  Upon request, OUTSOURCER shall provide CLIENT with references and a description of the credentials and qualifications of the OUTSOURCER Contract Executive, his/her backup and any proposed replacements. CLIENT reserves the right to request a replacement of the OUTSOURCER Contract Executive or his/her backup at any time on reasonable grounds, and OUTSOURCER shall promptly make a replacement after receiving such request.  The OUTSOURCER Contract Executive shall (1) have overall responsibility for managing and coordinating the performance of OUTSOURCER's obligations under this Agreement and (2) be authorized to act for and on behalf of OUTSOURCER with respect to all matters relating to this Agreement. CLIENT may rely upon the representations and agreements of the OUTSOURCER Contract Executive as lawfully binding on the OUTSOURCER; provided, however, the OUTSOURCER Contract Executive shall not have the authority to enter into written agreements to modify or supersede this Agreement, except to the extent this Agreement is modified by Change Orders executed by the OUTSOURCER Contract Executive and CLIENT.

### Section 6.2    Subcontractors.

(a)    OUTSOURCER may not subcontract the performance of its Services under this Agreement unless CLIENT consents to such subcontracting in writing in advance (which consent shall not be unreasonably withheld or delayed). OUTSOURCER shall ensure that all of its subcontractors comply with the terms of this Agreement.

**Error! Unknown document property name.**

(b)     OUTSOURCER shall be responsible for the work, performance and activities of each of its approved subcontractors, including compliance with the terms of this Agreement.  OUTSOURCER shall also be solely responsible for all payments to its subcontractors.

## ARTICLE VII        MANAGEMENT AND CONTROL.

### Section 7.1        Management Committee.

Upon execution of this Agreement, CLIENT and OUTSOURCER shall each appoint two representatives to serve on a management committee (the "Management Committee").  The Management Committee shall be authorized and responsible for (1) overseeing the provision of the Services and each Party's performance under this Agreement and (2) monitoring and resolving disagreements regarding the provision of the Services and the Service Levels.  A Party may change any of its representatives on the Management Committee upon notice to the other Party.  A quorum for any meeting of the Management Committee shall require attendance by at least one person appointed by each Party, and any action or decision by the Management Committee shall require the vote of at least one person appointed by each Party.

## ARTICLE VIII        INTELLECTUAL PROPERTY RIGHTS.

### Section 8.1        OUTSOURCER Intellectual Property.

(a)     "OUTSOURCER Intellectual Property" shall mean all software or other intellectual property (including any writings, discoveries, inventions or other materials covered by any rights of copyright, trademark or patent or any rights similar thereto, whether registered or unregistered, or otherwise protectible as trade secret, proprietary or confidential information) owned or developed by, or otherwise proprietary to, OUTSOURCER.  OUTSOURCER Intellectual Property shall also include all programs and documentation therefore and the tangible media on which such programs are recorded, as well as all reports, technology, training materials, forms, specifications, and other intellectual property owned or developed by or proprietary to OUTSOURCER, for use in providing the Services hereunder or otherwise in its business.

(b)     OUTSOURCER Intellectual Property is and will remain the property and confidential information of OUTSOURCER or its third party licensors, and CLIENT shall have no right, title or interest therein except to the extent of a perpetual license to use any materials prepared or provided by OUTSOURCER hereunder as part of the Services and except as may otherwise be provided in any separate license agreements.  No use of OUTSOURCER Intellectual Property at or in connection with any Service Location or equipment containing OUTSOURCER Intellectual Property shall confer any rights in such OUTSOURCER Intellectual Property on CLIENT, except for the license granted hereunder.  Such license shall survive any expiration or termination of this Agreement.

**Error! Unknown document property name.**

**Section 8.2** **CLIENT Intellectual Property.**

(a)  "CLIENT Intellectual Property" shall mean all software or other intellectual property (including any writings, discoveries, inventions or other materials covered by any rights of copyright, trademark or patent or any rights similar thereto, whether registered or unregistered, or otherwise protectible as trade secret, proprietary or confidential information) owned or developed by, or otherwise proprietary to, CLIENT. CLIENT Intellectual Property shall also include all programs and documentation therefore and the tangible media on which such programs are recorded, as well as all reports, technology, training materials, forms, specifications, and other intellectual property owned or developed by or proprietary to CLIENT.

