(c)    Upon request, CLIENT shall provide OUTSOURCER with reasonable evidence of payments received in respect of the Pre-Termination Accounts to validate the amounts posted and to invoice OUTSOURCER's Fees to CLIENT.

(d)    At OUTSOURCER's expense, OUTSOURCER shall, within ten (10) days of receipt of the notice of termination, deliver or otherwise make available to CLIENT, in electronic format, all CLIENT Data in OUTSOURCER's possession, including, without limitation, all records, correspondence, written files and other CLIENT-related materials.  In addition, OUTSOURCER shall destroy all copies of CLIENT Data in its possession after providing CLIENT with an electronic copy as provided above.

(e)    OUTSOURCER agrees to cooperate with CLIENT and any of its new billing agents in order to effectuate an orderly transition of services and billing from OUTSOURCER to CLIENT.

## ARTICLE XVIII    INDEMNITIES.

### Section 18.1    Indemnification in General.

This Article sets forth the Parties' rights and obligations concerning indemnification.  References in this Article to CLIENT or OUTSOURCER as an indemnified person includes CLIENT's or OUTSOURCER's subsidiaries and Affiliates and its and their respective officers, directors, employees and agents acting within the scope of their duties, and its and their successors and assigns.  References in this Article to a party "indemnifying" the other means that the indemnifying party shall, pursuant to the provisions of Section 19.6, indemnify and hold the other harmless from, against and in respect of any liabilities, obligations, claims, damages, costs and expenses (including court costs, reasonable costs of investigation and reasonable attorneys' fees and expenses as they are incurred) incurred by the indemnified party by reason of any action, suit, proceeding, claim or demand of or by or settlement with a third party ("Claims").  References in this Article to an act or omission includes acts or omissions by a Party's employees, agents, contractors or other representatives.

### Section 18.2    Intellectual Property Indemnity.

OUTSOURCER indemnifies CLIENT against any Claim that any OUTSOURCER Intellectual Property used by CLIENT in connection with this Agreement infringes any patent, copyright, or other intellectual property right of a third party unless such infringement results from CLIENT's use of such OUTSOURCER Intellectual Property in a manner which was not authorized by OUTSOURCER.

### Section 18.3    Indemnity for Violation of Law.

Each Party indemnifies the other against any Claim, fine, fee or other charge imposed upon or assessed against the other Party by a governmental authority arising out

of an alleged violation of applicable law (including HIPAA) by the indemnifying Party, except to the extent caused by the indemnified Party.

### Section 18.4    Other Indemnities.

(a)    CLIENT indemnifies OUTSOURCER against any Claim resulting from any breach of the representations, agreements, warranties and covenants of CLIENT in this Agreement, except to the extent caused by the negligence or willful misconduct of OUTSOURCER or its agents or by OUTSOURCER's breach of this Agreement.

(b)    OUTSOURCER indemnifies CLIENT against any Claim resulting from any breach of the representations, agreements, warranties and covenants of OUTSOURCER in this Agreement, except to the extent caused by the negligence or willful misconduct of CLIENT or its agents or by CLIENT's breach of this Agreement.

**Section 18.5** <u>**Indemnification Procedure.**</u>

(a)    The Party claiming Indemnification under this Article (the "Indemnified Party") shall deliver written notice (an "Indemnity Notice") to the Party against whom indemnity is claimed (the "Indemnitor") within 10 days of receipt of notice of a Claim.  An Indemnity Notice shall set forth in reasonable detail to the extent then available the facts concerning the Claim and the basis on which the Indemnified Party believes this indemnity applies.  The failure to give such Indemnity Notice shall not affect the right of the Indemnified Party to indemnity hereunder unless and to the extent that such failure has materially and adversely affected the defense of such Claims by the Indemnitor.  At any time after 30 days from the giving of such Indemnity Notice, the Indemnified Party may, at its option, contest, settle or otherwise compromise, or pay such Claim, unless it shall have received notice from the Indemnitor that Indemnitor intends, at Indemnitor's sole cost and expense, to assume and control the defense of any such matter, in which case the Indemnified Party shall have the right, at no cost or expense to Indemnitor, to participate in such defense.  If the Indemnitor does not assume the defense of such matter, and in any event until Indemnitor states in writing that it shall assume the defense, Indemnitor shall pay the costs of the Indemnified Party arising out of the defense until the defense is assumed; provided, however, that the Indemnitor shall have the right, at its own cost and expense, to participate in such defense and Indemnified Party shall consult with Indemnitor and obtain Indemnitor's consent, which shall not be unreasonably withheld or delayed, to any payment or settlement of any such Claim.  The Indemnified Party may not settle a Claim after the Indemnitor assumes the defense without the consent of the Indemnitor or unless the Indemnified Party first agrees to release the Indemnitor from any obligation to indemnify the Indemnified Party with respect to such Claim.  If Indemnitor proposes to settle, compromise or pay a Claim it may do so (1) with the consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed) or (2) without the consent of the Indemnified Party provided such settlement or compromise involves solely the payment of money and includes a release by any third party making such Claim against the Indemnified Party of all claims against the Indemnified Party which were the subject of the indemnification.  The Indemnified Party shall take all appropriate action to permit and authorize Indemnitor to assume and control the defense of any such Claim.  Indemnitor shall keep the Indemnified Party fully apprised at all times as to the status of the defense.  If Indemnitor does not assume the defense, the Indemnified Party shall keep Indemnitor apprised at all times as to the status of the defense.

(b)    Following indemnification as provided herein, an Indemnitor shall be subrogated to all rights of the Indemnified Party with respect to all third parties relating to the matter for which indemnification has been made.

## ARTICLE XIX        LIMITATION OF LIABILITY.

### Section 19.1    Limitation of Liability.

(a)        OUTSOURCER'S AGGREGATE LIABILITY TO CLIENT FOR DAMAGES ARISING UNDER OR RELATING TO THIS AGREEMENT UNDER ANY AND ALL CLAIMS OF ANY TYPE OR NATURE, BASED ON ANY THEORY OF LIABILITY (INCLUDING CONTRACT, TORT, NEGLIGENCE, WARRANTY OR STRICT LIABILITY), SHALL NOT EXCEED THE AMOUNT OF FEES PAID BY CLIENT TO OUTSOURCER WITHIN THE SIX MONTH PERIOD IMMEDIATELY PRECEDING THE MONTH IN WHICH THE CAUSE OF ACTION FOR SUCH DAMAGES AROSE.  CLIENT'S AGGREGATE LIABILITY TO OUTSOURCER FOR DAMAGES ARISING UNDER OR RELATING TO THIS AGREEMENT UNDER ANY AND ALL CLAIMS OF ANY TYPE OR NATURE, BASED ON ANY THEORY OF LIABILITY (INCLUDING CONTRACT, TORT, NEGLIGENCE, WARRANTY OR STRICT LIABILITY), SHALL NOT EXCEED THE AMOUNT OF FEES PAID BY CLIENT TO OUTSOURCER WITHIN THE SIX MONTH PERIOD IMMEDIATELY PRECEDING THE MONTH IN WHICH THE CAUSE OF ACTION FOR SUCH DAMAGES AROSE, PROVIDED THAT THIS LIMITATION OF LIABILITY SHALL NOT APPLY TO CLAIMS BY OUTSOURCER AGAINST CLIENT FOR FEES TO BE PAID BY CLIENT PURSUANT TO ARTICLE XII.

(b)        NEITHER PARTY SHALL BE LIABLE FOR INDIRECT, INCIDENTAL, EXEMPLARY, SPECIAL OR CONSEQUENTIAL DAMAGES (INCLUDING LOSS OF GOOD WILL)ARISING UNDER OR RELATING TO THIS AGREEMENT EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

### Section 19.2    Exclusions.

The limitations or exculpation of liability set forth in Section 19.1(a) are not applicable to the failure of CLIENT to make payments due under this Agreement.  The limitations or exculpation of liability set forth in Sections 19.1(a) and 19.1(b) are not applicable to:  (i) indemnification claims as set forth in Article XIII; (ii) a Party's liability for third party claims, (iii) a Party's liability for a breach of its confidentiality or business associate obligations under this Agreement (including the business associate agreement attached as Exhibit G hereto), or (iv) any claims against CLIENT arising from the grossly negligent acts or omissions or willful misconduct of OUTSOURCER or agents.

**ARTICLE XX        INSURANCE, RISK OF LOSS**

**Section 20.1   Insurance.**

During the Term, OUTSOURCER shall maintain and keep in full force and effect, at its sole cost and expense, insurance as set forth below with an insurance company licensed to do business in the location where the Services are to be performed.

(a)      Commercial General Liability insurance including, without limitation, contractual liability coverage that indicates this Agreement is a "covered contract," premises, completed operations, broad-form property damage, independent contractors and personal injury liability in an amount not less than $1,000,000 each occurrence and $1,000,000 aggregate.

(b)      Workers' Compensation insurance in accordance with statutory requirements as well as Employer's Liability Insurance with limits not less than $500,000. Such insurance shall cover all individuals who will be used in any capacity by OUTSOURCER in performing Services;

(c)      Fidelity Bond/Commercial Crime insurance covering employee dishonesty, including, without limitation, dishonest acts of OUTSOURCER and its employees, agents or subcontractors and such insurance shall also include third party liability coverage and be written for limits not less than $1,000,000;

(d)      Professional Liability insurance for operations performed for CLIENT and its employees or CLIENT's with limits of liability not less than $1,000,000 each claim and $3,000,000 aggregate; and

(e)      Umbrella/Excess Liability insurance on a follow form basis with a limit of not less than $5,000,000 for each occurrence and $5,000,000 aggregate and such umbrella insurance shall name as underlying policies the Commercial General Liability, and Employer's Liability insurance coverage required above.