(b)  All CLIENT Intellectual Property is and will remain the property and confidential information of CLIENT or its third party licensors, and OUTSOURCER shall have no right, title or interest therein except to the extent of such limited right to use such particular portions thereof as are necessary to enable OUTSOURCER to perform its Services hereunder or except as may otherwise be provided in any separate license agreements. No use of CLIENT Intellectual Property at or in connection with any Service Location or equipment containing CLIENT Intellectual Property shall confer any rights in such CLIENT Intellectual Property to OUTSOURCER.

## ARTICLE IX    DATA AND REPORTS

**Section 9.1** **Ownership of CLIENT Data.**

All CLIENT Data is, will be, and shall remain the property of CLIENT. CLIENT Data shall not, without CLIENT's prior written approval, be (1) used by OUTSOURCER or OUTSOURCER Agents other than in connection with providing the Services, (2) disclosed, sold, assigned, leased or otherwise provided to third parties by OUTSOURCER or OUTSOURCER Agents or (3) commercially exploited by or on behalf of OUTSOURCER or OUTSOURCER Agents. During the term of this Agreement, no CLIENT records shall be removed from CLIENT's premises or copied by OUTSOURCER or its agents except (i) as necessary for the OUTSOURCER's provision of Services hereunder; or (ii) as approved by CLIENT in writing.

**Section 9.2** **Errors.**

Except to the extent that OUTSOURCER is required by Exhibit A to identify errors, or an error otherwise becomes actually known to OUTSOURCER, OUTSOURCER shall not be responsible for the coding in CLIENT bills or for the pricing of CLIENT services.

## ARTICLE X    CONTINUED PROVISION OF SERVICES

### Section 10.1    Business Continuity Plan.

OUTSOURCER has made its Business Continuity Plan available to CLIENT and CLIENT acknowledges and agrees that CLIENT has read and understands the terms of such Business Continuity Plan.

### Section 10.2    Force Majeure.

(a)    If and to the extent that either Party's performance of any of its obligations pursuant to this Agreement is prevented, hindered or delayed by fire, flood, earthquake, elements of nature or acts of God, acts of war, terrorism, riots, civil disorders, rebellions or revolutions, or any other cause beyond the reasonable control of such Party (each, a "Force Majeure Event") and such non-performance could not have been prevented by reasonable precautions, then the non-performing Party shall be excused from any further performance of those obligations affected by the Force Majeure Event for as long as such Force Majeure Event continues and such Party continues to use its commercially reasonable efforts to recommence performance whenever and to whatever extent possible without delay, including through the use of alternate sources, work-around plans or other means.

(b)    The Party whose performance is prevented, hindered or delayed by a Force Majeure Event ("the Notifying Party") shall notify the other Party by telephone (or other means as may be available if telecommunication is unavailable), as soon as possible, and describe in reasonable detail the nature of the Force Majeure Event. The Notifying Party shall be excused from any further performance of its obligations affected by the Force Majeure Event until normal performance can be recommenced.

(c)    The occurrence of a Force Majeure Event does not limit or otherwise affect OUTSOURCER's obligation to provide either normal disaster recovery procedures or any other disaster recovery services described in Section 10.1.

### Section 10.3    Service Level Adjustment.

Upon the occurrence of a Force Majeure Event, the Parties acknowledge and agree that the Service Levels will need to be adjusted for a period of time to account for the Services affected by the Force Majeure Event.  The Parties agree to negotiate in good faith to determine a time frame and plan for lowering the Service Levels during the pendency of such Force Majeure Event.  In the event that the Parties are unable to agree on such adjusted Service Levels, the matter shall be resolved through the dispute resolution process set forth in Article XVI.

## ARTICLE XI          PAYMENTS TO OUTSOURCER

### Section 11.1    Fees.

In consideration of OUTSOURCER providing the Services, CLIENT shall pay to OUTSOURCER the Fees. OUTSOURCER's invoicing calculation(s), price elements and price data shall be provided to CLIENT in sufficient detail to substantiate calculation of the Fees. Upon request, OUTSOURCER shall provide CLIENT and its agents with access to all back-up documentation to support the calculation of Fees for audit purposes. Except as expressly set forth in this Agreement, there shall be no other charge or fees payable by CLIENT in respect of OUTSOURCER's performance of its obligations pursuant to this Agreement.