**Section 20.2   Certificate of Insurance/Additional Insured Status.**  The foregoing insurance policies shall list CLIENT as an additional insured.  Prior to the Go Live Date, OUTSOURCER shall cause its insurance carrier(s) to provide CLIENT with a certificate of insurance which (i) certifies the amount of insurance maintained by OUTSOURCER; (ii) certifies that CLIENT is an additional insured with respect to OUTSOURCER's policies, and (iii) certifies that CLIENT shall receive reasonable written notice prior to any reduction, modification, termination or expiration of such insurance.

**Section 20.3   Risk of Loss.**

Each Party is responsible for the risk of loss or damage to all tangible property, real or personal, owned or leased by it.

**ARTICLE XXI       MISCELLANEOUS PROVISIONS**

**Section 21.1    Assignment.**

Neither Party shall, without the consent of the other, assign this Agreement, or any amounts payable pursuant to this Agreement; provided, however, that a Party may assign this Agreement to its Affiliate upon written notice to the other Party as long as both the assignor and the assignee remain responsible for the performance of OUTSOURCER's obligations hereunder.  The consent of a Party to any assignment shall not constitute such Party's consent to further assignment.  This Agreement shall be binding on the Parties and their respective successors and permitted assigns.  Any assignment in contravention of this Section 21.1 shall be void.

**Section 21.2    Notices.**

Except as otherwise specified in this Agreement, all notices, requests, consents, approvals and other communications required or permitted shall be in writing and be deemed given when sent by certified mail or overnight delivery service to the addresses set forth below:

In the case of notice to CLIENT:

> North General Hospital
>
> 1879 Madison Avenue, 6th Floor
>
> New York, New York  10035
>
> Attention:     Mr. Frank Hagan
>
> Sr. Vice President & Chief Financial

In the case of notice to OUTSOURCER:

> Creditek LLC, 9 Sylvan Way, Suite 165, Parsippany, NJ 07054
>
> Attention:     Linda White
>
> SVP of Finance
>
> Telecopy No.: 973-292-9349
>
> Telephone No.:973-515-4900, ext 335

Either Party may change its address for notification purposes by giving the other Party notice of the new address and the date upon which it will become effective.

### Section 21.3   Counterparts.

This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one single agreement between the Parties. For purposes of executing this Agreement, a Party's facsimile or electronic signature shall have the same force and binding effect as an original signature. This Agreement shall not become effective and binding until its has been executed by and delivered to both Parties.

### Section 21.4   Relationship.

(a)   The Parties intend to create an independent contractor relationship and nothing contained in this Agreement shall be construed to make either CLIENT or OUTSOURCER partners, joint venturers, principals, agents or employees of the other. No officer, director, employee, OUTSOURCER agent or Affiliate retained by OUTSOURCER to perform work on CLIENT's behalf shall be deemed to be an employee, agent or contractor of CLIENT. Neither Party shall have any right, power or authority, express or implied, to bind the other.

(b)   Each Party shall be responsible for the management, direction, compensation (including employment related taxes) and control of its employees and such employees shall not be employees of the other Party.

### Section 21.5   Severability.

If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, then the remaining provisions of this Agreement, if capable of substantial performance, shall remain in full force and effect and such remaining provisions shall be deemed to be restated to reflect the original intentions of the Parties as nearly as possible, in accordance with applicable law.

### Section 21.6   Waiver.

No delay or omission by either Party to exercise any right or power it has under this Agreement shall impair or be construed as a waiver of such right or power. A waiver by any Party of any breach or covenant shall not be construed to be a waiver of any succeeding breach or any other covenant. All waivers must be in writing and signed by the Party waiving its rights.

### Section 21.7   Entire Agreement.

This Agreement represent the entire agreement between the Parties with respect to its subject matter and there are no other representations, understandings or agreements between the Parties relative to such subject matter.

### Section 21.8   Amendments.

No amendment to, or change, waiver or discharge of, any provision of this Agreement shall be valid unless in writing and signed by an authorized representative of

both Parties. Any terms and conditions varying from this Agreement on any purchase order from the other Party are void.

### Section 21.9    Survival.

The terms of Section 3.3, Section 3.4, Section 3.5, Section 4.2(d), Article VIII, Article IX, Article XIV, Section 16.5, Article XVII, Article XVIII, Article XIX, Article XX, Section 21.9, and Section 21.11 shall survive the expiration or termination of this Agreement.

### Section 21.10    Third Party Beneficiaries.

Except as otherwise provided in this Agreement, each Party intends that this Agreement shall not benefit, or create any right or cause of action in or for the behalf of, any person or entity other than CLIENT and OUTSOURCER.

### Section 21.11    Governing Law/Forum.

This Agreement and the rights and obligations of the Parties under this Agreement shall be construed in accordance with and be governed by the laws of the State of New York, without giving effect to the principles thereof relating to the conflicts of law. Each party to this Agreement hereby agrees and consents that any legal action or proceedings with respect to this Agreement shall only be brought in any New York State courts sitting in New York County. By execution and delivery of this Agreement, each such party hereby: (i) accepts the jurisdiction of the aforesaid courts; (ii) agrees to be bound by any judgment of any such courts with respect to this Agreement; (iii) waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue set forth above; and (iv) further waives any claim that any such suit, action or proceeding brought in any such courts has been brought in an inconvenient forum.

### Section 21.12    Covenant of Further Assurances.

The Parties covenant and agree that, subsequent to the execution and delivery of this Agreement and without any additional consideration, they shall execute and deliver any further legal instruments which are or may become necessary to effectuate the purposes of this Agreement.

### Section 21.13    Negotiated Terms.

The Parties agree that the terms and conditions of this Agreement are the result of negotiations between them and that this Agreement shall not be construed in favor of or against any Party by reason of the extent to which any Party or its professional advisors participated in its preparation.

### Section 21.14    Time Periods.

If a time period is not specified for an approval, consent, agreement, notification or performance, then such time period shall be deemed to be that which is reasonable

under the circumstances, but in no event more than five business days, unless otherwise agreed to by the Parties.

### Section 21.15 No Disqualified Individuals.

OUTSOURCER represents and warrants that neither OUTSOURCER nor any person providing services under the terms of this Agreement on behalf of OUTSOURCER: (i) has been convicted of a criminal offense related to healthcare (unless such individual has been officially reinstated into the Federal healthcare programs by the Office of Inspector General ("OIG") and provided proof of such reinstatement to CLIENT); (ii) is under sanction, exclusion or investigation (civil or criminal) related to healthcare by any Federal or state enforcement, regulatory, administrative or licensing agency or is ineligible for Federal or state program participation; or (iii) is listed on the General Services Administration of List of Parties Excluded from the Federal Procurement and Non-Procurement Program or OIG List of Excluded Individuals/Entities. OUTSOURCER shall immediately notify CLIENT in writing of any such conviction, sanction, exclusion, investigation or listing of OUTSOURCER or a member of its staff.

### Section 21.16 Ownership of CLIENT Records.

Notwithstanding anything to the contrary, the ownership and right of control of all reports, records, policies, procedures and documents prepared by OUTSOURCER or its staff in connection with Services rendered hereunder ("Records") will vest exclusively in the CLIENT.

### Section 21.17 Compliance with New York State Health Regulations.

To the extent applicable, in accordance with Section 400.4 of Title 10 (Health) of the Codes, Rules and Regulations of the State of New York: (i) each of the Parties to this Agreement shall comply with those provisions of Chapter V of Title 10 (Health) of the New York Codes, Rules and Regulations which are binding on that Party under the laws of the State of New York; and (ii) "Notwithstanding any other provision in this Agreement, the facility remains responsible for ensuring that any service provided pursuant to this Agreement complies with all pertinent provisions of Federal, State and local statutes, rules and regulations." Notwithstanding the foregoing, the provisions of the preceding sentence are not intended to diminish in any respect OUTSOURCER's obligations pursuant to this Agreement.

### Section 21.18 Consulting/Administrative Services Engagement.

The Parties acknowledge and agree that this Agreement is intended to be a consulting and administrative services arrangement and not a delegation of CLIENT's managerial responsibilities to OUTSOURCER. Notwithstanding anything to the contrary in this Agreement, CLIENT's governing board shall retain full administrative and management responsibility for the operation of its facilities consistent with applicable law. CLIENT's Board expressly retains authority over (a) the day-to-day operations of its facilities, (b) the hiring and firing employees; (c) the maintenance and control of its

### Section 21.19 Staff Health Requirements.

At OUTSOURCER's sole cost and expense, OUTSOURCER shall ensure that each of its staff who provides services on-site at CLIENT's facilities shall: (i) have the requisite physical examinations and immunizations as required by New York State Department of Health regulations for CLIENT's staff prior to each staff member's provision of Services hereunder; and (ii) comply with all inservice and occupational health requirements of CLIENT.

### Section 21.20 Security at OUSOURCER Facilities.

OUTSOURCER will adopt and implement security procedures and policies at any OUTSOURCER facility to the extent any Services are performed by OUTSOURCER for CLIENT at such sites. Such procedures and policies shall be commercially reasonable and consistent with applicable law and the security procedures and policies other billing service providers serving large institutional health care clients.

### Section 21.21 Severance Costs.

In the event that, pursuant to Section 2.1 above, CLIENT elects not to renew this Agreement at the end of the first renewal term and this Agreement expires at the end of thirty-six (36) months after the Go Live Date, then CLIENT agrees to reimburse OUTSOURCER for up to $96,000 in severance costs for OUTSOURCER's staff allocated to CLIENT's account during the term of this Agreement. The reimbursement payment shall be made in one (1) lump sum payment within sixty (60) days of the end of the term of this Agreement. No reimbursement of severance costs shall be required hereunder, if CLIENT renews this Agreement for two (2) one (1) year renewal terms after the initial Term.

IN WITNESS WHEREOF, CLIENT and OUTSOURCER have each caused this Agreement to be executed and delivered by its duly authorized representative.