### Section 11.2    Adjustment to Fees, Services and Service Levels.

The Fees, Services and Service Levels are based on the Assumptions set forth in Exhibit F which are derived from information provided by CLIENT to OUTSOURCER. CLIENT shall verify and be responsible for the accuracy of the Assumptions. Within the first two months of the Go Live Date, OUTSOURCER will run baselines to test the Assumptions, and to the extent that there is a material deviation in the Assumptions of more than ten percent (10%) for any given statistic which impacts on the cost to OUTSOURCER of its performance of Services hereunder, the Parties agree to negotiate in good faith to define and mutually agree upon adjustments to Fees, Services and Service Levels that shall be consistent with the intent of the Parties. Any such agreed adjustment shall be set forth in a Change Order.

### Section 11.3    Expenses.

All expenses relating to the Services (including, without limitation, any out-of-pocket or travel expenses) are included in the Fees and no other expenses shall be reimbursed by CLIENT unless agreed to by CLIENT in writing.

### Section 11.4    Proration.

All periodic fees or charges under this Agreement are to be computed on a calendar month basis and shall be prorated on a per diem basis for any partial month.

### Section 11.5    Patient/Third Party Payer Settlements.

Notwithstanding anything in this Agreement to the contrary, OUTSOURCER shall have the right, on a case by case basis where there is a demonstrated need by a Patient or Third Party Payer, to negotiate settlements involving payments by such Patient or Third Party Payer, as the case may be, of at least seventy percent (70%) of the invoice amount, without the CLIENT's prior approval. OUTSOURCER will create a monthly report which shall provide the summary settlement information by number of Accounts affected and dollars settled. OUTSOURCER will review such report with CLIENT Contract Executive quarterly to ensure settlements are appropriate to business needs as determined by CLIENT.

**Error! Unknown document property name.**

**ARTICLE XII        PAYMENT SCHEDULE AND INVOICES**

**Section 12.1    Fees.**

OUTSOURCER shall issue an invoice to CLIENT on or after the last day of each month for the Fees then due. All undisputed invoice amounts shall be due and payable within thirty (30) days of CLIENT's receipt of invoice, with the exception of invoices for Medicaid Fees. All undisputed invoice amounts for Medicaid Fees shall be due and payable within ninety (90) days of CLIENT's receipt of invoice; provided, however, that if CLIENT's average period for collections of Medicaid accounts receivables falls below sixty (60) days in any calendar quarter, then the Parties agree to adjust the payment terms for Medicaid Fees during the following calendar quarter to be the average number of days for Medicaid accounts receivables collections plus thirty (30) days. For example, if the average number of days for Medicaid collections during a quarter is fifty-five (55) days, then CLIENT shall pay undisputed invoice amounts for Medicaid Fees during the next calendar quarter within eighty-five (85) days of CLIENT's receipt of invoice. Notwithstanding the foregoing, if, after an adjustment in payment terms, the average number of days for Medicaid collections increases above sixty (60) days during any calendar quarter, the payment terms for Fees for Medicaid billing services shall return to ninety (90) days from receipt of invoice during the next quarter. CLIENT reserves the right to reasonably dispute an invoice.

**Section 12.2    Time of Payment.**

Any undisputed sum due pursuant to this Agreement, for which payment terms are not otherwise specified, shall be due and payable within thirty (30) days of CLIENT's receipt of invoice.

**Section 12.3    Detailed Invoices.**

OUTSOURCER shall provide invoices with sufficient detail to justify the Fees and any other payments due hereunder. Upon request, OUTSOURCER shall promptly provide CLIENT with back-up documentation necessary to justify the Fees and other payments charged by OUTSOURCER hereunder.

**Section 12.4    Late Fees.**

Any undisputed invoiced amounts not paid in a timely manner within the payment periods specified in Sections 12.1 and 12.2 above shall bear interest at a rate equal to the prime rate on the date when payment was due announced by Citibank, N.A. located in New York, New York, plus two hundred and fifty (250) basis points. Interest shall accrue from the date when an undisputed invoiced amount was due until the date when such amount is paid.

**Section 12.5    Additional Credits.**

OUTSOURCER agrees to provide CLIENT with the following credits against OUTSOURCER's Fees: (a) a $50,000 credit upon the closing of CLIENT's upcoming financing; and (b) an annual $25,000 credit on each annual anniversary of such closing.