OUTSOURCER

By: _____
Name: Ira Berenblum
Title: Executive Vice President
Date:

CLIENT

By: _____
Name: FRANCIS J. HYLAND
Title: SR VP, CFO
Date: FEBRUARY 9, 2006

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

## EXHIBIT A

## REQUIRED OUTSOURCER SERVICES FOR ONGOING AND BACKLOG ACCOUNTS

1)    Billing:

   a)    For all Ongoing Accounts, OUTSOURCER shall invoice the appropriate Third Party Payers and/or Patients on CLIENT's behalf in accordance with CLIENT policies and payer-specific requirements, including any additional required documentation.  OUTSOURCER shall submit completed claims under the appropriate provider number of CLIENT or its individual physicians and health care practitioners, as designated by CLIENT.  Consistent with applicable laws, rules, regulations and payor requirements, OUTSOURCER will submit claims to CLIENT's payors electronically or in writing, at CLIENT's sole discretion, provided that OUTSOURCER shall utilize the CLIENT's HIS System for electronically billing Accounts.

2)    Analyze and correct, where deficient, each Patient Account by reviewing the following:

   a)    Services provided

   b)    Payments to date

   c)    Collection notes

   d)    Patient demographic information

   e)    Procedure coding (provided that any issues with procedure coding will be referred to CLIENT.  OUTSOURCER will not make procedure code corrections.)

   f)    Primary and secondary insurance information

   g)    Explanation of benefits (EOB)

   h)    Explanation of payments (EOP)

   i)    Compliance with CLIENT's managed care contracts

   j)    Timely filing guidelines (Medicare, Medicaid, managed care contracts, etc.)

3)    Update demographic/insurance information:

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

a)  Whenever necessary and possible, OUTSOURCER shall contact the Patient and/or the Third Party Payer to obtain additional demographic/insurance information.

b)  OUTSOURCER shall contact CLIENT's employees and/or Agents, whenever there is insufficient Patient demographic/insurance information to be able to submit an invoice to a Third Party Payer and/or to the Patient.

4)  Update clinical information:

a)  OUTSOURCER shall contact CLIENT's employees and/or Agents to obtain or correct diagnosis, procedure or product code information.

5)  Re-bill when appropriate (including first time bills for secondary insurance Third Party Payers) denied invoices with all Third Party Payers. Electronic re-bills should be performed using CLIENT's HIS System. Hard copy re-bills can be printed from the CLIENT's or the OUTSOURCER's System. CLIENT will be solely responsible for appeals of denied bills with OUTSOURCER's assistance. OUTSOURCER shall bear all costs of printing and mailing hard copy invoices to Patients and Third Party Payers.

6)  Follow-up on all Open Third Party Payer Accounts

a)  OUTSOURCER shall, at a minimum, adhere to this follow-up schedule for unpaid or partially paid Accounts

i)  Medicare and Medicaid: 30 calendar days after bill date, OUTSOURCER shall contact the payer (or check the payer's website, if available) to determine why the Account has not been paid. OUTSOURCER shall promptly correct any errors or deficiencies identified and resubmit the Invoice to the Payer.

ii)  All other Third Party Payers: 40 calendar days after bill date, OUTSOURCER shall contact the payer to determine why the Account has not been paid. OUTSOURCER shall promptly correct any errors or deficiencies identified and resubmit the Invoice to the payer.

iii)  For the purposes of i. and ii. above, OUTSOURCER shall not rebill any Account prior to 31 calendar days for Medicare and Medicaid and 46 calendar days for all other Third Party Payers

b)  OUTSOURCER will continue to follow-up on every Third Party Payer Account until it is paid, transferred to a Self Pay category or becomes a Delinquent Account.

c)  To the extent problems are identified during its discussions/correspondence with Third Party Payers, OUTSOURCER

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

shall correct such problems and be responsible for resubmitting a completed/amended bill to the appropriate party.

d)     OUTSOURCER may update the above referenced schedule upon written agreement by CLIENT.

7)     Subject to applicable CLIENT policies, bill and follow-up on all Open Self Pay Accounts:

a)     For Self Pay balances greater than $150 but less than or equal to $250, OUTSOURCER shall, until payment is received, mail to Patient one statement and two letters on CLIENT's letterhead plus three letters on OUTSOURCER's Collection Agency letterhead, and make one phone call to Patient. OUTSOURCER's use of an OUTSOURCER Collection Agency shall not result in additional fees to CLIENT.

b)     For Self Pay balances over $250, OUTSOURCER shall, until payment is received, place two phone calls and mail up to four letters to Patient, on CLIENT letterhead, plus mail three letters on OUTSOURCER Collection Agency letterhead.

c)     For Self Pay balances which are less than or equal to $ 150, OUTSOURCER shall, until payment is received, mail one statement and one letter on CLIENT's letterhead plus two letters on OUTSOURCER's collection agency letterhead.

d)     OUTSOURCER shall develop and review with CLIENT Contract Executive for approval, a schedule with the timing of statement submission, letter submission and placement of phone calls contemplated in 5a through 5c above by the Effective Date.

e)     The letters shall provide Patients with the phone number for OUTSOURCER's customer service center, where the caller shall be greeted as if they had called CLIENT directly. Any Patient complaints shall be promptly reported to CLIENT in accordance with applicable policies of CLIENT.

f)     Accounts that remain in a Self Pay status and are unpaid 30 calendar days after the conclusion of steps 5a through 5c above shall be returned to CLIENT for approval and subsequent referral by OUTSOURCER to a CLIENT Collection Agency and be written-off to zero in the Systems.

8)     OUTSOURCER shall instruct Patient and Third Party Payers to remit payments to CLIENT's designated bank accounts.

9)     OUTSOURCER staff shall keep notes to record key interactions and changes to each Account. These notes as well as the payment history and other pertinent information shall be available electronically for referral to a CLIENT Collection Agency.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

10)    OUTSOURCER shall submit refund requests to CLIENT at least bi-weekly with proper supporting documentation

11)    OUTSOURCER shall submit write-off requests to CLIENT at least bi-weekly with proper supporting documentation. OUTSOURCER will not process a write off whose amount exceeds the limits imposed in Section 11.5 without CLIENT's prior written approval. CLIENT shall write-off the Accounts balance on the HIS System.

12)    Information Technology:

      a)    OUTSOURCER shall utilize the CLIENT's HIS System for billing Accounts.

      b)    OUTSOURCER shall maintain all relevant licenses for its Systems.

      c)    CLIENT shall maintain all relevant licenses for its Systems.

      d)    OUTSOURCER shall provide CLIENT with online, real time unlimited view capabilities into the OUTSOURCER System (if such system is utilized). CLIENT shall be able to view Account level information for every Open and Closed Account. OUTSOURCER shall train CLIENT's personnel in a manner consistent with the terms and conditions of the Agreement.

13)    Communications:

      a)    OUTSOURCER shall, at its own cost, provide the communications links and dedicated data lines between CLIENT and OUTSOURCER Service Locations and toll free number required to provide customer service to Patients.

14)    Reporting:

      a)    OUTSOURCER shall keep and maintain a standard reporting system to regularly inform CLIENT of the current status of Accounts.  Without limiting the foregoing sentence, OUTSOURCER shall provide CLIENT with a monthly report which shows in detail the number of Claims submitted for the month as well as a summary of billings, tracking, recordkeeping, adjustments, collections, and outstanding accounts receivables.  In addition, CLIENT shall determine any additional reports required to effectively manage its business (such reports, the "Custom Reports"), and there shall be no additional charge for Custom Reports.  To the extent Custom Reports are required, OUTSOURCER shall provide Custom Reports at no charge to CLIENT in the manner set forth in this Section.

      b)    OUTSOURCER and CLIENT shall jointly determine the release schedule for each Custom Report, based on the level of effort required to build such

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

report, the total number of such reports and their business importance to CLIENT, provided that (i) the initial Custom Reports requested by CLIENT shall be available within thirty (30) days of the Go-Live Date, and (ii) thereafter, all additional Custom Reports shall be available within thirty (30) days of CLIENT's request.

15)     OUTSOURCER shall provide and train the project staff required to perform the Services.

16)     OUTSOURCER shall provide the staff, at CLIENT's Service Location, required to gather the documentation (e.g., medical records) needed to support OUTSOURCER's collection activities.

17)     Continuous Process Improvement:  OUTSOURCER will conduct root cause analyses on all process deficiencies to aid in continuous process improvement efforts.

18)     CLIENT Collection Agency efforts:

    a)     OUTSOURCER will refer Delinquent Accounts, after review by CLIENT, to CLIENT Collection Agency.

    b)     Accounts referred to a CLIENT Collection Agency will be written-off in CLIENT's and OUTSOURCER's Systems at the time of referral.

    c)     OUTSOURCER will provide an electronic file with the Account's information (e.g. notes, payment history) to the CLIENT Collection Agency.

    d)     CLIENT will be responsible for all fees paid to the CLIENT Collection Agency.

19)     OUTSOURCER's Fees shall cover such costs as staffing, telecommunications, space, office equipment, data storage, outbound postage and travel for the management and staff needed to perform the Services.

20)     In addition to the foregoing billing services, OUTSOURCER shall provide assistance to CLIENT and its advisors in connection with any Medicare, Medicaid, or other reimbursement related audits regarding CLIENT.  OUTSOURCER shall provide CLIENT with prompt written notice of any threatened or pending audits regarding CLIENT as soon as OUTSOURCER becomes aware of them.  CLIENT reserves the right to direct CLIENT's response to any such audits, and OUTSOURCER shall promptly provide CLIENT with a copy of all correspondence with governmental regulators and an opportunity to participate in all proceedings or discussions.