## ARTICLE XIII        AUDITS

**Section 13.1**    Upon reasonable notice from CLIENT (for purposes of this Section 13.1, the "Requesting Party"), OUTSOURCER and OUTSOURCER's agents, as the case may be (for purposes of this Section 13.1, the "Other Party) shall provide Requesting Party or its agents, and any of Requesting Party's regulators upon written request by the Requesting Party, with access to and any assistance that they may reasonably require with respect to its relevant Service Location, records, books and other documentation, and information systems for the purpose of performing audits or inspections of the Services, billing, compliance with law, the Fees or other payments due hereunder and/or the business of Requesting Party relating to the Services. The Other Party shall, subject to its standard security requirements, provide, and shall cause its agents to provide, such Requesting Party, its agents or regulators, as applicable, any assistance that they may reasonably require, provided such assistance does not unreasonably interfere with the Other Party's performance of its obligations hereunder, and, with respect to OUTSOURCER, the performance of the Services in accordance with the Service Levels. Subject to Article VIII and Article IX, the Other Party shall provide Requesting Party Agents and regulators with access to Other Party's proprietary data relating to the Services, to the extent required to perform audits described in this Section 13.1, upon written request by CLIENT. If any audit by an auditor designated by Requesting Party or a regulatory authority results in the Requesting Party or Other Party being notified that it or its agents are not in compliance with any law, rule or regulation, the Other Party shall immediately notify the Requesting Party and shall cause Other Party and its Agents to promptly take actions to comply with applicable laws, rules or regulations. Requesting Party shall bear the expense of any such audit that is (1) required by any law, regulation or other audit requirement relating to Requesting Party's business or (2) necessary due to Requesting Party's noncompliance with any law, regulation or audit requirement imposed on Requesting Party. Other Party shall bear the expense of any such audit that is (a) required by any law, regulation or other audit requirement relating to Other Party's business or (b) necessary due to Other Party's or Other Party agents' noncompliance with any law, regulation or audit requirement imposed on Other Party or Other Party agents.

**Section 13.2    Fees.**

Upon reasonable notice, each Party shall provide the other Party and its Agents access to such financial records and supporting documentation as may be reasonably requested by the requesting Party to audit the records and documentation relating to the Cash Receipts and the Fees or other payments charged to CLIENT. If, as a result of such audit, it is determined that OUTSOURCER has overcharged or undercharged CLIENT, the Party that determined such error shall promptly notify the other Party and promptly

**Error! Unknown document property name.**

pay to CLIENT or OUTSOURCER, as the case may be, the amount of the overcharge or undercharge, plus interest at the prime rate announced on the date of the audit by Citibank, N.A. located in New York, New York, plus two hundred and fifty (250) basis points. Interest shall accrue from the date of receipt by OUTSOURCER of such incorrect amount until the date of payment to CLIENT or OUTSOURCER, as the case may be.

**Section 13.3    Record Retention.**

OUTSOURCER shall maintain sufficient records of the Services, the Fees and other payments due hereunder to allow Client to audit the Services and Services Levels and to justify the Fees and other payments charged hereunder, provided that, except as otherwise required by applicable law, OUTSOURCER shall not be required to retain any records or documentation relating to CLIENT or the Services provided under this Agreement so long as originals of such documentation have been provided to CLIENT for imaging and/or storage.

**Section 13.4    Facilities.**

In the event of an audit described in this Article XIII, OUTSOURCER agrees to give CLIENT and its agents reasonable access to the premises where such audit is being performed and such space (reasonably available), office furnishings (including lockable cabinets), telephone and facsimile service, utilities and office-related equipment and duplicating services as CLIENT and its agents may reasonably need to perform the audits described in this Article XIII.

**ARTICLE XIV        CONFIDENTIALITY; PROTECTED HEALTH
INFORMATION**

**Section 14.1    General Obligations.**

(a)        Each Party agrees that it shall not disclose to any third party (other than such Party's agents) any Confidential Information (including any information about the Fees) which it learns during the course of the performance of this Agreement, without the prior written consent of the other Party, except as necessary for a Party's performance hereunder or as required by law, regulation, or order of a court or regulatory agency or other authority having jurisdiction thereover, provided, however, that the Party under such obligation of disclosure shall promptly notify the other Party to afford that Party, at that Party's expense, an opportunity to object to such disclosure. Each Party shall treat the other's Confidential Information with the same level of care as it treats its own confidential information of like import, but not less than a reasonable level of care, shall disclose it within its own organization only on a need-to-know basis, and shall inform those to whom it rightfully discloses such Confidential Information of their obligations of confidentiality and non-disclosure hereunder.