21)     Attached hereto as Schedule 1 to this Exhibit A is a transition schedule for when each Party will begin providing Services under the Agreement.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

<u>Schedule 1</u>

[Attach Transition Schedule]

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

## EXHIBIT B

## SERVICE LEVELS

**A.    Financial**

1)    Days Revenue Outstanding (DRO)

    a)    Commencing on the date that is ten months after the Go Live Date, and monthly thereafter, OUTSOURCER shall maintain CLIENT outpatient DRO, defined as Accounts Receivable, times 360, divided by 4 times the aggregate gross revenue for the preceding three months, at 60 days or less. For example, if the gross outpatient Accounts Receivable was $ 20 Million and outpatient gross revenue for preceding 3 months was $ 10 million, $ 12 million and $ 11 million respectively, then the DRO calculation would be: $(20*360)/((10+12+11)*4)= 54.55$ days

    b)    The Parties shall, during the first three months after the Go Live Date work together to define a write-off policy for partially paid and/or aged Accounts, which policy shall be subject to CLIENT approval. The Parties' agreement as to the write-off criteria and methodology will be required prior to the computation of Service Level credits and bonuses discussed in Sections A(1)(c) and A(1)(d) below as well as for the evaluation of Service Level performance as discussed in Sections A(1)(a), 2 and 3 below and in Section E.

    c)    Monthly after the first twelve (12) months from the Agreement Date, CLIENT shall calculate DRO and notify OUTSOURCER of DRO results. If DRO is greater than 70 days for any three consecutive months, OUTSOURCER shall:

        i)    initiate a root-cause analysis to investigate the decline in performance and identify its cause.

        ii)    provide CLIENT Contract Executive with a report detailing the cause of and procedure for improving DRO with an action plan and implementation schedule within 5 business days of DRO notification. The action plan and implementation schedule shall be subject to CLIENT's approval.

        iv)    Implement action plan within 7 business days of DRO notification.

        v)    Satisfactorily resolve the root cause for the decline in performance and provide CLIENT with satisfactory assurance that such decline will not recur after the procedure has been completed.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

OUTSOURCER shall have 30 days to cure Service Level deficiencies.

vi)     At CLIENT's option, OUTSOURCER shall pay CLIENT a Service Level credit of .70% (seventy hundreds of one percent) of the average daily sales (computed as total Net Revenue for the preceding twelve months, divided by 365 working days per year) times the number of days in excess of 70 in the DRO calculation, for each month in which the DRO exceeds 70 days (e.g., monthly Service Level credits are computed as: .007 times (Net Revenue/365), times (DRO, in days, minus 70)). Service Level credits shall be applied as a credit against outstanding amounts due to OUTSOURCER under this Agreement. Regardless of CLIENT's acceptance of Service Level credits, CLIENT reserves all of its available rights and remedies at law or in equity with regard to a failure by OUTSOURCER to meet the Service Levels. The Parties agree that, if OUTSOURCER fails to meet the Service Levels, the losses, expenses and measure of damages suffered by CLIENT would be uncertain and difficult to calculate. Therefore, the Parties agree that the Service Level credits are their best estimate of such losses, expenses and damages and are not a penalty. The Parties recognize that the Service Level credits described in this Exhibit are liquidated damages, not penalties, which are intended to compensate CLIENT for OUTSOURCER's failure to meet the Service Levels.

d)     DRO Bonus Calculation.  Whenever the DRO, computed as indicated in Section A(1)(c) above, is less than 50 days, CLIENT will pay OUTSOURCER a bonus equal to 0.05% (fifty hundredths of one percent) of the average daily sales (computed as total Net Revenue for the preceding twelve months, divided by 365 working days per year) times the number of days for which the DRO calculation is less than 50 days, for each month in which the DRO is less than 50 days (e.g., the monthly bonus is computed as: .005 times (Net Revenue/365), times (50-DRO, in days)).

2)     Percent of Accounts Receivable (A/R) distribution by aging category (from Date of Entry)

Commencing on the date which is ten months after the Go Live Date, OUTSOURCER shall maintain the gross value of the outpatient A/R aged greater than 120 days from Date of Service (excluding Delinquent Accounts referred to a CLIENT Collection Agency) less than or equal to 20% of the total A/R outstanding, measured monthly during the last day of each month.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

3)    Speed to Collect

    a)    Collections of the Backlog A/R shall be completed within 300 days from the Go Live Date

    b)    Collections of each Ongoing Account shall be completed within the following schedule:

        i)    Self Pay: 120 days counted from the date OUTSOURCER first received the Account. If OUTSOURCER works the Account, finds relevant Third Party Payer insurance coverage and changes the Account's financial class on the HIS System, the deadline shall be extended by an additional 120 days from the date of the change in financial class.

        i)    Third Party Payer: 120 days counted from the date OUTSOURCER first received the Account. If OUTSOURCER works the Account, finds relevant secondary insurance coverage and changes the Account's financial class on the HIS System, the deadline shall be extended by an additional 120 days from the date of the change in financial class. If OUTSOURCER works the Account, collects from the primary and/or secondary payer source and there remains a Self Pay balance, the Account shall be worked within the parameters outlines in 3b.i. above.

**B.    Customer Service**

1)    Call center metrics:

    a)    ASA (average speed to answer):

        i)    OUTSOURCER average speed to answer all Patient calls may not exceed thirty seconds during any one-week period (during Hours of Operation).

    b)    Abandonment Rate/Blocked Calls Rate:

        i)    OUTSOURCER Call Center Abandonment Rate (Abandoned Calls/Total Calls) may not exceed 5% during any one-week period (during Hours of Operation).

        ii)    OUTSOURCER Call Center Blocked Call Rate may not exceed 5% during any one-week period (during Hours of Operation).

**C.    Information Technology**

1)    System Uptime

    a)    The OUTSOURCER Systems and call center phone systems shall be available an average of 95% of any one-month period during the Hours of Operation set forth in 2) below.

**Error! Unknown document property name.**

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

    i)    System Outage Notification

        (1)    OUTSOURCER shall notify CLIENT of any system outages, during Hours of Operation, which last more than one hour

        (2)    During system outage OUTSOURCER shall provide to CLIENT periodic status updates.

            (a)    Updates shall include action plan to recover system and estimated time to recover.

        (3)    If system outage is discovered by CLIENT, CLIENT shall use the following escalation plan to notify OUTSOURCER of the downtime:

            (a)    Call to OUTSOURCER help desk at 866-671-3955

            (b)    Call to Brian Snedeker at 201-247-8644

            (c)    Call to Adrienne Hurtt at 215-531-3301 or to such other numbers as designated in writing by OUTSOURCER Contract Executive from time to time.

2)    Hours of Operation

    a)    The OUTSOURCER Systems shall be available to CLIENT users from 9 a.m. – 6 p.m. EST Monday through Friday.

    b)    OUTSOURCER shall maintain and accept full responsibility for all software license requirements for its systems utilized or contemplated for executing the operations of this Agreement.

    c)    In addition, OUTSOURCER will make all reasonable efforts to provide CLIENT with uninterrupted access (conceptually intended to mean 24 hours, Monday through Friday) to data repository/reporting facilities. Such access excludes scheduled nightly backup and weekly regular maintenance efforts, the schedule of which OUTSOURCER will provide to CLIENT and may change at any time, or emergency maintenance as may be required from time to time.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

## EXHIBIT C

## FEES

1)     Fee for collection of Backlog Accounts

    a)     15.1 % of Cash Receipts

    b)     Cash Receipts received during the first 7 days after Go Live Date, will be excluded from 1(a) above.

2)     Fee for collection of Ongoing Accounts

    a)     5.65 % of Cash Receipts

    b)     Cash Receipts received during the first 7 days after Go Live Date, will be excluded from 2(a) above

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

## EXHIBIT D

## CLIENT REQUIRED SERVICES

1)    Registration:

    a)    CLIENT shall provide the physical facilities to allow Patients to be registered into the HIS System.

    b)    CLIENT shall collect all relevant Patient insurance, demographic and other pertinent information required to perform the necessary clinical and patient care services and for OUTSOURCER to bill and get paid (on CLIENT'S behalf) for these services

2)    Order Entry:

    a)    The following are CLIENT's responsibilities regarding Registration

        i)    Reviewing the Patient's information prior to entering the data and identify missing, incomplete or incorrect information.

        ii)    Entering the Patients information into the HIS System.

3)    Verification of Insurance Coverage:

    a)    As required by the Third Party Payer and based on the type of and charge for the service provided to Patients, CLIENT shall use its reasonable efforts to contact all Third Party Payers to ascertain whether the Patient is covered for the services they have or shall receive.

    b)    CLIENT shall provide OUTSOURCER with copies of Patients' insurance cards.

4)    Pre-Authorization of Insurance Coverage:

    a)    As required by CLIENT's managed care agreements, Medicare and Medicaid regulations, and/or the requirements indicated on each Patient's insurance card, CLIENT will obtain insurance pre-authorization for all services which require such pre-authorization.

    b)    When requested, CLIENT shall provide OUTSOURCER with copies of Patients' pre-authorization documentation.

5)    Medical Records Coding and Documentation

    a)    CLIENT shall be responsible for determining the appropriate procedure code for each service it provided to the Patients.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

    b)    The time elapsed from Date of Service to Bill Date shall not exceed 5 days for any Ongoing Account with a Date of Service on or after the Go Live Date

    c)    At OUTSOURCER's request, CLIENT shall provide, within five business days from receipt of such request, access to the clinical documentation needed to justify the services provided and/or the billing issued for an Account or group of Accounts

6)    Cash Posting:

    a)    CLIENT shall open a credit card payment lock-box with a financial institution of its choice.

    b)    CLIENT shall post all Cash Receipts into the HIS system no later than 5 days from receipt date

    c)    OUTSOURCER will promptly endorse and deposit in CLIENT's name and designated accounts all Cash Receipts received for Services performed by CLIENT, but made payable to or sent to OUTSOURCER or its Affiliates in connection with this Agreement.

    d)    CLIENT shall promptly provide OUTSOURCER with copies of all outpatient Third Party Payer explanation of benefits or of payments, correspondence, denials and any other relevant documentation received by CLIENT.