(b)        Notwithstanding the foregoing,

(i)    With the exception of patient information, the confidentiality obligations set forth in this Section 14.1 shall not apply to any information which the recipient party can establish to have become publicly available without its breach of this Agreement, been independently developed or obtained by the recipient party outside the scope of this Agreement and without reference to the other's Confidential Information received under this Agreement, been already known to recipient when disclosed hereunder, or been rightfully obtained by the recipient party from third parties without an obligation of confidentiality;

(ii)    OUTSOURCER may disclose a general description of the scope of Services and the Term to potential buyers of OUTSOURCER and persons or entities engaged in the valuation of OUTSOURCER or its Affiliates;

(iii)    OUTSOURCER may disclose the identity of CLIENT as a client of OUTSOURCER and the scope of Services hereunder to current or potential clients;

(iv)    CLIENT may disclose general information relating to the scope of Services and the duration of this Agreement to potential buyers of CLIENT or any one or more Affiliates of CLIENT;

(v)    either Party may disclose the provisions of this Agreement to its attorneys, bankers, public accountants, auditors, and other agents with a need to know such information in the ordinary course of business; and

(vi)    either Party may disclose the provisions of this Agreement to the extent required by any applicable law, regulation or rules of any stock exchange; provided, however, the Party disclosing the other Party's Confidential Information promptly notifies the other Party of such disclosure.

**Section 14.2    <u>Injunctive Relief</u>.**

Each Party acknowledges that the other Party may suffer irreparable damage in the event of a breach or threatened breach of any provision of this Article.  Accordingly, in such event, notwithstanding Article XVII, such Party shall be entitled to preliminary and final injunctive relief, as well as any and all other applicable remedies at law or equity, including the recovery of damages.

**Section 14.3    <u>No License</u>.**

The Parties acknowledge that (i) each Party maintains that the Confidential Information contains valuable trade secrets and (ii) all rights to Confidential Information are reserved by the disclosing party.  No license, express or implied, by estoppel or otherwise, under any trade secret right, trademark, patent, copyright or other proprietary right or applications that are now or may hereafter be owned by a party, is granted by the disclosure of Confidential Information under this Agreement.

**ARTICLE XV        REPRESENTATIONS AND WARRANTIES**

**Section 15.1    By CLIENT.**

CLIENT represents and warrants that:

(a)     It is a New York not-for-profit corporation which is tax-exempt under Federal and New York State law.

(b)     It has all requisite power and authority to execute, deliver and perform its obligations under this Agreement.

(c)     It is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which a license, authorization or qualification is required for the ownership or leasing of its assets or the transaction of business of the character transacted by it, except where the failure to be so licensed, authorized or qualified would not have a material adverse effect on its ability to fulfill the obligations under this Agreement.

(d)     The execution, delivery and performance of this Agreement has been duly authorized by CLIENT.

(e)     It has not disclosed any Confidential Information of OUTSOURCER as of the Agreement Date, other than to CLIENT's employees, officers, trustees, attorneys and agents, as applicable.

(f)     There is no outstanding litigation, arbitrated matter or other dispute to which CLIENT is a party which would reasonably be expected to have a potential or actual material adverse effect on the Parties' ability to fulfill their respective obligations under this Agreement.

**Section 15.2    By OUTSOURCER.**

OUTSOURCER represents and warrants that:

(a)     It is a corporation duly incorporated, validly existing and in good standing under the laws of the State of New Jersey.

(b)     It has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement.

(c)     It is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which a license, authorization or qualification is required for the ownership or leasing of its assets or the transaction of business of the character transacted by it, except where the failure to be so licensed, authorized or qualified would not have a material adverse effect on its ability to fulfill the obligations under this Agreement.

(d)    The execution, delivery and performance of this Agreement has been duly authorized by OUTSOURCER.

(e)    It shall comply with all applicable Federal, state and local laws (including HIPAA) and regulations applicable to OUTSOURCER and its Services and shall obtain all applicable permits and licenses required of OUTSOURCER in connection with its obligations under this Agreement.

(f)    It has not disclosed any Confidential Information of CLIENT as of the Agreement Date.

(g)    There is no outstanding litigation, arbitrated matter or other dispute to which OUTSOURCER is a party which would reasonably be expected to have a potential or actual material adverse effect on the Parties' ability to fulfill their respective obligations under this Agreement.

(h)    The OUTSOURCER Intellectual Property does not and will not infringe upon the proprietary rights of any third party.

(i)    Its practices shall be in accordance with the Fair Debt Collection Practices Act.

(j)    The Services shall be provided by OUTSOURCER in compliance with the terms of this Agreement, including the Service Levels.