7)    Information Download

CLIENT shall make available to OUTSOURCER a daily Referral File.

8)    Account Write offs and Credit Balances

CLIENT shall update the HIS System to reflect Account write offs and credit balances, recommended by OUTSOURCER and approved by CLIENT, within 2 weeks from receipt of such OUTSOURCER's request

9)    Information Technology

    a)    CLIENT shall bear all costs for licensing, hosting and maintaining its HBOC HIS and NDC billing systems.

    b)    CLIENT shall bear the electronic billing costs for Outpatient Accounts.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

## EXHIBIT E

### EVENTS OF DEFAULT AND CURE PERIODS

Each of the following constitutes an OUTSOURCER Event of Default with respect to the subject matter covered by such Event of Default.  Upon the occurrence of a below mentioned Event of Default and upon receipt of Default Notice from CLIENT, OUTSOURCER shall cure (or, in the case of 1) below, mitigate) such OUTSOURCER Event of Default within the time periods set forth below:

1)      An Event of Default has occurred if OUTSOURCER knowingly engages in corporate malfeasance.  There shall be no cure period for such Event of Default.

2)      An Event of Default shall have occurred with respect to the Service Level requirements set forth below if OUTSOURCER fails to satisfy the specific parameters described below:

   a)      <u>DRO:</u>  An Event of Default has occurred with respect to OUTSOURCER's DRO obligation in Exhibit B if the average DRO computed monthly for 3 consecutive months is greater than 80 days. OUTSOURCER shall have 90 days after its receipt of Default Notice to cure such Event of Default.

   b)      <u>Distribution of Account Receivable Aging:</u> An Event of Default has occurred with respect to Exhibit B, Part A, Item 2 if the percent of outpatient A/R older than 120 days from Date of Service exceeds 25% for any two consecutive months. OUTSOURCER shall have 90 days after its receipt of Default Notice to cure such Event of Default.

   c)      <u>System Uptime/Access:</u>  An Event of Default has occurred with respect to OUTSOURCER's System Uptime/Access obligations in Exhibit B if its Systems are inaccessible for reporting and analysis more than 5% for any one month during the Hours of Operation set forth on Exhibit B. OUTSOURCER shall have 30 days after its receipt of Default Notice to cure such Event of Default.

   d)      <u>Customer Service Levels:</u> An Event of Default has occurred with respect to OUTSOURCER's Customer Service obligations in Exhibit B, Part B, as set forth in Exhibit B, Part B, Section 1(a)(i)and 1(b)(i) and (ii). OUTSOURCER shall have 30 days after its receipt of Default Notice to cure such Event of Default.

3)      Other Events of Default covering subject matters not covered in this Exhibit E shall be cured by OUTSOURCER within 30 days after OUTSOURCER's receipt of the Default Notice.

**Error! Unknown document property name.**

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

## EXHIBIT F

## SIGNIFICANT ASSUMPTIONS

## Information Provided by CLIENT

North General Hospital
Accounts Receivable month end balance (by discharge date)
As of August 31, 2005

| FINANCIAL CLASS | CURRENT | 31-60 | 61-90 | 91-120 | 121-150 | 151-180 | 181-210 | 211-240 | 241-999 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| **INPATIENT** | | | | | | | | | | |
| Blue Cross | 18,413 | 24,622 | 37,380 | 45,052 | 5,800 | 4,397 | 1,000 | 300 | 8,704 | 145,667 |
| COMMERCIAL | 84,663 | 144,245 | 100,205 | 24,822 | 41,889 | 30,972 | 98,479 | 22,798 | 179,270 | 727,344 |
| COMPENSATION | 17,090 | 18,191 | - | - | - | 12,298 | - | - | 66,983 | 114,561 |
| HMO | 24,690 | 10,344 | 11,150 | - | 8,308 | 863 | 655 | 750 | 3,739 | 60,499 |
| MEDICAID | 1,192,610 | 1,166,407 | 260,331 | 676,817 | 633,449 | 405,188 | 510,829 | 284,723 | 4,116,113 | 9,246,467 |
| MEDICARE | 2,267,941 | 909,353 | 468,529 | 196,985 | 104,049 | 190,486 | 128,570 | 189,742 | 1,735,532 | 6,191,185 |
| NO FAULT | - | - | - | - | - | - | 8,008 | - | - | 8,008 |
| SELF PAY | 21,256 | 8,393 | 52,151 | 5,873 | 8,393 | 13,052 | - | 15,415 | 333,467 | 458,000 |
| | 3,626,664 | 2,281,554 | 929,746 | 949,548 | 801,887 | 657,256 | 747,541 | 513,728 | 6,443,808 | 16,951,731 |
| **OUTPATIENT** | | | | | | | | | | |
| Blue Cross | 71,503 | 31,536 | 26,965 | 19,920 | 26,703 | 14,696 | 17,701 | 13,184 | 71,698 | 293,905 |
| COMMERCIAL | 225,094 | 275,822 | 198,658 | 223,579 | 111,052 | 129,408 | 87,020 | 74,211 | 446,183 | 1,771,026 |
| COMPENSATION | 29,176 | 63,033 | 20,334 | 31,792 | 15,778 | 19,801 | 8,989 | 15,174 | 84,240 | 288,316 |
| HMO | 61,887 | 48,021 | 38,053 | 44,660 | 38,168 | 35,733 | 25,616 | 24,852 | 109,301 | 426,290 |
| MEDICAID | 1,383,993 | 1,238,483 | 669,745 | 568,233 | 528,055 | 472,348 | 378,885 | 425,521 | 1,608,261 | 7,273,525 |
| MEDICARE | 467,147 | 452,546 | 307,678 | 328,330 | 245,561 | 165,139 | 132,870 | 117,662 | 765,043 | 2,981,977 |
| NO FAULT | 42,414 | 15,094 | 30,761 | 23,311 | 3,132 | 21,992 | 3,605 | 21,516 | 93,520 | 255,346 |
| SELF PAY | 991,751 | 961,353 | 1,125,419 | 382,938 | 162,926 | 121,901 | 86,186 | 80,634 | 563,333 | 4,476,439 |
| | 3,272,964 | 3,085,888 | 2,417,613 | 1,622,763 | 1,131,376 | 981,016 | 740,873 | 772,754 | 3,741,579 | 17,766,825 |

**INPATIENT**
Accounts Receivable # of accounts

| FINANCIAL CLASS | CURRENT | 31-60 | 61-90 | 91-120 | 121-150 | 151-180 | 181-210 | 211-240 | 241-999 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| Blue Cross | 7 | 10 | 8 | 6 | 8 | 9 | 4 | 1 | 7 | 60 |
| COMMERCIAL | 12 | 16 | 13 | 9 | 7 | 11 | 11 | 4 | 26 | 109 |
| COMPENSATION | 1 | 2 | - | - | - | 1 | - | - | 2 | 6 |
| HMO | 9 | 7 | 3 | - | 4 | 4 | 3 | 1 | 3 | 34 |
| MEDICAID | 313 | 324 | 258 | 223 | 178 | 143 | 103 | 43 | 575 | 2,160 |
| MEDICARE | 189 | 134 | 84 | 88 | 75 | 67 | 63 | 50 | 409 | 1,159 |
| NO FAULT | - | - | - | - | - | - | 1 | - | - | 1 |
| SELF PAY | 3 | 1 | 3 | 1 | 2 | 2 | - | 2 | 54 | 68 |
| | 534 | 494 | 369 | 327 | 274 | 237 | 185 | 101 | 1,076 | 3,597 |
| **OUTPATIENT** | | | | | | | | | | |
| Blue Cross | 125 | 96 | 134 | 95 | 92 | 78 | 75 | 42 | 408 | 1,145 |
| COMMERCIAL | 350 | 399 | 387 | 401 | 310 | 268 | 238 | 260 | 2,670 | 5,283 |
| COMPENSATION | 30 | 49 | 30 | 27 | 37 | 35 | 26 | 31 | 410 | 675 |
| HMO | 123 | 145 | 148 | 146 | 134 | 120 | 99 | 82 | 721 | 1,718 |
| MEDICAID | 6,074 | 5,608 | 3,299 | 2,343 | 2,850 | 2,415 | 1,967 | 2,518 | 15,157 | 42,231 |
| MEDICARE | 1,486 | 1,258 | 1,344 | 1,091 | 1,144 | 1,124 | 1,200 | 1,004 | 9,415 | 19,066 |
| NO FAULT | 10 | 12 | 9 | 14 | 6 | 8 | 7 | 16 | 206 | 288 |
| SELF PAY | 1,198 | 1,259 | 1,464 | 541 | 210 | 169 | 94 | 134 | 1,029 | 6,098 |
| | 9,396 | 8,826 | 6,815 | 4,658 | 4,783 | 4,217 | 3,706 | 4,087 | 30,016 | 76,504 |

Error! Unknown document property name.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