**Section 15.3    DISCLAIMER OF WARRANTIES.**

EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTIES AND SPECIFICALLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**ARTICLE XVI        DISPUTE RESOLUTION.**

**Section 16.1    Contract Executives.**

All disputes relating to this Agreement shall initially be referred by the Party raising the dispute to the CLIENT Contract Executive and the OUTSOURCER Contract Executive.  If such Contract Executives are unable to resolve the dispute within 5 business days after referral of the matter to them, the Parties shall submit the dispute to the Management Committee.

**Section 16.2    Management Committee.**

The Management Committee shall meet at least once every calendar quarter during the Term (or at such other time as either Party may designate in a notice to the other) for the purpose of reviewing the overall performance of the Parties' respective

obligations under this Agreement and resolving disputes, if any, that may arise under this Agreement, provided that the Management Committee will in all events meet within ten (10) days of a Party's referral of a dispute to the Management Committee. The Management Committee shall consider disputes in the order such disputes are brought before it. In the event the Management Committee is unable to resolve a dispute within 5 business days of the date of the meeting during which such dispute was considered, either Party may seek its available remedies at law or in equity.

### Section 16.3    Continuity of Services.

OUTSOURCER acknowledges that the performance of its obligations pursuant to this Agreement is critical to the CLIENT's business and operations. Accordingly, in the event of any dispute between CLIENT and OUTSOURCER, each Party shall continue to perform its obligations (including payment of Fees and other payments pursuant to Article XI and Article XIII, except for any such amounts as are actually in dispute) under this Agreement in good faith during the pendency of such dispute resolution proceedings or a litigation unless and until this Agreement is terminated in accordance with the provisions hereof.

### Section 16.4    Expedited Dispute Resolution.

Notwithstanding anything to the contrary contained in this Agreement, in the event of a dispute relating to or arising out of a Default Notice, the dispute resolution procedures described in this Article must be commenced and completed within the Default Cure Period.

### Section 16.5    Third Party Claims.

Notwithstanding the above dispute resolution provisions, in the event that a third party initiates a judicial action against either Party hereto in connection with or arising out of this Agreement, that Party shall have the right to seek to implead the other Party into that action, and the above dispute resolution provisions shall not be a bar to such impleader.

## ARTICLE XVII    TERMINATION.

### Section 17.1    Conditions of Termination.

In addition to expiration at the end of the Term specified in Article II, this Agreement may be terminated under the following circumstances.

(a)     Termination for Cause.

(i)     By CLIENT:

If OUTSOURCER, subject to Exhibit E, fails to perform any of its material obligations under this Agreement (an "OUTSOURCER Event of Default"), and, upon written notice of such Event of Default (the "Default Notice") from CLIENT, does not cure such Event of Default within the Default Cure Period specified on Exhibit E, then CLIENT may, by giving written termination notice to OUTSOURCER, terminate this Agreement as of the date specified in the termination notice.

(ii)     By OUTSOURCER:

If CLIENT fails to materially perform any of its obligations under this Agreement (including, subject to Section 10.2, (i) materially failing to pay any undisputed invoices in the manner set forth in Section 12.1 or Section 12.2, as applicable; or (ii) materially failing to perform the CLIENT Required Services (each a "CLIENT Event of Default"), and upon Default Notice from OUTSOURCER, does not cure such Event of Default within forty-five (45) days of such Default Notice, then OUTSOURCER may, by giving written termination notice to CLIENT, terminate this Agreement as of the date specified in the termination notice.

(b)     Termination for Insolvency.

If either Party files for bankruptcy, becomes or is declared insolvent, or is the subject of any proceedings related to its liquidation, insolvency or for the appointment of a receiver or similar officer for it, makes an assignment for the benefit of all of its creditors, or enters into an agreement for the composition, extension, or readjustment of substantially all of its obligations (in any event, the "Dissolving Party"), then the other Party may, by giving written notice to the Dissolving Party, terminate this Agreement as of a date specified in such notice of termination, but not sooner than 30 days after the such notice.

**Section 17.2    Effects of all Terminations.**

If this Agreement is terminated by any reason whatsoever, upon such termination:

(a)     CLIENT shall continue to pay OUTSOURCER for all undisputed Fees and other payments due under this Agreement through the Termination Date.

(b)     OUTSOURCER shall continue to collect, and CLIENT shall continue to pay, OUTSOURCER Fees for Cash Receipts received by CLIENT from Third Party Payers and Patients during the thirty (30) day period following the Termination Date, but only to the extent such payments are in respect of Patient bill dates on or prior to the Termination Date (such pre-termination Accounts, the "Pre-Termination Accounts").