## OUTSOURCER'S Assumptions

| FINANCIAL CLASS | CURRENT | 31-60 | 61-90 | 91-120 | 121-150 | 151-180 | 181-210 | 211-240 | 241-999 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| **OUTPATIENT** | | | | | | | | | | |
| Blue Cross | 71,503 | 31,536 | 26,965 | 19,920 | 26,703 | 14,696 | 17,701 | 13,184 | 71,698 | 293,905 |
| COMMERCIAL | 225,094 | 275,822 | 198,658 | 223,579 | 111,052 | 129,408 | 87,020 | 74,211 | 446,183 | 1,771,026 |
| COMPENSATION | 29,176 | 63,033 | 20,334 | 31,792 | 15,778 | 19,801 | 8,989 | 15,174 | 84,240 | 288,316 |
| HMO | 61,887 | 48,021 | 38,053 | 44,660 | 38,168 | 35,733 | 25,616 | 24,852 | 109,301 | 426,290 |
| MEDICAID | 1,383,993 | 1,238,483 | 669,745 | 568,233 | 528,055 | 472,348 | 378,885 | 425,521 | 1,608,261 | 7,273,525 |
| MEDICARE | 467,147 | 452,546 | 307,678 | 328,330 | 245,561 | 165,139 | 132,870 | 117,662 | 765,043 | 2,981,977 |
| NO FAULT | 42,414 | 15,094 | 30,761 | 23,311 | 3,132 | 21,992 | 3,605 | 21,516 | 93,520 | 255,346 |
| SELF PAY | 991,751 | 961,353 | 1,125,419 | 382,938 | 162,926 | 121,901 | 86,186 | 80,634 | 563,333 | 4,476,439 |
| | 3,272,964 | 3,085,888 | 2,417,613 | 1,622,763 | 1,131,376 | 981,016 | 740,873 | 772,754 | 3,741,579 | 17,766,825 |
| | | | | | | | | | | |
| **Recoveries** | | | | | | | | | | |
| Medicare/Medicaid | | 98% | 95% | 95% | 90% | 80% | 75% | 75% | 45% | |
| Self pay | | 20% | 20% | 20% | 20% | 20% | 15% | 15% | 15% | |
| Other | | 98% | 95% | 90% | 75% | 65% | 55% | 45% | 30% | |
| Net to charge care/caid | | 68% | 68% | 68% | 68% | 68% | 68% | 68% | 68% | |
| Net to charge other | | 68% | 68% | 68% | 68% | 68% | 68% | 68% | 68% | |
| Anticipated recoveries | | $ 1,601,814 | $ 1,056,159 | $ 862,362 | $ 602,876 | $ 467,171 | $ 325,992 | $ 333,270 | $ 971,011 | 6,220,655 |

Number of patient visits/year: 118,000
Net Outpatient revenue/yr: $ 25.7 MM
Gross Outpatient revenue/yr: $ 41.2 MM

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

EXHIBIT G

BUSINESS ASSOCIATE ADDENDUM

This Addendum, dated as of _____, 2006 ("Addendum"), supplements and is made a part of the Services Agreement (as defined below) by and between North General Hospital ("Covered Entity") and Creditek LLC ("Business Associate").

WHEREAS, Covered Entity and Business Associate are parties to the Services Agreement pursuant to which Business Associate provides certain services to Covered Entity. In connection with Business Associate's services, Business Associate creates or receives Protected Health Information from or on behalf of Covered Entity, which information is subject to protection under the Federal Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191 and related regulations promulgated by the Secretary (collectively, "HIPAA").

WHEREAS, in light of the foregoing and the requirements of HIPAA, Business Associate and Covered Entity agree to be bound by the following terms and conditions:

1)    Definitions.

    a)    General. Terms used, but not otherwise defined, in this Addendum shall have the same meaning as those terms in the Privacy Rule and the Security Rule.

    b)    Specific.

        i)    Electronic Protected Health Information. "Electronic Protected Health Information" shall have the same meaning as the term "electronic protected health information" in 45 CFR 160.103, limited to the information that Business Associate creates, receives, maintains, or transmits from or on behalf of Covered Entity.

        ii)    Individual. "Individual" shall have the same meaning as the term "individual" in 45 CFR 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR 164.502(g).

        iii)    Privacy Rule. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR parts 160 and 164.

        iv)    Protected Health Information. "Protected Health Information" shall have the same meaning as the term "protected health information" in 45 CFR 160.103, limited to the information created or received by Business Associate from or on behalf of Covered Entity.

        v)    Required By Law. "Required by Law" shall have the same meaning as the term "required by law" in 45 CFR 164.103.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

        vi)    <u>Secretary</u>. "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

        vii)    <u>Security Rule</u>. "Security Rule" shall mean the Security Standards at 45 CFR parts 160 and 164.

        viii)    <u>Services Agreement</u>. "Services Agreement" shall mean any present or future agreements, either written or oral, between Covered Entity and Business Associate under which Business Associate provides services to Covered Entity which involve the use or disclosure of Protected Health Information.

2)    <u>Obligations and Activities of Business Associate</u>.

    a)    <u>Use and Disclosure</u>. Business Associate agrees to not use or disclose Protected Health Information other than as permitted or required by the Services Agreement or as Required By Law.

    b)    <u>Appropriate Safeguards</u>. Business Associate agrees to use appropriate safeguards to prevent use or disclosure of the Protected Health Information other than as provided for by the Services Agreement. Without limiting the generality of the foregoing sentence, Business Associate will:

        i)    Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of Electronic Protected Health Information as required by the Security Rule;

        ii)    Ensure that any agent, including a subcontractor, to whom Business Associate provides Electronic Protected Health Information agrees to implement reasonable and appropriate safeguards to protect Electronic Protected Health Information; and

        iii)    Report to Covered Entity any security incident (as defined by the Security Rule) of which Business Associate becomes aware.

    c)    <u>Mitigation</u>. Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Addendum.

    d)    <u>Reporting</u>. Business Associate agrees to report to Covered Entity any use or disclosure of the Protected Health Information not provided for by the Services Agreement of which it becomes aware.

    e)    <u>Agents</u>. Business Associate agrees to ensure that any agent, including a subcontractor, to whom it provides Protected Health Information received from, or created or received by Business Associate on behalf of Covered

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

Entity agrees to the same restrictions and conditions that apply through this Addendum to Business Associate with respect to such information.

f) <u>Access to Designated Record Sets</u>. To the extent that Business Associate possesses or maintains Protected Health Information in a Designated Record Set, Business Associate agrees to provide access, at the request of Covered Entity, and in the time and manner designated by the Covered Entity, to Protected Health Information in a Designated Record Set, to Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under 45 CFR 164.524.

g) <u>Amendments to Designated Record Sets</u>. To the extent that Business Associate possesses or maintains Protected Health Information in a Designated Record Set, Business Associate agrees to make any amendment(s) to Protected Health Information in a Designated Record Set that the Covered Entity directs or agrees to pursuant to 45 CFR 164.526 at the request of Covered Entity or an Individual, and in the time and manner designated by the Covered Entity.

h) <u>Access to Books and Records</u>. Business Associate agrees to make internal practices, books, and records, including policies and procedures and Protected Health Information, relating to the use and disclosure of Protected Health Information received from, or created or received by Business Associate on behalf of, Covered Entity available to the Covered Entity, or to the Secretary, in a time and manner designated by the Covered Entity or designated by the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule.

i) <u>Accountings</u>. Business Associate agrees to document such disclosures of Protected Health Information and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528.

j) <u>Requests for Accountings</u>. Business Associate agrees to provide to Covered Entity or an Individual, in the time and manner designated by the Covered Entity, information collected in accordance with Section 2(i) of this Addendum, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528.

3) <u>Permitted Uses and Disclosures by Business Associate</u>.

a) <u>Services Agreement</u>.  Except as otherwise limited in this Addendum, Business Associate may use or disclose Protected Health Information to perform functions, activities, or services for, or on behalf of, Covered Entity as specified in the Services Agreement, provided that such use or

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

disclosure would not violate the Privacy Rule if done by Covered Entity or the minimum necessary policies and procedures of the Covered Entity.

b)    Use for Administration of Business Associate. Except as otherwise limited in this Addendum, Business Associate may use Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

c)    Disclosure for Administration of Business Associate. Except as otherwise limited in this Addendum, Business Associate may disclose Protected Health Information for the proper management and administration of the Business Associate, provided that disclosures are Required by Law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

4)    Permissible Requests by Covered Entity.  Except as set forth in Section 3 of this Addendum, Covered Entity shall not request Business Associate to use or disclose Protected Health Information in any manner that would not be permissible under the Privacy Rule if done by Covered Entity.

5)    Term and Termination.

a)    Term. This Addendum shall be effective as of the date of this Addendum, and shall terminate when all of the Protected Health Information provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this Section.

b)    Termination for Cause. Upon Covered Entity's knowledge of a material breach of this Addendum by Business Associate, Covered Entity shall either:

i)    Provide an opportunity for Business Associate to cure the breach or end the violation.  If Business Associate does not cure the breach or end the violation within the time specified by Covered Entity, Covered Entity shall terminate: (A) this Addendum; (B) all of the provisions of the Services Agreement that involve the use or disclosure of Protected Health Information; and (C) such other provisions, if any, of the Services Agreement as Covered Entity designates in its sole discretion;

ii)    Immediately terminate: (A) this Addendum; (B) all of the provisions of the Services Agreement that involve the use or disclosure of Protected

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

Health Information; and (C) such other provisions, if any, of the Services Agreement as Covered Entity designates in its sole discretion if Business Associate has breached a material term of this Addendum and cure is not possible; or

        iii)     If neither termination nor cure are feasible, Covered Entity shall report the violation to the Secretary.

    c)    <u>Effect of Termination</u>.

        i)     Except as provided in paragraph (ii) of this Section 5(c), upon termination of this Addendum, for any reason, Business Associate shall return or destroy all Protected Health Information received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to Protected Health Information that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the Protected Health Information.

        ii)    In the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon mutual agreement of the Parties that return or destruction of Protected Health Information is infeasible, Business Associate shall extend the protections of this Addendum to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Health Information.

6)    <u>Miscellaneous</u>.

    a)    <u>Regulatory References</u>. A reference in this Addendum to a section in HIPAA means the section as in effect or as amended.

    b)    <u>Amendment</u>. The Parties agree to take such action as is necessary to amend the Services Agreement from time to time as is necessary for Covered Entity to comply with the requirements of the HIPAA.

    c)    <u>Survival</u>. The respective rights and obligations of Business Associate under Section 5(c) of this Addendum shall survive the termination of the Services Agreement.

    d)    <u>Interpretation</u>. Any ambiguity in this Addendum shall be resolved to permit Covered Entity to comply with HIPAA.

    e)    <u>Miscellaneous</u>. The terms of this Addendum are hereby incorporated into the Services Agreement. Except as otherwise set forth in Section 6(d) of this Addendum, in the event of a conflict between the terms of this Addendum and the terms of the Services Agreement, the terms of this Addendum shall prevail. The terms of the Services Agreement which are not modified by this Addendum shall remain in full force and effect in

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

accordance with the terms thereof. The Services Agreement together with this Addendum constitutes the entire agreement between the parties with respect to the subject matter contained herein. This Addendum may be executed in counterparts, each of which when taken together shall constitute one original.

**IN WITNESS WHEREOF**, the parties have executed this Addendum as of the date set forth above.

**NORTH GENERAL HOSPITAL**          **CREDITEK LLC**

By: _____          By: _____

    Name:                                  Name:
    Title:                                 Title:

**Error! Unknown document property name.**

# EXHIBIT

# 2



1251 Avenue of the Americas
Suite 4100
New York, New York 10020
646.624.5929

<u>By Overnight Mail</u>

August 1, 2007

North General Hospital
1879 Madison Avenue, 6th Floor
New York, New York 10035
Attention:  John P. Maher

Re: <u>Collection of Past Due Account for Services Rendered - Amount Due: $1,050,164.32</u>

Dear Sir,

North General Hospital ("North General") owes Creditek LLC ("Creditek"), a subsidiary of Genpact Limited ("Genpact"), the amount of $1,050,164.32 for services rendered by Creditek under the Outsourcing Agreement between North General and Creditek dated February 9, 2006 (the "Agreement").  This amount includes interest on such unpaid fees as provided for in Section 12.4 of the Agreement. Also enclosed for your reference is a copy of Creditek's invoices for the applicable months of unpaid fees.  As you are aware the unpaid balance has been in arrears for some time and other payments have been frequently delinquent, including those under agreements we have reached to liquidate the outstanding balance owed. Capitalized terms used but not defined in this letter shall have the meanings ascribed to them in the Agreement.

This matter has been forwarded to my office to take action against North General Hospital for the collection of this past due account.  Notice is hereby provided to North General Hospital pursuant to Section 21.2 ("Notices") and Section 17.1 (a) (ii) ("Conditions of Termination, Termination for Cause by OUTSOURCER") of our Agreement. Before any legal action is initiated, I am writing to ask for your cooperation and to request that North General pay Creditek, by wire transfer of immediately available funds, the amount of $1,050,164.32 within ten (10) days of your receipt of this letter.

If Creditek does not receive payment in full within 10 days, Creditek and Genpact will have to consider their available options under the Agreement, including legal action

against North General to seek all available remedies at law and equity, including damages and costs that may be recoverable.

North General's non payment of invoices in accordance with Sections 12.1 and 12.2 of the Agreement constitutes an Event of Default under the terms of Section 17.1 (a.)(ii) of the Agreement which was not cured by North General within the timeframe provided for under the Agreement. On February 5, 2007, Creditek provided North General with a Default Notice and requested that this Client Event of Default for non payment be cured within the 45 days provided for in the Agreement. North General failed to cure this Event of Default within the required timeframe and Creditek's right to terminate the Agreement and cease all operations became effective on March 22, 2007.

Creditek and Genpact are in receipt of your letter to Ed Berenblum of Creditek dated April, 10 2007. Your letter references the Default Notice and formally disputes certain amounts invoiced by Creditek and stated as unpaid and past due by Creditek in the Default Notice. Section 16.4 of the Agreement requires that any dispute arising out of a Default Notice must be commenced and completed within the 45 day Default Cure Period. Given that North General did not send the dispute letter until after the 45 day cure period, North General's rights to dispute the Default Notice expired on March 22, 2007.

Please let us resolve this matter amicably and expeditiously, and preserve our business relationship. Creditek and Genpact remain committed to working with North General to resolve these delinquencies and further improve and strengthen our relationship. Your cooperation is very much appreciated.

Sincerely,

Victor Guaglianone
Senior Vice President and General Counsel

CC: Ed Berenblum

EXHIBIT

3

Jennifer,

Can you do me a favor and review this with Frank ASAP. Without the download we are not able to produce the results that we both expect from this project. We have resources scheduled to be brought on based on receiving the download in 30 days, but we have to postpone that if the file is not ready.

Thanks

Brian


Brian D. Snedeker
Vice President
Creditek Healthcare, a Genpact Company
201-247-8644

The information transmitted is intended only for the person or entity to which it is addressed and may contain material that is confidential, privileged and exempt from disclosure under applicable law. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material in a secure receptacle or by shredding the document.

----- Forwarded by Brian Snedeker/CTK on 06/23/2006 02:14 PM -----

| | | |
|---|---|---|
| "Genie Santana" <Genie.Santana@NGSC.ORG> | To:<BSnedeker@creditek.com> | |
| 06/23/2006 01:59 PM | cc:"Jennifer Palmer" <Jennifer.Palmer@NGSC.ORG>, "Michele Prisco" <Michele.Prisco@NGSC.ORG> | |
| | Subject: RE: HBOC file | |

Hello Brian,

The paperwork has been forwarded to Jennifer Palmer for review and final approval. Frank Hagan's signature is pending. Once that is received and submitted, McKessson will begin working on your request. I will advise

Regards,
Genie

-----Original Message-----
From: BSnedeker@creditek.com [mailto:BSnedeker@creditek.com]
Sent: Friday, June 23, 2006 12:17 PM
To: Genie Santana
Subject: HBOC file

Good afternoon Genie,

Just wanted to follow-up with you on the HBOC file.  Do you have an estimated completion date from them?  It would help us a lot in planning IT and operational resources if they could provide an estimated

completion date.

Thanks

Regards,

Brian


Brian D. Snedeker
Vice President
Creditek Healthcare, a Genpact Company
201-247-8644

The information transmitted is intended only for the person or entity to
which it is addressed and may contain material that is confidential,
privileged and exempt from disclosure under applicable law.  Any review,
re-transmission, dissemination or other use of, or taking of any action
in reliance upon, this information by persons or entities other than the
intended recipient is prohibited.  If you received this in error, please
contact the sender and delete the material in a secure receptacle or by
shredding the document.

# EXHIBIT

# 4

From: Genie Santana
Sent: Friday, July 07, 2006 9:43 AM
To: Jennifer Palmer
Cc: 'BSnedeker@creditek.com'
Subject: FW: SQL WORK ORDER 76402

Please respond to email from McKesson.


From: Elizabeth
Sent: Thursday, July 06, 2006 8:28 AM
To: Genie Santana
Subject: SQL WORK ORDER 76402

Good morning.
I have finished writing the queries and am ready to start testing. I
know we exchanged many emails about what to select. After going thru
these I think I need verification on what I am selecting. Also, I do
have a few questions/clarifications on some data elements.


What Accounts are currently being selected:
OP and ER accounts that had a charge or transaction (adj,payment,refund,
transfer) within the last week ( 7 days).
I know the last email you sent, you asked if the days could be increased
to 8, but if you run this every Sunday, won't going back 8 days give you


some accounts that were sent the previous week? I put all of these
accounts into a user defined table. This user defined table is used for
ALL


**Creditek comment:  Please include transactions for all 8 days so that
there is overlap to insure that there are no missing accts or
transactions


4 download files. In the emails we exchanged there were many different
account selection criteria mentioned:
    1) OP and ER accounts discharged w/ specified date range
    2) All AR accounts form last week
    3) OP and ER accts with a acct balance and OP and ER accts that had a
transaction posted last two weeks I can Select accounts anyway that you
all want. Just let me know.


**Creditek comment: Please select all open OP and ER accounts with an
open balance, as WELL as all OP and ER accounts where a transaction
(pymt, adj, refund, transfer) was posted in the last 8 days


Charge File:
For Charge Type , we will send 0 or 2  (0=Time of Charge, 2=Auto Daily)

Do you need the department for the charge. Currently I am sending the charge code(sim code) and description.


**Creditek comment: If available we would like the department code


Transaction File:
I am sending the plan code (payor). Do you need the Carrier code?


**Creditek comment: If available please include both the payer and carrier code


Billing File:
Initial Bill date - I run a subquery and get the bill date for bill_seq=1 Last Bill date - I use the bill date for the last bill seq nbr.


Also,
I have the unix file paths set to
//ngh-data/departments/Finance/star/CrediTek_OP_FMR/filename.txt
Filename = chrgs, trans, billing, and insurance If this is not correct, let me know.


Elizabeth
Mckesson - Information Solutions


Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

# EXHIBIT

# 5

**Brian Snedeker**

07/17/2006 04:00 PM

To:"Genie Santana" <Genie.Santana@NGSC.ORG>
cc:"Jennifer Palmer" <Jennifer.Palmer@NGSC.ORG>,
    "Michele Prisco" <Michele.Prisco@NGSC.ORG>
Subject: RE: SQL WORK ORDER 76402

Genie,

No changes were made.  Everything we discussed at the time of the work order is still the same (the 8 days and the account selection process as confirmed on e-mails on 6/6).  I responded to the other two items because she asked a question (whether something should be included or not) and thought it warranted a response.

Regards,

Brian

Brian D. Snedeker
Vice President
Creditek Healthcare, a Genpact Company
201-247-8644

The information transmitted is intended only for the person or entity to which it is addressed and may contain material that is confidential, privileged and exempt from disclosure under applicable law.  Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact the sender and delete the material in a secure receptacle or by shredding the document.

**"Genie Santana"
<Genie.Santana@NGS
C.ORG>**

07/17/2006 04:02 PM

To:<BSnedeker@creditek.com>
cc:"Jennifer Palmer" <Jennifer.Palmer@NGSC.ORG>,
    "Michele Prisco" <Michele.Prisco@NGSC.ORG>
Subject: RE: SQL WORK ORDER 76402

```
Brian,

I just needed to confirm the verbage on McKessons email. NO changes will
be made to the workorder at this time. It has been signed off on and
making a change will incur additional costs. McKesson, will be producing
test files as soon as they receive a response to go ahead.


Thanks,
Genie

-----Original Message-----
From: BSnedeker@creditek.com [mailto:BSnedeker@creditek.com]
```

Sent: Monday, July 17, 2006 3:07 PM
To: Genie Santana
Cc: Jennifer Palmer
Subject: RE: SQL WORK ORDER 76402

Genie,

Please see comments in Dark blue that begin with Creditek comment

Brian D. Snedeker
Vice President
Creditek Healthcare, a Genpact Company
201-247-8644

The information transmitted is intended only for the person or entity to
which it is addressed and may contain material that is confidential,
privileged and exempt from disclosure under applicable law.  Any review,
re-transmission, dissemination or other use of, or taking of any action
in reliance upon, this information by persons or entities other than the
intended recipient is prohibited.  If you received this in error, please
contact the sender and delete the material in a secure receptacle or by
shredding the document.



                    "Genie  Santana"

                    <Genie.Santana@NG        To:       "Jennifer
Palmer" <Jennifer.Palmer@NGSC.ORG>
                    SC.ORG>                  cc:
<BSnedeker@creditek.com>

                                            Subject:  RE: SQL WORK
ORDER 76402
                    07/11/2006 02:25

                    PM




Please advise on the status of this request.

Thanks,
Genie

From: Genie Santana
Sent: Friday, July 07, 2006 9:43 AM
To: Jennifer Palmer
Cc: 'BSnedeker@creditek.com'
Subject: FW: SQL WORK ORDER 76402

Please respond to email from McKesson.


From: Elizabeth
Sent: Thursday, July 06, 2006 8:28 AM
To: Genie Santana
Subject: SQL WORK ORDER 76402

Good morning.
I have finished writing the queries and am ready to start testing. I
know we exchanged many emails about what to select. After going thru
these I think I need verification on what I am selecting. Also, I do
have a few questions/clarifications on some data elements.


What Accounts are currently being selected:
OP and ER accounts that had a charge or transaction (adj,payment,refund,
transfer) within the last week ( 7 days).
I know the last email you sent, you asked if the days could be increased
to 8, but if you run this every Sunday, won't going back 8 days give you


some accounts that were sent the previous week? I put all of these
accounts into a user defined table. This user defined table is used for
ALL


**Creditek comment:  Please include transactions for all 8 days so that
there is overlap to insure that there are no missing accts or
transactions


4 download files. In the emails we exchanged there were many different
account selection criteria mentioned:
    1) OP and ER accounts discharged w/ specified date range
    2) All AR accounts form last week
    3) OP and ER accts with a acct balance and OP and ER accts that had a
transaction posted last two weeks I can Select accounts anyway that you
all want. Just let me know.


**Creditek comment: Please select all open OP and ER accounts with an
open balance, as WELL as all OP and ER accounts where a transaction
(pymt, adj, refund, transfer) was posted in the last 8 days


Charge File:
For Charge Type , we will send 0 or 2  (0=Time of Charge, 2=Auto Daily)

Do you need the department for the charge. Currently I am sending the
charge code(sim code) and description.


**Creditek comment: If available we would like the department code



Transaction File:
I am sending the plan code (payor). Do you need the Carrier code?


**Creditek comment: If available please include both the payer and
carrier code



Billing File:
Initial Bill date - I run a subquery and get the bill date for
bill_seq=1 Last Bill date - I use the bill date for the last bill seq
nbr.


Also,
I have the unix file paths set to
//ngh-data/departments/Finance/star/CrediTek_OP_FMR/filename.txt
Filename = chrgs, trans, billing, and insurance If this is not correct,
let me know.


Elizabeth
Mckesson - Information Solutions


Confidentiality Notice: This e-mail message, including any attachments,
is for the sole use of the intended recipient(s) and may contain
confidential and privileged information. Any unauthorized review, use,
disclosure or distribution is prohibited. If you are not the intended
recipient, please contact the sender by reply e-mail and destroy all
copies of the original message.

# EXHIBIT

# 6

**From:** Samuel Daniel [mailto:Samuel.Daniel@NGSC.ORG]
**Sent:** Tuesday, March 13, 2007 10:40 AM
**To:** Berenblum, Ed
**Cc:** Chaneta Glenn
**Subject:** RE: North General Hospital contract termination

YES.

---

**From:** Berenblum, Ed [mailto:ed.berenblum@genpact.com]
**Sent:** Monday, March 12, 2007 8:20 PM
**To:** Samuel Daniel
**Cc:** Frank Hagan
**Subject:** RE: North General Hospital contract termination

Sam:

Can you do Friday morning?


Ed Berenblum

General Manager,

Creditek Healthcare, a Genpact Company

9 Sylvan Way, Suite 165, Parsippany NJ 07054

973-355-2946 office, 631-431-1707 cell ed.berenblum@genpact.com

www.genpact.com


The information transmitted is intended only for the person or entity to which it is addressed and may contain material that is confidential, privileged and exempt from disclosure under applicable law. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material in a secure receptacle or by shredding the document (s).

---

**From:** Samuel Daniel [mailto:Samuel.Daniel@NGSC.ORG]
**Sent:** Monday, March 12, 2007 4:52 PM
**To:** Berenblum, Ed
**Cc:** Frank Hagan
**Subject:** RE: North General Hospital contract termination

Ed, I am sorry to hear that we are so far down the road before I heard from you . But I would like to work with you to resolve the present situation. If and when NGH makes a change in Vendor I would agree a transition period would be the way to go. Unfortunately the hospital would not be able to make a lump sum payment of a $1million at this time and suugest we structure a payment plan ASAP to prevent an abrupt termination. Let us arrange to meet and discuss this situation .

---

**From:** Berenblum, Ed [mailto:ed.berenblum@genpact.com]
**Sent:** Sunday, March 11, 2007 10:21 PM
**To:** Gene Norman; james.perkins@bowne.com; patrick.burke@mutualofamerica.com; gordon.bell@citigroup.com; eedjr@aol.com; rweaddy500@aol.com; lsfrancis@worldnet.att.net; egiscombe@giscombehenderson.net; kim.green@willis.com; aburit@aol.com; M_Jeziorski@yahoo.com;

penmed@aol.com; emccabe@africanart.org; Frank Hagan; sam.daniels@NGSC.org;
APerez@bmcc.cuny.edu
**Cc:** Paolillo, Regina; Ferrara, Juan; White, Linda; White, Heather; Clauss, Jr., Thomas F.; Miller, William;
Specht, Bill; Snedeker, Brian
**Subject:** North General Hospital contract termination

To the Board of Directors and CEO of North General Hospital:

For three years I had the honor of being a fellow member of the Board and of the Finance Committee. In 2005 the Hospital invited my company, Creditek, to bid on a project to bill and collect outpatient receivables on the Hospital's behalf. We won this project through competitive bidding against several other companies and at a rate which was much lower than that of the incumbent vendor. Immediately after we were notified of the Hospital's decision to consider Creditek, I regrettably renounced my position with the Board, as it seemed incompatible with this new project.

Our contract states that North General should provide a daily electronic file summarizing all transactions impacting outpatient accounts. This file would have been loaded into our automated collections system for processing. Our staff, using the information from this file, would have analyzed and efficiently corrected and rebilled unpaid or rejected claims. Unfortunately, the Hospital was never able to produce an acceptable file. My experience as a former Finance Committee member provided us insight into how critical this project was to the Hospital's cash flow. We knew that the prior outsourcing contract terminated on 2/28/07, that the Hospital needed to quickly replace the over $ 1 million collected monthly, and that there was limited access to credit. To jump start the project, Creditek developed a costly manual workaround and added staff over and above the initial budget to keep cash coming until the file could be produced. Under these circumstances, Creditek started operations in March 2006 and within three months was able to substantially recover the drop in cash flow created by the prior outsourcing company. However, what we expected to be a one to two month expensive manual workaround turned into a costly (for Creditek) permanent solution, as an acceptable transaction file never materialized.

Compounding the added costs and complexity caused by these manual processes, the Hospital was, since the beginning, an inconsistent payer. My many meetings with Frank always ended in promises of a big catch-up payment soon to come and an interim and small partial payment. Over time, partial and skipped payments accumulated to the current outstanding balance of almost $ 1 million in unpaid invoices (equivalent to approximately eight month billings at the average invoice amount). No longer able to tolerate this situation, on February 5, 2007 we notified the Hospital of its Default under the terms of our Agreement (copy attached) and requested that this Default be cured within the 45 days provided in the Agreement. As we never heard back from the Hospital, on March 5, 2007 we sent a Notice of Default and Potential Termination which states that, unless we hear back from North General Hospital, we will cease all operations on or about March 22nd, 2007 (copy attached).

I am sending this communication to you hoping to remedy this situation before the Termination date. If the Hospital plans to replace Creditek with another contractor, we will be happy to work with them to execute an orderly transition. The Agreement provides approximately $ 90,000 in compensation for early termination and this could partially cover the costs incurred during that period. If instead the hospital intends to perform these services internally, please be advised that you will need at least 25 people to keep up with the number of defective invoices that need to be corrected daily (approximately 90% of everything billed) as well as with the substantial number of payer denials caused by North General's incomplete order entry, incorrect coding, and lack of adequate insurance verification at the time of service. Again, we will be happy to work with you during this transition. In either case, we still expect to get paid in full under the terms of the Agreement (which include but are not limited to such costs as the early termination penalty discussed above and interest penalties on all unpaid amounts).

I think this is a regrettable situation that neither one of us desired. Let's get together and resolve it as the friends we used to be.

Thank you


Ed Berenblum

General Manager,

Creditek Healthcare, a Genpact Company

9 Sylvan Way, Suite 165, Parsippany NJ 07054

973-355-2946 office, 631-431-1707 cell ed.berenblum@genpact.com

www.genpact.com


The information transmitted is intended only for the person or entity to which it is addressed and may contain material that is confidential, privileged and exempt from disclosure under applicable law. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material in a secure receptacle or by shredding the document (s).