Michael J. Keane (MK-7655)
Kevin G. Donoghue (KD-2875)
GARFUNKEL, WILD & TRAVIS, P.C.
*Attorneys for Defendant*
111 Great Neck Road
Great Neck, New York 11021
(516) 393-2200
E-mail: mkeane@gwtlaw.com
        kdonoghue@gwtlaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

CREDITEK, LLC,

                Plaintiff,

    -against-

NORTH GENERAL HOSPITAL,

                Defendant.

------------------------------------x

**ATTORNEY DECLARATION
IN SUPPORT OF MOTION
TO DISMISS THE COMPLAINT**

CV 07-9322

(J. COTE)

       MICHAEL J. KEANE, declares under the penalty of perjury and pursuant to 28 U.S.C.

§ 1746, that:

       1.      I am a member of the law firm of Garfunkel, Wild & Travis, P.C., counsel to

defendant North General Hospital (the "Hospital"), and I submit this Declaration in support of

the Hospital's motion for an order under Rule 12(b)(3) and (b)(6) of the Federal Rules of Civil

Procedure and 28 U.S.C. § 1406(a), dismissing plaintiff Creditek, LLC's ("Plaintiff") Complaint.

The basis of this motion is that Plaintiff improperly filed this breach of contract action in this

Court when there is a forum selection clause requiring the action be filed in state court in New

York County. Annexed as Exhibit A is a copy of Plaintiff's complaint, filed with this Court on

October 17, 2007 (the "Complaint"), and attached thereto as Exhibit 1 is a copy of the parties'

agreement underlying the Complaint, entitled Outsourcing Agreement, dated February 9, 2006 (the "Agreement").

2.     This lawsuit arises out of Plaintiff's claim that, among other things, the Hospital breached the Agreement, pursuant to which Plaintiff was required to provide management and collection services relating to certain of the Hospital's outpatient account receivables.   The Agreement contains a forum selection clause which specifically requires that any legal action or proceeding with respect to the Agreement be brought in a New York State court sitting in New York County. *See* Exhibit 1, § 21.11, to the Complaint, annexed as Exhibit A.

3.     The forum selection clause continues:

> By execution and delivery of this Agreement, each such party hereby: (i) accepts the jurisdiction of the aforesaid courts; (ii) agrees to be bound by any judgment of any such courts with respect to this Agreement; (iii) waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue set forth above; and (iv) further waives any claim that such suit, action or proceeding brought in any such courts has been brought in an inconvenient forum.

*Id.*

4.     Accordingly, Plaintiff is prohibited – by contract – from commencing this action in any federal court, and is only permitted to commence an action in a New York State court sitting in New York County. *Id.*

5.     Based on the foregoing and the accompanying Memorandum of Law, the Hospital respectfully requests that this Court issue an order, under Rules 12(b)(3) and (b)(6) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1406(a), dismissing the Complaint in its entirety and granting the Hospital such other and further relief as this Court may deem just and proper.

Executed at Great Neck, New York on December 7, 2007 under the penalty of perjury and pursuant to 28 U.S.C. § 1746.

_____

MICHAEL J. KEANE (MK-7655)

# EXHIBIT A

Christopher G. Kelly
Christelette A. Hoey
HOLLAND & KNIGHT LLP
195 Broadway, Floor 24
New York, NY 10007-3189
(212) 513-3200



RECEIVED
OCT 17 2007
U.S.D.C. S.D. N.Y.
CASHIERS

**JUDGE COTE**

ATTORNEYS FOR PLAINTIFF
CREDITEK LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**'07 CIV 9322**

-------------------------------------------------- X

CREDITEK LLC,                          :    07 Civ. _____

           Plaintiff,              :

    -against-                         :            **COMPLAINT**

NORTH GENERAL HOSPITAL,                :

           Defendant.              :

-------------------------------------------------- X

Plaintiff Creditek LLC ("Creditek" or "Plaintiff"), through its attorneys, Holland & Knight LLP, by way of Complaint against defendant North General Hospital ("NGH" or "Defendant"), alleges as follows:

### NATURE OF THE DISPUTE

1.     This is an action for a money judgment in an amount to be determined at trial, but not less than US $1,050,164.32, together with interest and reasonable attorneys' fees and costs, arising out of Defendant's material breach of an Outsourcing Agreement ("Agreement") entered into between Creditek and Defendant on or about February 9, 2006. A copy of the Agreement as executed by the parties is annexed hereto as Exhibit 1.

Case 1:07-cv-09322-DLC    Document 9    Filed 12/07/2007    Page 6 of 91

## PARTIES

2.      Creditek is a New Jersey corporation with its principal place of business located at 9 Sylvan Way, Suite 165, Parsippany, NJ 07054. Creditek is in the business of, *inter alia*, assisting clients in the management, collection and resolution of client accounts receivable.

3.      Upon information and belief, NGH is a New York not-for-profit corporation and hospital with its principal place of business located at 1879 Madison Avenue, New York, New York 10035.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

5.      Venue is properly laid in this District pursuant to 28 U.S.C. § 1391(a), as Defendant does business and resides in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Southern District of New York.

## FACTUAL BACKGROUND

**The Agreement**

6.      Creditek and Defendant entered into the Agreement, whereby Creditek agreed to provide certain outsourcing services to Defendant and arising from or related to NGH's patient accounts receivable (the "Services").

7.      The outsourcing services provided to NGH by Creditek pursuant to the Agreement included, but were not limited to, providing Defendant with invoicing appropriate patients and/or third-party payers for all outpatient accounts, including any necessary follow-up thereto; analyzing and correcting patient accounts, including updating demographic, insurance,

and clinical information, as required; entering and retaining notes related to all accounts; reporting to Defendant with respect to the current status of all accounts; and providing and training staff required to perform the outsourcing services. See Agreement, Exhibit A.

8.      Pursuant to the Agreement, Creditek was to be compensated for its services by payment of 15.1% of cash receipts Defendant received from Backlog Accounts Receivable, as defined under the Agreement, and 5.65% of cash receipts Defendant received from Ongoing Accounts, as defined under the Agreement ("Fees"). See Agreement, Exhibit C.

9.      Pursuant to the Agreement, "[i]n consideration of [Creditek] providing the Services, [NGH] shall pay to [Creditek] the Fees." Agreement, § 11.1. The Agreement essentially defines the Fees as "Backlog Accounts Receivable" and "Ongoing Accounts" created by Defendant for its provision of health services to its patients. See Agreement, § 1.1 and Exhibit C.

10.     Pursuant to the Agreement, NGH agreed to pay Creditek's Fees within thirty (30) days of Defendant's receipt of an invoice from Creditek for the invoiced amounts. See Agreement, §§ 12.1, 12.2.

11.     Pursuant to the Agreement, NGH explicitly agreed, *inter alia*, to provide Creditek with a daily, electronic referral file that summarized all transactions impacting patients' accounts (the "File"). See Agreement, §§ 1.1, 4.2(c), and Exhibit D(7).

**Creditek's Performance Pursuant to the Agreement**

12.     Creditek provided outsourcing services to NGH pursuant to the Agreement during the 16-month period of March, 2006 through July, 2007.

13.     From March, 2006 to present, NGH has received and continues to receive monies from its accounts receivable and that are otherwise subject to Fees due Creditek under the

3

Agreement. In particular, from March, 2006 through July, 2007, NGH received US $3.3 million from collections on the Backlog Accounts Receivable and US $16.1 million from collections on the Ongoing Accounts that are subject to Fees due Creditek under the Agreement.

## NGH's Failures to Pay Amounts Due Under the Agreement

14.    From the commencement of Creditek's invoices in April, 2006, to February, 2007, Defendant failed to make timely and complete payments for invoiced Services under the Agreement.

15.    On or about December 20, 2006, and in an effort to avoid payment for the Services, Defendant raised, for the first time, an objection to the percentage due Creditek in Fees for the Backlog Accounts Receivable, and demanded an unilateral reduction in percentage on all accounts worked by Creditek for the Ongoing Accounts.

16.    At no point did Defendant ever pay, in full, undisputed amounts otherwise due Creditek under the Agreement.

17.    On or before February, 2007, Creditek advised Defendant that Creditek would stop providing the Services unless Defendant paid the amounts past due under the Agreement.

18.    On or about February 5, 2007, Creditek sent Defendant a Default Notice for nonpayment of invoices under the Agreement, which noticed that Defendant had overdue invoices dating back to May 2006, and its overdue bill totaled approximately US $714,965, including accrued interest of US $17,289.

19.    No timely objection under the Agreement to the February 5, 2007 Default Notice, or amounts owed, was ever received by Creditek.

20.    On or about February 21, 2007, Creditek sent Defendant a Termination Notice for an outstanding, past-due balance under the Agreement, which noticed that Defendant had an

4

overdue balance of approximately US $1,075,985, including accrued interest of US $21,343 and termination fees of US $96,000.

21.     No timely objection under the Agreement to the February 21, 2007 Termination Notice, or amounts owed, was ever received by Creditek.

22.     On or about March 2, 2007, after receiving a check from NGH for $59,351.97, which was returned for insufficient funds, Creditek received a replacement check from Defendant in the amount of US $59,351.97.

23.     On or about March 5, 2007, Creditek sent Defendant a notice of default and potential termination, to take effect as of March 22, 2007, on grounds that NGH had an overdue balance of approximately US $911,139.49, including interest.

24.     Based upon NGH's repeated representations that it would pay Creditek, Creditek .continued to perform services throughout July, 2007.

25.     On August 1, 2007, Creditek's parent company, Genpact Limited ("Genpact"), wrote NGH demanding NGH immediately settle the amounts due and owing Creditek, which totaled US $1,050,164.32. No response to that letter has ever been received by Creditek or Genpact. A copy of that letter is annexed hereto as Exhibit 2.

26.     Despite Defendant's failure and refusal to pay Creditek the Fees owed, up to and including July, 2007, Creditek, in good faith, continued to provide Defendant with the Services due under the Agreement because it believed Defendant would pay all outstanding amounts owed thereunder.

27.     Despite repeated demands by Creditek, Defendant has failed and refused to make any further payments due and owing from Defendant to Creditek for the outsourcing services provided.

5

**NGH's Failures to Perform Under the Agreement**

28.     Pursuant to the Agreement, NGH agreed to cooperate to ensure Creditek could efficiently and effectively perform the Services.  Critical to this cooperation was, *inter alia*, NGH providing Creditek with the patient account data in an electronic format, referred to as the "File," as defined under the Agreement.  See Agreement, §§ 1.1, 4.2(c), and Exhibit D(7).

29.     Pursuant to the Agreement, Creditek was to receive the File from Defendant on a daily basis and in an electronic format.  See Agreement, §§ 1.1, 4.2(c), and Exhibit D(7).

30.     From the execution of the Agreement in or about February, 2006, Creditek never received electronic data in the format the parties agreed would constitute the File.  As a result, Creditek was forced to spend additional time and manpower not originally contemplated by the Agreement to provide services that were otherwise capable of being performed more efficiently had the File been supplied in the format NGH obligated itself to supply under the Agreement.

31.     Throughout April, May, and June, 2006, and based upon NGH's continued representations that it would supply the File, Creditek attempted to work with Defendant to create a sufficient referral file.

32.     On or about June 6, 2006, Creditek approved the specifications for the File that Defendant promised to provide through its subcontractor, McKesson HBOC, Inc. ("HBOC").

33.     On or about June 23, 2006, Creditek learned NGH had not yet approved HBOC's download program.  A copy of that June 23, 2006 communication is annexed hereto as Exhibit 3.

34.     On or about July 6, 2006, HBOC sent Defendant an email advising of HBOC's willingness to test the download and requesting approval of its contents.  A copy of that July 6, 2006 email is annexed hereto as Exhibit 4.

6

35.    On or about July 11, 2006, HBOC sent a second notice to Defendant advising of HBOC's willingness to test the download and requesting approval of its contents. A copy of that July 11, 2006 email is annexed hereto as Exhibit 5.

36.    Throughout October, November, and December, 2006, Creditek continued to work with Defendant to create a sufficient referral file.

37.    On March 8, 2007, Creditek sent Defendant a letter advising that Creditek had not yet received the File as required under the Agreement, thereby substantially increasing Creditek's costs to perform thereunder.

38.    On or about March 11, 2007, Creditek advised Defendant's Board of Directors (the "Board") and CEO that Defendant had failed to provide the File, which in turn hindered Creditek's efforts to accurately correct and re-bill unpaid or rejected claims. Creditek also advised the Board and CEO that Defendant owed Creditek an outstanding balance of almost US $1 million in unpaid invoices. A copy of that March 11, 2007 email is annexed hereto as Exhibit 6.

39.    Despite repeated demands by Creditek, Defendant never provided Creditek with a functioning daily electronic referral file, as required under the Agreement, for Creditek to perform its obligations with optimal efficiency thereunder.

40.    Despite Defendant's failure and refusal to provide Creditek with the File, up to and including July, 2007, Creditek, in good faith, continued to provide Defendant with the Services due under the Agreement because it believed Defendant would honor its obligations to provide the File as required thereunder.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

41.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 40 of this Complaint as though fully set forth herein.

42.     The Agreement entered into between Creditek and Defendant, whereby Creditek agreed to provide revenue-cycle outsourcing services to Defendant in connection with patient billing, in exchange for the payment of Fees, is a valid and enforceable contract.

43.     Defendant has materially breached the Agreement by failing to pay Creditek pursuant to the terms of the Agreement.

44.     Defendant has materially breached the Agreement by failing to provide Creditek with the information needed to optimize Creditek's potential Fees under the Agreement.

45.     As a direct and proximate result of Defendant's material breach of the Agreement, Creditek has sustained damages in an amount to be determined at trial, but not less than US $1,050,164.32, together with interest, costs and attorneys' fees.

46.     Creditek has fully performed all of its obligations under the Agreement.

## SECOND CAUSE OF ACTION
### (Quantum Meruit)

47.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 46 of this Complaint as though fully set forth herein.

48.     Creditek has performed outsourcing services for Defendant in good faith, at the request, and for the benefit, of Defendant.

49.     Defendant has accepted these services.

50.     Creditek had a reasonable expectation to be compensated for the services rendered to Defendant.

51.   The fair and reasonable value of the outsourcing services rendered by Creditek to Defendant for which payment has not been made shall be determined at trial, but is not less than US $1,050,164.32.

52.   By reason of the foregoing, Creditek has sustained damages in an amount to be determined at trial, but not less than US $1,050,164.32, together with interest, costs, and reasonable attorneys' fees.

### THIRD CAUSE OF ACTION
### (Negligent Misrepresentation)

53.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 52 of this Complaint as though fully set forth herein.

54.   Defendant had a duty not to make any misrepresentations to Creditek regarding production of the File.

55.   Defendant represented to Creditek that Defendant could and would produce the File to ensure Creditek could efficiently and effectively perform its obligations under the Agreement.

56.   Defendant's representations to Creditek regarding production of the File were untrue.

57.   Defendant should have known that the representations to Creditek regarding production of the File were untrue when Defendant made them.

58.   At the time Defendant represented to Creditek that it could and would produce the File, Defendant knew Creditek would rely upon the representations in making its decision to continue providing the Services to Defendant.

59.   Creditek did, in fact, rely upon the representations Defendant made to Creditek regarding production of the File and provided Defendant with the Services.   When Creditek

continued to provide Defendant with the Services, Creditek was under the belief that Defendant would provide Creditek with the File to ensure Creditek could efficiently and effectively perform its obligations under the Agreement.

60.    Creditek reasonably and justifiably relied upon Defendant's representations regarding production of the File.

61.    By reason of the foregoing, Creditek has sustained damages in an amount to be determined at trial, together with interest, costs, and reasonable attorneys' fees.

WHEREFORE, plaintiff Creditek LLC demands judgment and relief against Defendant as follows:

A.    On the First Cause of Action, imposing liability upon Defendant and awarding Plaintiff an amount to be determined at trial, but not less than US $1,050,164.32, together with interest, costs and attorneys' fees;

B.    On the Second Cause of Action, imposing liability upon Defendant and awarding Plaintiff an amount to be determined at trial, but not less than US $1,050,164.32, together with interest, costs and attorneys' fees;

C.    On the Third Cause of Action, imposing liability upon Defendant and awarding Plaintiff an amount to be determined at trial, together with interest, costs and attorneys' fees; and

10

D.  Granting Plaintiff such further and other relief as the Court deems just and proper.

Dated: New York, New York
       October 17, 2007

HOLLAND & KNIGHT LLP

By:  _Christopher G. Kelly_
Christopher G. Kelly
Christelette A. Hoey
195 Broadway, Floor 24
New York, New York 10007
(212) 513-3200

Attorneys for Plaintiff
Creditek LLC

# 4793362_v7

11

# EXHIBIT

# 1

# OUTSOURCING AGREEMENT

dated as of _____

by and between

**North General Hospital**

**and**

**Creditek LLC**

This **OUTSOURCING AGREEMENT** ("Agreement"), dated as of
_____ (the "Agreement Date"), is by and between Creditek LLC
("OUTSOURCER"), having its principal place of business at 9 Sylvan Way, Suite 165,
Parsippany, NJ 07054, and North General Hospital, having its principal place of business
at 1879 Madison Avenue, New York, NY 10035 ("CLIENT").

W I T N E S S E T H:

WHEREAS, the purpose of this Agreement is to establish the general terms and
conditions applicable to OUTSOURCER's provision of revenue cycle outsourcing
services (as described herein) to CLIENT for which CLIENT and OUTSOURCER desire
to enter into this Agreement; and

WHEREAS, OUTSOURCER desires to provide to CLIENT, and CLIENT desires
to obtain from OUTSOURCER, the revenue cycle outsourcing services described in this
Agreement on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, for and in consideration of the agreements set forth below,
CLIENT and OUTSOURCER agree as follows:

**ARTICLE I        DEFINITIONS AND CONSTRUCTION**

**Section 1.1    Definitions.**

The following defined terms used in this Agreement shall have the meanings
specified below:

"Abandoned Call" shall mean a call where caller has hung up after being placed
on hold by an automated or manual OUTSOURCER system.

"Account" means the right to payment for services rendered or to be rendered to
Patients.

"Accounts Receivable" or "A/R" means the aggregate of all Open Accounts for
CLIENT's hospital outpatient and diagnostic and treatment center services, valued at
Charge amounts.

"Affiliate" shall mean, with respect to a Party, any entity controlling, controlled
by or under common control with, such Party. The terms "control", "controlling" and
"controlled", as used in this definition, shall mean the legal, beneficial or equitable
ownership, direct or indirect, of more than 50 percent of the aggregate of the voting
equity interests in such entity.

"Agreement Date" shall have the meaning set forth in the introduction.

"Allowances" shall mean the reserve that represents the difference between the
gross value of the Accounts Receivable and the anticipated cash value of the Net
Accounts Receivable.

**Error! Unknown document property name.**

"Assumptions" shall mean the information set forth in Exhibit F.

"ASA" or "Average Speed to Answer" shall mean the time it takes for a patient phone call to be answered by OUTSOURCER after the call is connected to the OUTSOURCER system.

"Backlog Accounts Receivable" shall mean all Accounts Receivable greater than 30 days old from the date of service as of the Go Live Date.

"Blocked Call" shall mean a call to OUTSOURCER where caller gets a busy signal and cannot connect to OUTSOURCER system.

"Cash Receipts", as used herein, includes, without limitation, all payments received, transferred in or posted to, regardless of source and without exception, which apply to the Accounts, whether by cash, check, wire transfer, credit card, receipt by CLIENT, CLIENT's bank, lender, agent, or lock box, or payment off-set with or by a Third Party Payer.

"Change in Scope of Service(s)" shall mean any service that is requested by CLIENT in writing and: (a) outside the scope of the Required Services, and (b) requires staffing, technology, software changes, or other resources in addition to or different than those required for performance of the Required Services.

"Change in Scope of Service Levels" shall mean any service levels established by OUTSOURCER and CLIENT in connection with the Change in Scope of Services.

"Change Order" shall have the meaning set forth in Section 3.2.

"Charge" shall mean the invoice value of an Account at CLIENT's non-discounted pricing (i.e., gross revenue before contractual allowable).

"Claim" shall mean any civil, criminal, administrative or investigative action or proceeding against a Party.

"CLIENT Agents" shall mean the agents, subcontractors and representatives of CLIENT.

"CLIENT Collection Agency" shall mean a third party collection agency hired by CLIENT.

"CLIENT Contract Executive" shall have the meaning set forth in Section 4.1.

"CLIENT Data" shall mean all data and information submitted to OUTSOURCER or OUTSOURCER Agents in tangible form (including electronic form) by CLIENT or CLIENT's agents or obtained, developed or produced by OUTSOURCER or OUTSOURCER Agents on behalf of CLIENT.

**Error! Unknown document property name.**

"CLIENT Event of Default" shall have the meaning set forth in Section 17.1(a)(ii).

"CLIENT Intellectual Property" shall have the meaning set forth in Section 8.2.

"CLIENT Service Location" shall mean CLIENT's facility located at 1879 Madison Avenue, New York, New York 10035 and any other outpatient facilities owned, operated, or managed by CLIENT.

"CLIENT Required Services" shall have the meaning set forth on Exhibit D.

"Closed Account" shall mean a zero balance Account.

"Confidential Information" shall mean the terms and conditions of this Agreement and all information, data (including CLIENT Data regarding CLIENT's patients, referral sources, professional staff, employees, finances, payors or other business-related matters) knowledge and know-how (in whatever form and however communicated) relating directly or indirectly to the disclosing Party (or to its Affiliates or contractors, or to its or their businesses, operations, properties, products, markets or financial positions) that is delivered or disclosed by such Party or any of its officers, directors, partners, members, employees, agents, Affiliates or shareholders to the other Party in writing, electronically, orally or through visual means, or that such Party learns or obtains orally, through observation or analyses, interpretations, compilations, studies or evaluations of such information, data, knowledge or know-how.

"Contract Year" shall mean each 12-month period commencing on the Go Live Date during the Term.

"Date of Service" shall mean the date in which a Patient has been examined and/or treated at North General Hospital or at any if its facilities.

"Days Revenue Outstanding (DRO)" shall have the meaning set forth on Exhibit B.

"Default Cure Period" shall mean the cure periods set forth on Exhibit E.

"Default Notice" shall have the meaning set forth in Section 17.1(a)(i).

"Delinquent Account" shall mean an Account which remains unpaid in part or in full until the earlier to occur of (i) the date on which OUTSOURCER's reasonable billing and follow-up efforts (as outlined in Exhibit A) have been expended, or (ii) the date which is 12 months after the Account's date of service.

"Event of Default" shall mean, with respect to OUTSOURCER, an OUTSOURCER Event of Default and, with respect to CLIENT, a CLIENT Event of Default.

**Error! Unknown document property name.**

"Fees" shall mean the fees for the Services as described on Exhibit C and any other amounts payable by CLIENT to OUTSOURCER pursuant to this Agreement in respect of the Services provided hereunder.

"Force Majeure Event" shall have the meaning set forth in Section 10.2.

"Go Live Date" shall mean the date when OUTSOURCER receives the first Referral File from CLIENT.

"HIS System" shall mean CLIENT's McKesson STAR hospital information system, the functional replacement of such system, or its then-current patient accounting system in use.

"HIPAA" has the meaning set forth in Section 3.3.

"Management Committee" shall have the meaning set forth in Section 7.1.

"Net Accounts Receivable" shall mean the aggregate expected cash value of all Accounts.

"Net Revenue" shall mean the anticipated cash value of Charges (net of CLIENT and Patient adjustments and write-offs and Third Party Payer contractual discounts, adjustments and write-offs).

"New Accounts" shall mean all Accounts billed for the first time after the Go Live Date.

"Ongoing Accounts" shall mean all New Accounts as well as all Accounts billed for the first time during the 30 days preceding the Go Live Date.

"Open Account" shall mean an Account with a balance other than zero

"OUTSOURCER Agents" shall mean the agents, subcontractors, suppliers and representatives of OUTSOURCER.

"OUTSOURCER Collection Agency" shall mean OUTSOURCER's agents responsible for sending out follow-up letters to Patients with respect to Open Accounts.

"OUTSOURCER Contract Executive" shall have the meaning set forth in Section 6.1.

"OUTSOURCER Event of Default" shall have the meaning set forth in Section 17.1(a)(i).

"OUTSOURCER Intellectual Property" shall have the meaning set forth in Section 8.1.

"OUTSOURCER Required Services" shall mean the OUTSOURCER services described in Exhibit A

**Error! Unknown document property name.**

"OUTSOURCER Service Location" shall mean any OUTSOURCER processing center.

"OUTSOURCER's System" shall mean OUTSOURCER's MaxPro, C-RMS, Medical Manager and/or imaging systems, or their functional replacements.

"Parties" shall mean CLIENT and OUTSOURCER, collectively.

"Party" shall mean either CLIENT or OUTSOURCER, as the case may be.

"Patient" shall mean a patient who receives outpatient services from CLIENT (at CLIENT's Service Location).

"Physician" shall mean any physician working for or associated with North General Hospital or its Affiliates.

"Pre-Termination Accounts" shall have the meaning set forth in Section 17.2(b).

"Prime Rate" shall mean the United States of America prime rate as recorded in the New York edition of the Wall Street Journal the day of a receipt or payment, as the case may be.

"Project Staff" shall mean the personnel of OUTSOURCER who provide the Services.

"Referral File" shall mean the daily electronic file submitted by CLIENT to OUTSOURCER, which, at a minimum, will provide the details of all outpatient transactions posted to the HIS on the preceding day, as well as all cumulative activity for all Open outpatient Accounts.

"Required Services" shall mean the services described on Exhibit A as such services apply to OUTSOURCER and as described on Exhibit D when such services apply to CLIENT.

"Self Pay" shall mean an Account where the Patient is responsible for the open balance.

"Service Levels" shall mean those performance standards set forth on Exhibit B and the performance standards established by OUTSOURCER and CLIENT in connection with any Change in Scope of Services.

"Service Location" shall mean the CLIENT Service Location, the OUTSOURCER Service Location or any Additional OUTSOURCER Service Location.

"Services" shall mean the Required Services and the Change in Scope of Services, collectively.

"Standard Reports" shall mean those reports listed on Exhibit A

**Error! Unknown document property name.**

"Systems" shall mean the CLIENT's HIS System or OUTSOURCER's System and/or their functional replacements.

"Term" shall have the meaning set forth in Section 2.1.

"Termination Date" shall mean the date when OUTSOURCER ceases to provide Services under this Agreement.

"Third Party Payers" shall mean third party payers, including Medicare, Medicaid, commercial insurance carriers, Worker's Compensation, auto, health maintenance organizations and preferred provider organizations.

**Section 1.2    References; Exhibits.**

In this Agreement: (i) the Exhibits shall be incorporated into and deemed part of this Agreement and all references to this Agreement shall include the Exhibits; (ii) references to any law or regulation shall mean references to the law or regulation in changed or supplemented form or to a newly adopted law or regulation replacing a previous law or regulation; and (iii) references to the word "including" or the phrase "e.g." in this Agreement shall mean "including, without limitation".

The following are the Exhibits to this Agreement:

| Exhibit | Description |
|---------|-------------|
| A | Required Outsourcer Services |
| B | Service Levels |
| C | Fees |
| D | Required Client Services |
| E | Events of Default and Cure Periods |
| F | Significant Assumptions |
| G | Business Associate Addendum |

**Section 1.3    Headings.**

The article and section headings and the table of contents are for reference and convenience only and shall not be considered in the interpretation of this Agreement.

**ARTICLE II        TERM**

**Section 2.1    Term.**

The term of this Agreement (the "Term") shall be from the Agreement Date through the date which is two (2) years after the Go Live Date (such date, the "Expiration Date"), unless terminated earlier pursuant to Article XVII. This Agreement will automatically be extended for additional renewal terms of twelve (12) months each unless OUTSOURCER or CLIENT gives written notice to the other at least 360 days prior to the commencement of a renewal term.

**Error! Unknown document property name.**

## ARTICLE III        SERVICES

### Section 3.1    Generally.

OUTSOURCER shall be responsible for providing to CLIENT the OUTSOURCER Required Services, subject to the Service Levels specified on Exhibit B, CLIENT's policies and procedures, and such additional Change in Scope of Services that may be from time to time mutually agreed upon in writing by the Parties in the manner set forth in Section 3.2. CLIENT shall be responsible for providing OUTSOURCER the CLIENT Required Services. The Parties agree that the Go Live Date shall be no later than March 1, 2006. The Parties have mutually agreed upon a transition schedule (attached hereto as Exhibit A) for when each Party shall begin providing Required Services hereunder (including any pre-Go Live Date activities), and each Party shall make all reasonable efforts necessary to comply with such schedule.

### Section 3.2    Change in Scope of Services.

CLIENT may from time to time during the Term request (1) ongoing additions or changes to the scope of the individual component tasks included in the OUTSOURCER Required Services and/or (2) new or additional services, collectively a "Change in Scope of Services", Within 15 business days of receipt of such a request from CLIENT, if OUTSOURCER elects to perform such Change in Scope of Services, OUTSOURCER shall provide CLIENT with (1) a written description of the work OUTSOURCER anticipates performing in connection with such Change in Scope of Service, (2) a schedule for commencing and completing the Change in Scope of Service, (3) (a) the price for such Change in Scope of Service, if CLIENT has requested a fixed price for such Change in Scope of Service, or (b) an estimate of the time, resources and prices for such Change in Scope of Service, if CLIENT has requested a time and materials quotation for such Change in Scope of Service, and (4) when appropriate, the resources necessary to provide the Change in Scope of Service. OUTSOURCER shall not begin performing any Change in Scope of Service until CLIENT Contract Executive has provided OUTSOURCER with written authorization to perform the Change in Scope of Service from the CLIENT Contract Executive. The document (the "Change Order") evidencing each agreed upon Change in Scope of Service shall reference Exhibit A and be deemed an amendment thereto. During the Term, OUTSOURCER's time and materials rates applicable to Changes in Scope of Services requested by CLIENT hereunder shall be mutually agreed upon by the Parties in writing.

### Section 3.3    Legal and Regulatory Compliance.

(a)    OUTSOURCER represents, warrants and covenants that, throughout the Term, OUTSOURCER shall provide its Services in accordance with (A) all applicable present and future federal, state and local laws, rules, regulations and agency guidelines including, without limitation: (i) laws, rules, regulations and guidelines regarding billing, collection and payment for medical and other health care services, (ii) the Health Insurance Portability and Accountability Act of 1996 and its related regulations ("HIPAA"); (iii) any applicable laws relating to the confidentiality of

**Error! Unknown document property name.**

CLIENT's patients; and (iv) the Fair Debt Collection Practices Act and its related regulations and (B) present and future rules, regulations and guidelines of all applicable third party payors. Without limiting the foregoing sentence, OUTSOURCER further represents, warrants and covenants that it will comply with all present and future HIPAA standards applicable to electronic transactions performed by OUTSOURCER on CLIENT's behalf, including electronic claims submissions.

(b)     Without limiting the foregoing paragraph, the Parties agree to comply with all federal, state and local laws, rules, and regulations regarding the security, integrity and confidentiality of patient health information and any subsequent amendments thereto, including any regulations, standards or rules promulgated under HIPAA. Additionally, OUTSOURCER hereby agrees to all of the terms and conditions set forth in the Business Associate Addendum attached hereto as Exhibit G, which Addendum will be executed and delivered by the Parties on the Agreement Date.

(c)     OUTSOURCER shall cooperate with the compliance efforts of CLIENT to ensure both Parties' compliance with all applicable federal and state laws, rules and regulations and with all applicable rules and guidelines of third party payors. OUTSOURCER will provide CLIENT with a copy of its current compliance program prior to the Agreement Date (and will subsequently provide CLIENT with any amendments to the program), and shall do the following:

(i)     If OUTSOURCER finds evidence of erroneous or improper claims (whether due to the conduct of OUTSOURCER, CLIENT or their agents), OUTSOURCER shall refrain from the submission of such claims and promptly (within ten (10) days) notify CLIENT. OUTSOURCER shall provide CLIENT with all claim specific information and shall identify all evidence of the erroneous or improper claim.

(ii)     OUTSOURCER shall identify and research any overpayments made to CLIENT and shall notify CLIENT once the overpayment has been validated. This information shall be provided weekly to CLIENT.

(iii)     OUTSOURCER shall process claims and (upon direction by CLIENT) bill for CLIENT's services only on the basis of accurate and appropriate documentation. Unless otherwise directed by CLIENT, all claims will be sent to payors using CLIENT's HIS System. OUTSOURCER shall not use "defaults" or engage in any similar practice that provides or creates missing billing or coding information based on assumed practices or other inappropriate criteria. OUTSOURCER shall employ only individuals who have appropriate training or experience to be able to review CLIENT bills and render the Services hereunder. OUTSOURCER shall seek clarification from CLIENT in all instances for any ambiguous, conflicting, missing, or insufficient documentation received from CLIENT.

(iv)     OUTSOURCER shall comply with all applicable billing, coding and collection policies of CLIENT. Without limiting the foregoing, if CLIENT has designated a certain billing, diagnosis or treatment code, then OUTSOURCER shall

not change such codes on any claims submitted on behalf of CLIENT without the prior written authorization of CLIENT.

(d)    In the event that a change in applicable federal, state or local laws, rules or regulations increases OUTSOURCER's cost of providing Services hereunder by more than ten percent (10%), then (i) OUTSOURCER shall provide written notice to CLIENT along with sufficient back-up documentation which demonstrates the increase in OUTSOURCER's costs, (ii) the Parties will negotiate a reasonable increase in the Fees to compensate OUTSOURCER for the increase in its costs, provided that any increase will be subject to mutual written agreement of the Parties, and (iii) if the Parties cannot agree upon an increase in Fees within ninety (90) days of OUTSOURCER's initial notice, then either Party may terminate this Agreement without cause or penalty (in which case, CLIENT shall not be required to pay OUTSOURCER's severance costs as provided in Section 21.21).

**Section 3.4    Compliance With Disclosure Law.**

To the extent applicable under Section 1861(v)(1)(i) of the Social Security Act, as amended, OUTSOURCER agrees that, upon request made in accordance with applicable law and regulations, the Comptroller General of the United States, the United States Department of Health and Human Services and the duly authorized representatives of the foregoing shall be given access by OUTSOURCER to the following records from the date of this Agreement until the expiration of four (4) years after the furnishing of the Services under this Agreement: this Agreement, and all books, documents and records of OUTSOURCER and its subcontractors that are necessary to verify the nature and extent of the costs to CLIENT of Services rendered hereunder. Furthermore, in the event that any request for OUTSOURCER's books, documents and records is made pursuant to this section, OUTSOURCER shall promptly give notice of such request to CLIENT and shall promptly provide CLIENT with a copy of such request and each book, document and record made available to the persons and agencies listed above. This provision shall survive termination or expiration of this Agreement.

**Section 3.5    Non-Solicitation.**

Except as otherwise expressly provided in this Agreement or with OUTSOURCER's prior written consent, during the Term and for two years after termination or expiration of this Agreement, CLIENT agrees not to solicit or hire any of OUTSOURCER's or its Affiliates' and contractors' employees that become known to CLIENT as a result of the Services provided under this Agreement. Except as otherwise expressly provided in this Agreement or with CLIENT's prior written consent, during the Term and for two years after termination or expiration of this Agreement, OUTSOURCER agrees not to solicit or hire any of CLIENT's or its Affiliates' employees that become known to OUTSOURCER as a result of providing the Services under this Agreement. Notwithstanding the foregoing either Party may at any time hire any contractor, partner, employee or agent of the other Party that responds to a general solicitation to the public.

**Error! Unknown document property name.**

## ARTICLE IV   CLIENT RESPONSIBILITIES

In addition to any specific obligations for which CLIENT is given responsibility in this Agreement, CLIENT shall perform the following responsibilities during the Term.

### Section 4.1     CLIENT Contract Executive.

CLIENT shall appoint one or more individuals (each the "CLIENT Contract Executive") who from the Agreement Date shall serve as the primary CLIENT representatives. The CLIENT Contract Executives shall (1) have overall responsibility for managing and coordinating the performance of CLIENT's obligations under this Agreement, (2) be authorized to act for and on behalf of CLIENT with respect to all matters relating to this Agreement, (3) define and communicate the CLIENT's business priorities to OUTSOURCER, (4) make timely decisions that would impact the OUTSOURCER's ability to perform under this Agreement; and (5) facilitate the implementation of this Agreement throughout CLIENT's entire organization. OUTSOURCER may rely upon the representations and agreements of a CLIENT Contract Executive as lawfully binding on the CLIENT; provided, however, a CLIENT Contract Executive shall not have the authority to enter into written agreements to modify or supersede this Agreement.  CLIENT reserves the right to change the individual(s) appointed as CLIENT Contract Executives from time to time upon notice to OUTSOURCER.

### Section 4.2     CLIENT Rights and Obligations.

(a)     With respect to activities or services not expressly delegated to OUTSOURCER hereunder, CLIENT reserves the right to engage in such activities and/or to engage third parties to provide such services to CLIENT.

(b)     CLIENT shall promptly notify OUTSOURCER of any and all notices received by CLIENT or CLIENT Agents from a Patient and/or Third Party Payer regarding an outstanding invoice in respect of an Account, or regarding OUTSOURCER's billing efforts regarding any outstanding invoice.  OUTSOURCER agrees to promptly notify CLIENT of any and all notices received by OUTSOURCER or OUTSOURCER's Agents from a Patient and/or Third Party Payer regarding billing disputes, patient complaints or pending or threatened audits regarding CLIENT as soon as OUTSOURCER becomes aware of them.  CLIENT reserves the right to direct CLIENT's response to any such disputes, complaints and audits, and OUTSOURCER shall promptly provide CLIENT with a copy of all related documents and correspondence and an opportunity to participate in all proceedings or discussions.

(c)     CLIENT shall reasonably cooperate with OUTSOURCER so OUTSOURCER can efficiently and effectively perform the Services.

(d)     All collections for CLIENT's health care services shall be deposited in bank accounts established by CLIENT from time to time.  Such accounts shall be established in the name of CLIENT, and CLIENT shall have sole signature authority over such accounts.  Authorized signers on such account(s) shall be designated

and approved by Client. OUTSOURCER will have no ownership rights in, or signature authority with respect to, such bank account(s) nor shall OUTSOURCER have authority to negotiate or assert ownership rights in and/or to checks made payable to CLIENT. Any collections for CLIENT's health care services shall not be subject to set-off, abatement, reduction, or counterclaim by OUTSOURCER for any reason. OUTSOURCER's sole authority with respect to CLIENT's bank account(s) shall be to access information relating to the deposits made to such account. In the event that any payments or remittances for CLIENT's health care services are sent to or received by OUTSOURCER, then OUTSOURCER shall forward such payments or remittances to CLIENT's bank account(s) within five (5) business days from OUTSOURCER's receipt of such payments or remittances. CLIENT shall execute any instruments as may be required to authorize OUTSOURCER to obtain information from CLIENT's bank account(s) necessary to provide the Services hereunder.

**ARTICLE V        SERVICE LEVELS.**

**Section 5.1    Service Levels.**

As of the Go Live Date, OUTSOURCER shall perform the Services in accordance with generally accepted industry standards and with the specifications and representations made in this Agreement, including the Service Levels set forth in Exhibit B.

**Section 5.2    Adjustment of Service Levels.**

Either Party may, at any time upon notice to the other Party, initiate negotiations to review and, upon agreement by the Management Committee, adjust any Service Level which such Party in good faith believes is inappropriate at the time. Any decision by the Management Committee to adjust any Service Level must be made by a vote that includes the affirmative vote of at least one representative of each Party. Notwithstanding the foregoing, the Parties agree that any adjustments to the Service Levels shall not materially reduce or adversely affect the Services or the quality of OUTSOURCER's performance hereunder.

**Section 5.3    Reports.**

At no additional cost to CLIENT, OUTSOURCER shall provide custom reports, as required by CLIENT, and Standard Reports as described on Exhibit A.

**Section 5.4    Root-Cause Analysis.**

Within five days of receipt of a notice from CLIENT with respect to OUTSOURCER's failure to provide the Services in accordance with the Service Levels, OUTSOURCER shall: (1) initiate a root-cause analysis to identify the cause of such failure and investigate the decline in performance, (2) develop a plan acceptable to CLIENT to correct such failure, (3) provide CLIENT Contract Executive with a report detailing the cause of and procedure for correcting the failure with an action plan and implementation schedule; (4) provide CLIENT with satisfactory assurance that such

**Error! Unknown document property name.**

failure will not recur after the procedure has been completed, (5) subject to Section 17.1(a), have 30 days to cure Service Level deficiencies unless otherwise specified in Exhibit E; and (6) OUTSOURCER will provide CLIENT with applicable Service Level credits in accordance with Exhibit B.

### Section 5.5    Measurement and Monitoring Tools.

OUTSOURCER shall implement the necessary measurement and monitoring tools and procedures required to measure and report OUTSOURCER's performance against the applicable Service Levels. Such measurement and monitoring shall permit reporting at a level of detail sufficient to verify compliance with the Service Levels and shall be subject to audit by CLIENT upon request. Additionally, OUTSOURCER shall provide CLIENT with monthly reports regarding its performance against the applicable Service Levels.

### ARTICLE VI    PROJECT TEAM.

### Section 6.1    OUTSOURCER Contract Executive.

OUTSOURCER shall appoint an individual (the "OUTSOURCER Contract Executive"), and designate his/her backup, who from the Agreement Date shall serve as the primary OUTSOURCER representative. The initial OUTSOURCER Contract Executive shall be: Brian Snedeker (with Adrienne Hurtt as a back-up), and any replacements of the OUTSOURCER Contract Executive or his/her back-up shall require the prior written approval of CLIENT. Upon request, OUTSOURCER shall provide CLIENT with references and a description of the credentials and qualifications of the OUTSOURCER Contract Executive, his/her backup and any proposed replacements. CLIENT reserves the right to request a replacement of the OUTSOURCER Contract Executive or his/her backup at any time on reasonable grounds, and OUTSOURCER shall promptly make a replacement after receiving such request. The OUTSOURCER Contract Executive shall (1) have overall responsibility for managing and coordinating the performance of OUTSOURCER's obligations under this Agreement and (2) be authorized to act for and on behalf of OUTSOURCER with respect to all matters relating to this Agreement. CLIENT may rely upon the representations and agreements of the OUTSOURCER Contract Executive as lawfully binding on the OUTSOURCER; provided, however, the OUTSOURCER Contract Executive shall not have the authority to enter into written agreements to modify or supersede this Agreement, except to the extent this Agreement is modified by Change Orders executed by the OUTSOURCER Contract Executive and CLIENT.

### Section 6.2    Subcontractors.

(a)    OUTSOURCER may not subcontract the performance of its Services under this Agreement unless CLIENT consents to such subcontracting in writing in advance (which consent shall not be unreasonably withheld or delayed). OUTSOURCER shall ensure that all of its subcontractors comply with the terms of this Agreement.

(b)    OUTSOURCER shall be responsible for the work, performance and activities of each of its approved subcontractors, including compliance with the terms of this Agreement.  OUTSOURCER shall also be solely responsible for all payments to its subcontractors.

### ARTICLE VII        MANAGEMENT AND CONTROL.

#### Section 7.1    Management Committee.

Upon execution of this Agreement, CLIENT and OUTSOURCER shall each appoint two representatives to serve on a management committee (the "Management Committee").  The Management Committee shall be authorized and responsible for (1) overseeing the provision of the Services and each Party's performance under this Agreement and (2) monitoring and resolving disagreements regarding the provision of the Services and the Service Levels.  A Party may change any of its representatives on the Management Committee upon notice to the other Party.  A quorum for any meeting of the Management Committee shall require attendance by at least one person appointed by each Party, and any action or decision by the Management Committee shall require the vote of at least one person appointed by each Party.

### ARTICLE VIII        INTELLECTUAL PROPERTY RIGHTS.

#### Section 8.1    OUTSOURCER Intellectual Property.

(a)    "OUTSOURCER Intellectual Property" shall mean all software or other intellectual property (including any writings, discoveries, inventions or other materials covered by any rights of copyright, trademark or patent or any rights similar thereto, whether registered or unregistered, or otherwise protectible as trade secret, proprietary or confidential information) owned or developed by, or otherwise proprietary to, OUTSOURCER.  OUTSOURCER Intellectual Property shall also include all programs and documentation therefore and the tangible media on which such programs are recorded, as well as all reports, technology, training materials, forms, specifications, and other intellectual property owned or developed by or proprietary to OUTSOURCER, for use in providing the Services hereunder or otherwise in its business.

(b)    OUTSOURCER Intellectual Property is and will remain the property and confidential information of OUTSOURCER or its third party licensors, and CLIENT shall have no right, title or interest therein except to the extent of a perpetual license to use any materials prepared or provided by OUTSOURCER hereunder as part of the Services and except as may otherwise be provided in any separate license agreements.  No use of OUTSOURCER Intellectual Property at or in connection with any Service Location or equipment containing OUTSOURCER Intellectual Property shall confer any rights in such OUTSOURCER Intellectual Property on CLIENT, except for the license granted hereunder.  Such license shall survive any expiration or termination of this Agreement.

**Error! Unknown document property name.**

**Section 8.2    CLIENT Intellectual Property.**

      (a)    "CLIENT Intellectual Property" shall mean all software or other intellectual property (including any writings, discoveries, inventions or other materials covered by any rights of copyright, trademark or patent or any rights similar thereto, whether registered or unregistered, or otherwise protectible as trade secret, proprietary or confidential information) owned or developed by, or otherwise proprietary to, CLIENT. CLIENT Intellectual Property shall also include all programs and documentation therefore and the tangible media on which such programs are recorded, as well as all reports, technology, training materials, forms, specifications, and other intellectual property owned or developed by or proprietary to CLIENT.

      (b)    All CLIENT Intellectual Property is and will remain the property and confidential information of CLIENT or its third party licensors, and OUTSOURCER shall have no right, title or interest therein except to the extent of such limited right to use such particular portions thereof as are necessary to enable OUTSOURCER to perform its Services hereunder or except as may otherwise be provided in any separate license agreements. No use of CLIENT Intellectual Property at or in connection with any Service Location or equipment containing CLIENT Intellectual Property shall confer any rights in such CLIENT Intellectual Property to OUTSOURCER.

### ARTICLE IX    DATA AND REPORTS

**Section 9.1    Ownership of CLIENT Data.**

All CLIENT Data is, will be, and shall remain the property of CLIENT. CLIENT Data shall not, without CLIENT's prior written approval, be (1) used by OUTSOURCER or OUTSOURCER Agents other than in connection with providing the Services, (2) disclosed, sold, assigned, leased or otherwise provided to third parties by OUTSOURCER or OUTSOURCER Agents or (3) commercially exploited by or on behalf of OUTSOURCER or OUTSOURCER Agents. During the term of this Agreement, no CLIENT records shall be removed from CLIENT's premises or copied by OUTSOURCER or its agents except (i) as necessary for the OUTSOURCER's provision of Services hereunder; or (ii) as approved by CLIENT in writing.

**Section 9.2    Errors.**

Except to the extent that OUTSOURCER is required by Exhibit A to identify errors, or an error otherwise becomes actually known to OUTSOURCER, OUTSOURCER shall not be responsible for the coding in CLIENT bills or for the pricing of CLIENT services.

## ARTICLE X    CONTINUED PROVISION OF SERVICES

### Section 10.1    Business Continuity Plan.

OUTSOURCER has made its Business Continuity Plan available to CLIENT and CLIENT acknowledges and agrees that CLIENT has read and understands the terms of such Business Continuity Plan.

### Section 10.2    Force Majeure.

(a)    If and to the extent that either Party's performance of any of its obligations pursuant to this Agreement is prevented, hindered or delayed by fire, flood, earthquake, elements of nature or acts of God, acts of war, terrorism, riots, civil disorders, rebellions or revolutions, or any other cause beyond the reasonable control of such Party (each, a "Force Majeure Event") and such non-performance could not have been prevented by reasonable precautions, then the non-performing Party shall be excused from any further performance of those obligations affected by the Force Majeure Event for as long as such Force Majeure Event continues and such Party continues to use its commercially reasonable efforts to recommence performance whenever and to whatever extent possible without delay, including through the use of alternate sources, work-around plans or other means.

(b)    The Party whose performance is prevented, hindered or delayed by a Force Majeure Event ("the Notifying Party") shall notify the other Party by telephone (or other means as may be available if telecommunication is unavailable), as soon as possible, and describe in reasonable detail the nature of the Force Majeure Event. The Notifying Party shall be excused from any further performance of its obligations affected by the Force Majeure Event until normal performance can be recommenced.

(c)    The occurrence of a Force Majeure Event does not limit or otherwise affect OUTSOURCER's obligation to provide either normal disaster recovery procedures or any other disaster recovery services described in Section 10.1.

### Section 10.3    Service Level Adjustment.

Upon the occurrence of a Force Majeure Event, the Parties acknowledge and agree that the Service Levels will need to be adjusted for a period of time to account for the Services affected by the Force Majeure Event. The Parties agree to negotiate in good faith to determine a time frame and plan for lowering the Service Levels during the pendency of such Force Majeure Event. In the event that the Parties are unable to agree on such adjusted Service Levels, the matter shall be resolved through the dispute resolution process set forth in Article XVI.

## ARTICLE XI          PAYMENTS TO OUTSOURCER

### Section 11.1    Fees.

In consideration of OUTSOURCER providing the Services, CLIENT shall pay to OUTSOURCER the Fees. OUTSOURCER's invoicing calculation(s), price elements and price data shall be provided to CLIENT in sufficient detail to substantiate calculation of the Fees. Upon request, OUTSOURCER shall provide CLIENT and its agents with access to all back-up documentation to support the calculation of Fees for audit purposes. Except as expressly set forth in this Agreement, there shall be no other charge or fees payable by CLIENT in respect of OUTSOURCER's performance of its obligations pursuant to this Agreement.

### Section 11.2    Adjustment to Fees, Services and Service Levels.

The Fees, Services and Service Levels are based on the Assumptions set forth in Exhibit F which are derived from information provided by CLIENT to OUTSOURCER. CLIENT shall verify and be responsible for the accuracy of the Assumptions. Within the first two months of the Go Live Date, OUTSOURCER will run baselines to test the Assumptions, and to the extent that there is a material deviation in the Assumptions of more than ten percent (10%) for any given statistic which impacts on the cost to OUTSOURCER of its performance of Services hereunder, the Parties agree to negotiate in good faith to define and mutually agree upon adjustments to Fees, Services and Service Levels that shall be consistent with the intent of the Parties. Any such agreed adjustment shall be set forth in a Change Order.

### Section 11.3    Expenses.

All expenses relating to the Services (including, without limitation, any out-of-pocket or travel expenses) are included in the Fees and no other expenses shall be reimbursed by CLIENT unless agreed to by CLIENT in writing.

### Section 11.4    Proration.

All periodic fees or charges under this Agreement are to be computed on a calendar month basis and shall be prorated on a per diem basis for any partial month.

### Section 11.5    Patient/Third Party Payer Settlements.

Notwithstanding anything in this Agreement to the contrary, OUTSOURCER shall have the right, on a case by case basis where there is a demonstrated need by a Patient or Third Party Payer, to negotiate settlements involving payments by such Patient or Third Party Payer, as the case may be, of at least seventy percent (70%) of the invoice amount, without the CLIENT's prior approval. OUTSOURCER will create a monthly report which shall provide the summary settlement information by number of Accounts affected and dollars settled. OUTSOURCER will review such report with CLIENT Contract Executive quarterly to ensure settlements are appropriate to business needs as determined by CLIENT.

**Error! Unknown document property name.**

**ARTICLE XII     PAYMENT SCHEDULE AND INVOICES**

**Section 12.1    Fees.**

OUTSOURCER shall issue an invoice to CLIENT on or after the last day of each month for the Fees then due. All undisputed invoice amounts shall be due and payable within thirty (30) days of CLIENT's receipt of invoice, with the exception of invoices for Medicaid Fees. All undisputed invoice amounts for Medicaid Fees shall be due and payable within ninety (90) days of CLIENT's receipt of invoice; provided, however, that if CLIENT's average period for collections of Medicaid accounts receivables falls below sixty (60) days in any calendar quarter, then the Parties agree to adjust the payment terms for Medicaid Fees during the following calendar quarter to be the average number of days for Medicaid accounts receivables collections plus thirty (30) days. For example, if the average number of days for Medicaid collections during a quarter is fifty-five (55) days, then CLIENT shall pay undisputed invoice amounts for Medicaid Fees during the next calendar quarter within eighty-five (85) days of CLIENT's receipt of invoice. Notwithstanding the foregoing, if, after an adjustment in payment terms, the average number of days for Medicaid collections increases above sixty (60) days during any calendar quarter, the payment terms for Fees for Medicaid billing services shall return to ninety (90) days from receipt of invoice during the next quarter. CLIENT reserves the right to reasonably dispute an invoice.

**Section 12.2    Time of Payment.**

Any undisputed sum due pursuant to this Agreement, for which payment terms are not otherwise specified, shall be due and payable within thirty (30) days of CLIENT's receipt of invoice.

**Section 12.3    Detailed Invoices.**

OUTSOURCER shall provide invoices with sufficient detail to justify the Fees and any other payments due hereunder. Upon request, OUTSOURCER shall promptly provide CLIENT with back-up documentation necessary to justify the Fees and other payments charged by OUTSOURCER hereunder.

**Section 12.4    Late Fees.**

Any undisputed invoiced amounts not paid in a timely manner within the payment periods specified in Sections 12.1 and 12.2 above shall bear interest at a rate equal to the prime rate on the date when payment was due announced by Citibank, N.A. located in New York, New York, plus two hundred and fifty (250) basis points. Interest shall accrue from the date when an undisputed invoiced amount was due until the date when such amount is paid.

**Section 12.5   Additional Credits.**

OUTSOURCER agrees to provide CLIENT with the following credits against OUTSOURCER's Fees: (a) a $50,000 credit upon the closing of CLIENT's upcoming financing; and (b) an annual $25,000 credit on each annual anniversary of such closing.

## ARTICLE XIII    AUDITS

**Section 13.1**   Upon reasonable notice from CLIENT (for purposes of this Section 13.1, the "Requesting Party"), OUTSOURCER and OUTSOURCER's agents, as the case may be (for purposes of this Section 13.1, the "Other Party) shall provide Requesting Party or its agents, and any of Requesting Party's regulators upon written request by the Requesting Party, with access to and any assistance that they may reasonably require with respect to its relevant Service Location, records, books and other documentation, and information systems for the purpose of performing audits or inspections of the Services, billing, compliance with law, the Fees or other payments due hereunder and/or the business of Requesting Party relating to the Services. The Other Party shall, subject to its standard security requirements, provide, and shall cause its agents to provide, such Requesting Party, its agents or regulators, as applicable, any assistance that they may reasonably require, provided such assistance does not unreasonably interfere with the Other Party's performance of its obligations hereunder, and, with respect to OUTSOURCER, the performance of the Services in accordance with the Service Levels. Subject to Article VIII and Article IX, the Other Party shall provide Requesting Party Agents and regulators with access to Other Party's proprietary data relating to the Services, to the extent required to perform audits described in this Section 13.1, upon written request by CLIENT. If any audit by an auditor designated by Requesting Party or a regulatory authority results in the Requesting Party or Other Party being notified that it or its agents are not in compliance with any law, rule or regulation, the Other Party shall immediately notify the Requesting Party and shall cause Other Party and its Agents to promptly take actions to comply with applicable laws, rules or regulations. Requesting Party shall bear the expense of any such audit that is (1) required by any law, regulation or other audit requirement relating to Requesting Party's business or (2) necessary due to Requesting Party's noncompliance with any law, regulation or audit requirement imposed on Requesting Party. Other Party shall bear the expense of any such audit that is (a) required by any law, regulation or other audit requirement relating to Other Party's business or (b) necessary due to Other Party's or Other Party agents' noncompliance with any law, regulation or audit requirement imposed on Other Party or Other Party agents.

**Section 13.2   Fees.**

Upon reasonable notice, each Party shall provide the other Party and its Agents access to such financial records and supporting documentation as may be reasonably requested by the requesting Party to audit the records and documentation relating to the Cash Receipts and the Fees or other payments charged to CLIENT. If, as a result of such audit, it is determined that OUTSOURCER has overcharged or undercharged CLIENT, the Party that determined such error shall promptly notify the other Party and promptly

**Error! Unknown document property name.**

pay to CLIENT or OUTSOURCER, as the case may be, the amount of the overcharge or undercharge, plus interest at the prime rate announced on the date of the audit by Citibank, N.A. located in New York, New York, plus two hundred and fifty (250) basis points. Interest shall accrue from the date of receipt by OUTSOURCER of such incorrect amount until the date of payment to CLIENT or OUTSOURCER, as the case may be.

### Section 13.3    Record Retention.

OUTSOURCER shall maintain sufficient records of the Services, the Fees and other payments due hereunder to allow Client to audit the Services and Services Levels and to justify the Fees and other payments charged hereunder, provided that, except as otherwise required by applicable law, OUTSOURCER shall not be required to retain any records or documentation relating to CLIENT or the Services provided under this Agreement so long as originals of such documentation have been provided to CLIENT for imaging and/or storage.

### Section 13.4    Facilities.

In the event of an audit described in this Article XIII, OUTSOURCER agrees to give CLIENT and its agents reasonable access to the premises where such audit is being performed and such space (reasonably available), office furnishings (including lockable cabinets), telephone and facsimile service, utilities and office-related equipment and duplicating services as CLIENT and its agents may reasonably need to perform the audits described in this Article XIII.

### ARTICLE XIV    CONFIDENTIALITY; PROTECTED HEALTH INFORMATION

### Section 14.1    General Obligations.

(a)    Each Party agrees that it shall not disclose to any third party (other than such Party's agents) any Confidential Information (including any information about the Fees) which it learns during the course of the performance of this Agreement, without the prior written consent of the other Party, except as necessary for a Party's performance hereunder or as required by law, regulation, or order of a court or regulatory agency or other authority having jurisdiction thereover, provided, however, that the Party under such obligation of disclosure shall promptly notify the other Party to afford that Party, at that Party's expense, an opportunity to object to such disclosure. Each Party shall treat the other's Confidential Information with the same level of care as it treats its own confidential information of like import, but not less than a reasonable level of care, shall disclose it within its own organization only on a need-to-know basis, and shall inform those to whom it rightfully discloses such Confidential Information of their obligations of confidentiality and non-disclosure hereunder.

(b)    Notwithstanding the foregoing,

(i)     With the exception of patient information, the confidentiality obligations set forth in this Section 14.1 shall not apply to any information which the recipient party can establish to have become publicly available without its breach of this Agreement, been independently developed or obtained by the recipient party outside the scope of this Agreement and without reference to the other's Confidential Information received under this Agreement, been already known to recipient when disclosed hereunder, or been rightfully obtained by the recipient party from third parties without an obligation of confidentiality;

(ii)    OUTSOURCER may disclose a general description of the scope of Services and the Term to potential buyers of OUTSOURCER and persons or entities engaged in the valuation of OUTSOURCER or its Affiliates;

(iii)   OUTSOURCER may disclose the identity of CLIENT as a client of OUTSOURCER and the scope of Services hereunder to current or potential clients;

(iv)    CLIENT may disclose general information relating to the scope of Services and the duration of this Agreement to potential buyers of CLIENT or any one or more Affiliates of CLIENT;

(v)     either Party may disclose the provisions of this Agreement to its attorneys, bankers, public accountants, auditors, and other agents with a need to know such information in the ordinary course of business; and

(vi)    either Party may disclose the provisions of this Agreement to the extent required by any applicable law, regulation or rules of any stock exchange; provided, however, the Party disclosing the other Party's Confidential Information promptly notifies the other Party of such disclosure.

## Section 14.2   Injunctive Relief.

Each Party acknowledges that the other Party may suffer irreparable damage in the event of a breach or threatened breach of any provision of this Article.  Accordingly, in such event, notwithstanding Article XVII, such Party shall be entitled to preliminary and final injunctive relief, as well as any and all other applicable remedies at law or equity, including the recovery of damages.

## Section 14.3   No License.

The Parties acknowledge that (i) each Party maintains that the Confidential Information contains valuable trade secrets and (ii) all rights to Confidential Information are reserved by the disclosing party.  No license, express or implied, by estoppel or otherwise, under any trade secret right, trademark, patent, copyright or other proprietary right or applications that are now or may hereafter be owned by a party, is granted by the disclosure of Confidential Information under this Agreement.

**Error! Unknown document property name.**20

## ARTICLE XV       REPRESENTATIONS AND WARRANTIES

### Section 15.1   By CLIENT.

CLIENT represents and warrants that:

(a)       It is a New York not-for-profit corporation which is tax-exempt under Federal and New York State law.

(b)       It has all requisite power and authority to execute, deliver and perform its obligations under this Agreement.

(c)       It is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which a license, authorization or qualification is required for the ownership or leasing of its assets or the transaction of business of the character transacted by it, except where the failure to be so licensed, authorized or qualified would not have a material adverse effect on its ability to fulfill the obligations under this Agreement.

(d)       The execution, delivery and performance of this Agreement has been duly authorized by CLIENT.

(e)       It has not disclosed any Confidential Information of OUTSOURCER as of the Agreement Date, other than to CLIENT's employees, officers, trustees, attorneys and agents, as applicable.

(f)       There is no outstanding litigation, arbitrated matter or other dispute to which CLIENT is a party which would reasonably be expected to have a potential or actual material adverse effect on the Parties' ability to fulfill their respective obligations under this Agreement.

### Section 15.2   By OUTSOURCER.

OUTSOURCER represents and warrants that:

(a)       It is a corporation duly incorporated, validly existing and in good standing under the laws of the State of New Jersey.

(b)       It has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement.

(c)       It is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which a license, authorization or qualification is required for the ownership or leasing of its assets or the transaction of business of the character transacted by it, except where the failure to be so licensed, authorized or qualified would not have a material adverse effect on its ability to fulfill the obligations under this Agreement.

**Error! Unknown document property name.**

       (d)     The execution, delivery and performance of this Agreement has been duly authorized by OUTSOURCER.

       (e)     It shall comply with all applicable Federal, state and local laws (including HIPAA) and regulations applicable to OUTSOURCER and its Services and shall obtain all applicable permits and licenses required of OUTSOURCER in connection with its obligations under this Agreement.

       (f)     It has not disclosed any Confidential Information of CLIENT as of the Agreement Date.

       (g)     There is no outstanding litigation, arbitrated matter or other dispute to which OUTSOURCER is a party which would reasonably be expected to have a potential or actual material adverse effect on the Parties' ability to fulfill their respective obligations under this Agreement.

       (h)     The OUTSOURCER Intellectual Property does not and will not infringe upon the proprietary rights of any third party.

       (i)     Its practices shall be in accordance with the Fair Debt Collection Practices Act.

       (j)     The Services shall be provided by OUTSOURCER in compliance with the terms of this Agreement, including the Service Levels.

**Section 15.3**  **DISCLAIMER OF WARRANTIES.**

EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTIES AND SPECIFICALLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**ARTICLE XVI**     **DISPUTE RESOLUTION.**

**Section 16.1**  **Contract Executives.**

All disputes relating to this Agreement shall initially be referred by the Party raising the dispute to the CLIENT Contract Executive and the OUTSOURCER Contract Executive. If such Contract Executives are unable to resolve the dispute within 5 business days after referral of the matter to them, the Parties shall submit the dispute to the Management Committee.

**Section 16.2**  **Management Committee.**

The Management Committee shall meet at least once every calendar quarter during the Term (or at such other time as either Party may designate in a notice to the other) for the purpose of reviewing the overall performance of the Parties' respective

obligations under this Agreement and resolving disputes, if any, that may arise under this Agreement, provided that the Management Committee will in all events meet within ten (10) days of a Party's referral of a dispute to the Management Committee. The Management Committee shall consider disputes in the order such disputes are brought before it. In the event the Management Committee is unable to resolve a dispute within 5 business days of the date of the meeting during which such dispute was considered, either Party may seek its available remedies at law or in equity.

Section 16.3    <u>Continuity of Services.</u>

OUTSOURCER acknowledges that the performance of its obligations pursuant to this Agreement is critical to the CLIENT's business and operations. Accordingly, in the event of any dispute between CLIENT and OUTSOURCER, each Party shall continue to perform its obligations (including payment of Fees and other payments pursuant to Article XI and Article XIII, except for any such amounts as are actually in dispute) under this Agreement in good faith during the pendency of such dispute resolution proceedings or a litigation unless and until this Agreement is terminated in accordance with the provisions hereof.

Section 16.4    <u>Expedited Dispute Resolution.</u>

Notwithstanding anything to the contrary contained in this Agreement, in the event of a dispute relating to or arising out of a Default Notice, the dispute resolution procedures described in this Article must be commenced and completed within the Default Cure Period.

Section 16.5    <u>Third Party Claims.</u>

Notwithstanding the above dispute resolution provisions, in the event that a third party initiates a judicial action against either Party hereto in connection with or arising out of this Agreement, that Party shall have the right to seek to implead the other Party into that action, and the above dispute resolution provisions shall not be a bar to such impleader.

### ARTICLE XVII        TERMINATION.

Section 17.1    <u>Conditions of Termination.</u>

In addition to expiration at the end of the Term specified in Article II, this Agreement may be terminated under the following circumstances.

(a)    Termination for Cause.

(i)    By CLIENT:

If OUTSOURCER, subject to Exhibit E, fails to perform any of its material obligations under this Agreement (an "OUTSOURCER Event of Default"), and, upon written notice of such Event of Default (the "Default Notice") from CLIENT, does not cure such Event of Default within the Default Cure Period specified on Exhibit E, then CLIENT may, by giving written termination notice to OUTSOURCER, terminate this Agreement as of the date specified in the termination notice.

(ii)    By OUTSOURCER:

If CLIENT fails to materially perform any of its obligations under this Agreement (including, subject to Section 10.2, (i) materially failing to pay any undisputed invoices in the manner set forth in Section 12.1 or Section 12.2, as applicable; or (ii) materially failing to perform the CLIENT Required Services (each a "CLIENT Event of Default"), and upon Default Notice from OUTSOURCER, does not cure such Event of Default within forty-five (45) days of such Default Notice, then OUTSOURCER may, by giving written termination notice to CLIENT, terminate this Agreement as of the date specified in the termination notice.

(b)    Termination for Insolvency.

If either Party files for bankruptcy, becomes or is declared insolvent, or is the subject of any proceedings related to its liquidation, insolvency or for the appointment of a receiver or similar officer for it, makes an assignment for the benefit of all of its creditors, or enters into an agreement for the composition, extension, or readjustment of substantially all of its obligations (in any event, the "Dissolving Party"), then the other Party may, by giving written notice to the Dissolving Party, terminate this Agreement as of a date specified in such notice of termination, but not sooner than 30 days after the such notice.

**Section 17.2    Effects of all Terminations.**

If this Agreement is terminated by any reason whatsoever, upon such termination:

(a)    CLIENT shall continue to pay OUTSOURCER for all undisputed Fees and other payments due under this Agreement through the Termination Date.

(b)    OUTSOURCER shall continue to collect, and CLIENT shall continue to pay, OUTSOURCER Fees for Cash Receipts received by CLIENT from Third Party Payers and Patients during the thirty (30) day period following the Termination Date, but only to the extent such payments are in respect of Patient bill dates on or prior to the Termination Date (such pre-termination Accounts, the "Pre-Termination Accounts").

**Error! Unknown document property name.** 24

(c)     Upon request, CLIENT shall provide OUTSOURCER with reasonable evidence of payments received in respect of the Pre-Termination Accounts to validate the amounts posted and to invoice OUTSOURCER's Fees to CLIENT.

(d)     At OUTSOURCER's expense, OUTSOURCER shall, within ten (10) days of receipt of the notice of termination, deliver or otherwise make available to CLIENT, in electronic format, all CLIENT Data in OUTSOURCER's possession, including, without limitation, all records, correspondence, written files and other CLIENT-related materials.  In addition, OUTSOURCER shall destroy all copies of CLIENT Data in its possession after providing CLIENT with an electronic copy as provided above.

(e)     OUTSOURCER agrees to cooperate with CLIENT and any of its new billing agents in order to effectuate an orderly transition of services and billing from OUTSOURCER to CLIENT.

## ARTICLE XVIII     INDEMNITIES.

### Section 18.1   Indemnification in General.

This Article sets forth the Parties' rights and obligations concerning indemnification.  References in this Article to CLIENT or OUTSOURCER as an indemnified person includes CLIENT's or OUTSOURCER's subsidiaries and Affiliates and its and their respective officers, directors, employees and agents acting within the scope of their duties, and its and their successors and assigns.  References in this Article to a party "indemnifying" the other means that the indemnifying party shall, pursuant to the provisions of Section 19.6, indemnify and hold the other harmless from, against and in respect of any liabilities, obligations, claims, damages, costs and expenses (including court costs, reasonable costs of investigation and reasonable attorneys' fees and expenses as they are incurred) incurred by the indemnified party by reason of any action, suit, proceeding, claim or demand of or by or settlement with a third party ("Claims"). References in this Article to an act or omission includes acts or omissions by a Party's employees, agents, contractors or other representatives.

### Section 18.2   Intellectual Property Indemnity.

OUTSOURCER indemnifies CLIENT against any Claim that any OUTSOURCER Intellectual Property used by CLIENT in connection with this Agreement infringes any patent, copyright, or other intellectual property right of a third party unless such infringement results from CLIENT's use of such OUTSOURCER Intellectual Property in a manner which was not authorized by OUTSOURCER.

### Section 18.3   Indemnity for Violation of Law.

Each Party indemnifies the other against any Claim, fine, fee or other charge imposed upon or assessed against the other Party by a governmental authority arising out

of an alleged violation of applicable law (including HIPAA) by the indemnifying Party, except to the extent caused by the indemnified Party.

### Section 18.4    Other Indemnities.

(a)    CLIENT indemnifies OUTSOURCER against any Claim resulting from any breach of the representations, agreements, warranties and covenants of CLIENT in this Agreement, except to the extent caused by the negligence or willful misconduct of OUTSOURCER or its agents or by OUTSOURCER's breach of this Agreement.

(b)    OUTSOURCER indemnifies CLIENT against any Claim resulting from any breach of the representations, agreements, warranties and covenants of OUTSOURCER in this Agreement, except to the extent caused by the negligence or willful misconduct of CLIENT or its agents or by CLIENT's breach of this Agreement.

### Section 18.5  Indemnification Procedure.

(a)     The Party claiming Indemnification under this Article (the "Indemnified Party") shall deliver written notice (an "Indemnity Notice") to the Party against whom indemnity is claimed (the "Indemnitor") within 10 days of receipt of notice of a Claim.  An Indemnity Notice shall set forth in reasonable detail to the extent then available the facts concerning the Claim and the basis on which the Indemnified Party believes this indemnity applies.  The failure to give such Indemnity Notice shall not affect the right of the Indemnified Party to indemnity hereunder unless and to the extent that such failure has materially and adversely affected the defense of such Claims by the Indemnitor.  At any time after 30 days from the giving of such Indemnity Notice, the Indemnified Party may, at its option, contest, settle or otherwise compromise, or pay such Claim, unless it shall have received notice from the Indemnitor that Indemnitor intends, at Indemnitor's sole cost and expense, to assume and control the defense of any such matter, in which case the Indemnified Party shall have the right, at no cost or expense to Indemnitor, to participate in such defense.  If the Indemnitor does not assume the defense of such matter, and in any event until Indemnitor states in writing that it shall assume the defense, Indemnitor shall pay the costs of the Indemnified Party arising out of the defense until the defense is assumed; provided, however, that the Indemnitor shall have the right, at its own cost and expense, to participate in such defense and Indemnified Party shall consult with Indemnitor and obtain Indemnitor's consent, which shall not be unreasonably withheld or delayed, to any payment or settlement of any such Claim.  The Indemnified Party may not settle a Claim after the Indemnitor assumes the defense without the consent of the Indemnitor or unless the Indemnified Party first agrees to release the Indemnitor from any obligation to indemnify the Indemnified Party with respect to such Claim.  If Indemnitor proposes to settle, compromise or pay a Claim it may do so (1) with the consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed) or (2) without the consent of the Indemnified Party provided such settlement or compromise involves solely the payment of money and includes a release by any third party making such Claim against the Indemnified Party of all claims against the Indemnified Party which were the subject of the indemnification.  The Indemnified Party shall take all appropriate action to permit and authorize Indemnitor to assume and control the defense of any such Claim.  Indemnitor shall keep the Indemnified Party fully apprised at all times as to the status of the defense.  If Indemnitor does not assume the defense, the Indemnified Party shall keep Indemnitor apprised at all times as to the status of the defense.

(b)     Following indemnification as provided herein, an Indemnitor shall be subrogated to all rights of the Indemnified Party with respect to all third parties relating to the matter for which indemnification has been made.

## ARTICLE XIX      LIMITATION OF LIABILITY.

### Section 19.1   Limitation of Liability.

(a)      OUTSOURCER'S AGGREGATE LIABILITY TO CLIENT FOR DAMAGES ARISING UNDER OR RELATING TO THIS AGREEMENT UNDER ANY AND ALL CLAIMS OF ANY TYPE OR NATURE, BASED ON ANY THEORY OF LIABILITY (INCLUDING CONTRACT, TORT, NEGLIGENCE, WARRANTY OR STRICT LIABILITY), SHALL NOT EXCEED THE AMOUNT OF FEES PAID BY CLIENT TO OUTSOURCER WITHIN THE SIX MONTH PERIOD IMMEDIATELY PRECEDING THE MONTH IN WHICH THE CAUSE OF ACTION FOR SUCH DAMAGES AROSE.  CLIENT'S AGGREGATE LIABILITY TO OUTSOURCER FOR DAMAGES ARISING UNDER OR RELATING TO THIS AGREEMENT UNDER ANY AND ALL CLAIMS OF ANY TYPE OR NATURE, BASED ON ANY THEORY OF LIABILITY (INCLUDING CONTRACT, TORT, NEGLIGENCE, WARRANTY OR STRICT LIABILITY), SHALL NOT EXCEED THE AMOUNT OF FEES PAID BY CLIENT TO OUTSOURCER WITHIN THE SIX MONTH PERIOD IMMEDIATELY PRECEDING THE MONTH IN WHICH THE CAUSE OF ACTION FOR SUCH DAMAGES AROSE, PROVIDED THAT THIS LIMITATION OF LIABILITY SHALL NOT APPLY TO CLAIMS BY OUTSOURCER AGAINST CLIENT FOR FEES TO BE PAID BY CLIENT PURSUANT TO ARTICLE XII.

(b)      NEITHER PARTY SHALL BE LIABLE FOR INDIRECT, INCIDENTAL, EXEMPLARY, SPECIAL OR CONSEQUENTIAL DAMAGES (INCLUDING LOSS OF GOOD WILL)ARISING UNDER OR RELATING TO THIS AGREEMENT EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

### Section 19.2   Exclusions.

The limitations or exculpation of liability set forth in Section 19.1(a) are not applicable to the failure of CLIENT to make payments due under this Agreement.  The limitations or exculpation of liability set forth in Sections 19.1(a) and 19.1(b) are not applicable to:  (i) indemnification claims as set forth in Article XIII; (ii) a Party's liability for third party claims, (iii) a Party's liability for a breach of its confidentiality or business associate obligations under this Agreement (including the business associate agreement attached as Exhibit G hereto), or (iv) any claims against CLIENT arising from the grossly negligent acts or omissions or willful misconduct of OUTSOURCER or agents.

## ARTICLE XX    INSURANCE, RISK OF LOSS

### Section 20.1  Insurance.

During the Term, OUTSOURCER shall maintain and keep in full force and effect, at its sole cost and expense, insurance as set forth below with an insurance company licensed to do business in the location where the Services are to be performed.

(a)    Commercial General Liability insurance including, without limitation, contractual liability coverage that indicates this Agreement is a "covered contract," premises, completed operations, broad-form property damage, independent contractors and personal injury liability in an amount not less than $1,000,000 each occurrence and $1,000,000 aggregate.

(b)    Workers' Compensation insurance in accordance with statutory requirements as well as Employer's Liability Insurance with limits not less than $500,000. Such insurance shall cover all individuals who will be used in any capacity by OUTSOURCER in performing Services;

(c)    Fidelity Bond/Commercial Crime insurance covering employee dishonesty, including, without limitation, dishonest acts of OUTSOURCER and its employees, agents or subcontractors and such insurance shall also include third party liability coverage and be written for limits not less than $1,000,000;

(d)    Professional Liability insurance for operations performed for CLIENT and its employees or CLIENT's with limits of liability not less than $1,000,000 each claim and $3,000,000 aggregate; and

(e)    Umbrella/Excess Liability insurance on a follow form basis with a limit of not less than $5,000,000 for each occurrence and $5,000,000 aggregate and such umbrella insurance shall name as underlying policies the Commercial General Liability, and Employer's Liability insurance coverage required above.

### Section 20.2  Certificate of Insurance/Additional Insured Status.  The
foregoing insurance policies shall list CLIENT as an additional insured.  Prior to the Go Live Date, OUTSOURCER shall cause its insurance carrier(s) to provide CLIENT with a certificate of insurance which (i) certifies the amount of insurance maintained by OUTSOURCER; (ii) certifies that CLIENT is an additional insured with respect to OUTSOURCER's policies, and (iii) certifies that CLIENT shall receive reasonable written notice prior to any reduction, modification, termination or expiration of such insurance.

### Section 20.3  Risk of Loss.

Each Party is responsible for the risk of loss or damage to all tangible property, real or personal, owned or leased by it.

**Error! Unknown document property name.**20.

## ARTICLE XXI   MISCELLANEOUS PROVISIONS

### Section 21.1   Assignment.

Neither Party shall, without the consent of the other, assign this Agreement, or any amounts payable pursuant to this Agreement; provided, however, that a Party may assign this Agreement to its Affiliate upon written notice to the other Party as long as both the assignor and the assignee remain responsible for the performance of OUTSOURCER's obligations hereunder. The consent of a Party to any assignment shall not constitute such Party's consent to further assignment. This Agreement shall be binding on the Parties and their respective successors and permitted assigns. Any assignment in contravention of this Section 21.1 shall be void.

### Section 21.2   Notices.

Except as otherwise specified in this Agreement, all notices, requests, consents, approvals and other communications required or permitted shall be in writing and be deemed given when sent by certified mail or overnight delivery service to the addresses set forth below:

In the case of notice to CLIENT:

> North General Hospital
>
> 1879 Madison Avenue, 6th Floor
>
> New York, New York  10035
>
> Attention:   Mr. Frank Hagan
>
> Sr. Vice President & Chief Financial

In the case of notice to OUTSOURCER:

> Creditek LLC, 9 Sylvan Way, Suite 165, Parsippany, NJ 07054
>
> Attention:   Linda White
>
> SVP of Finance
>
> Telecopy No.: 973-292-9349
>
> Telephone No.:973-515-4900, ext 335

Either Party may change its address for notification purposes by giving the other Party notice of the new address and the date upon which it will become effective.

**Error! Unknown document property name.**

### Section 21.3   Counterparts.

This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one single agreement between the Parties. For purposes of executing this Agreement, a Party's facsimile or electronic signature shall have the same force and binding effect as an original signature. This Agreement shall not become effective and binding until its has been executed by and delivered to both Parties.

### Section 21.4   Relationship.

(a)   The Parties intend to create an independent contractor relationship and nothing contained in this Agreement shall be construed to make either CLIENT or OUTSOURCER partners, joint venturers, principals, agents or employees of the other. No officer, director, employee, OUTSOURCER agent or Affiliate retained by OUTSOURCER to perform work on CLIENT's behalf shall be deemed to be an employee, agent or contractor of CLIENT. Neither Party shall have any right, power or authority, express or implied, to bind the other.

(b)   Each Party shall be responsible for the management, direction, compensation (including employment related taxes) and control of its employees and such employees shall not be employees of the other Party.

### Section 21.5   Severability.

If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, then the remaining provisions of this Agreement, if capable of substantial performance, shall remain in full force and effect and such remaining provisions shall be deemed to be restated to reflect the original intentions of the Parties as nearly as possible, in accordance with applicable law.

### Section 21.6   Waiver.

No delay or omission by either Party to exercise any right or power it has under this Agreement shall impair or be construed as a waiver of such right or power. A waiver by any Party of any breach or covenant shall not be construed to be a waiver of any succeeding breach or any other covenant. All waivers must be in writing and signed by the Party waiving its rights.

### Section 21.7   Entire Agreement.

This Agreement represent the entire agreement between the Parties with respect to its subject matter and there are no other representations, understandings or agreements between the Parties relative to such subject matter.

### Section 21.8   Amendments.

No amendment to, or change, waiver or discharge of, any provision of this Agreement shall be valid unless in writing and signed by an authorized representative of

both Parties. Any terms and conditions varying from this Agreement on any purchase order from the other Party are void.

### Section 21.9   Survival.

The terms of Section 3.3, Section 3.4, Section 3.5, Section 4.2(d), Article VIII, Article IX, Article XIV, Section 16.5, Article XVII, Article XVIII, Article XIX, Article XX, Section 21.9, and Section 21.11 shall survive the expiration or termination of this Agreement.

### Section 21.10   Third Party Beneficiaries.

Except as otherwise provided in this Agreement, each Party intends that this Agreement shall not benefit, or create any right or cause of action in or for the behalf of, any person or entity other than CLIENT and OUTSOURCER.

### Section 21.11   Governing Law/Forum.

This Agreement and the rights and obligations of the Parties under this Agreement shall be construed in accordance with and be governed by the laws of the State of New York, without giving effect to the principles thereof relating to the conflicts of law.  Each party to this Agreement hereby agrees and consents that any legal action or proceedings with respect to this Agreement shall only be brought in any New York State courts sitting in New York County.  By execution and delivery of this Agreement, each such party hereby: (i) accepts the jurisdiction of the aforesaid courts; (ii) agrees to be bound by any judgment of any such courts with respect to this Agreement; (iii) waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue set forth above; and (iv) further waives any claim that any such suit, action or proceeding brought in any such courts has been brought in an inconvenient forum.

### Section 21.12   Covenant of Further Assurances.

The Parties covenant and agree that, subsequent to the execution and delivery of this Agreement and without any additional consideration, they shall execute and deliver any further legal instruments which are or may become necessary to effectuate the purposes of this Agreement.

### Section 21.13   Negotiated Terms.

The Parties agree that the terms and conditions of this Agreement are the result of negotiations between them and that this Agreement shall not be construed in favor of or against any Party by reason of the extent to which any Party or its professional advisors participated in its preparation.

### Section 21.14   Time Periods.

If a time period is not specified for an approval, consent, agreement, notification or performance, then such time period shall be deemed to be that which is reasonable

**Error! Unknown document property name.**

under the circumstances, but in no event more than five business days, unless otherwise agreed to by the Parties.

### Section 21.15 <u>No Disqualified Individuals</u>.

OUTSOURCER represents and warrants that neither OUTSOURCER nor any person providing services under the terms of this Agreement on behalf of OUTSOURCER: (i) has been convicted of a criminal offense related to healthcare (unless such individual has been officially reinstated into the Federal healthcare programs by the Office of Inspector General ("OIG") and provided proof of such reinstatement to CLIENT); (ii) is under sanction, exclusion or investigation (civil or criminal) related to healthcare by any Federal or state enforcement, regulatory, administrative or licensing agency or is ineligible for Federal or state program participation; or (iii) is listed on the General Services Administration of List of Parties Excluded from the Federal Procurement and Non-Procurement Program or OIG List of Excluded Individuals/Entities. OUTSOURCER shall immediately notify CLIENT in writing of any such conviction, sanction, exclusion, investigation or listing of OUTSOURCER or a member of its staff.

### Section 21.16 <u>Ownership of CLIENT Records</u>.

Notwithstanding anything to the contrary, the ownership and right of control of all reports, records, policies, procedures and documents prepared by OUTSOURCER or its staff in connection with Services rendered hereunder ("Records") will vest exclusively in the CLIENT.

### Section 21.17 <u>Compliance with New York State Health Regulations</u>.

To the extent applicable, in accordance with Section 400.4 of Title 10 (Health) of the Codes, Rules and Regulations of the State of New York: (i) each of the Parties to this Agreement shall comply with those provisions of Chapter V of Title 10 (Health) of the New York Codes, Rules and Regulations which are binding on that Party under the laws of the State of New York; and (ii) "Notwithstanding any other provision in this Agreement, the facility remains responsible for ensuring that any service provided pursuant to this Agreement complies with all pertinent provisions of Federal, State and local statutes, rules and regulations." Notwithstanding the foregoing, the provisions of the preceding sentence are not intended to diminish in any respect OUTSOURCER's obligations pursuant to this Agreement.

### Section 21.18 <u>Consulting/Administrative Services Engagement</u>.

The Parties acknowledge and agree that this Agreement is intended to be a consulting and administrative services arrangement and not a delegation of CLIENT's managerial responsibilities to OUTSOURCER. Notwithstanding anything to the contrary in this Agreement, CLIENT's governing board shall retain full administrative and management responsibility for the operation of its facilities consistent with applicable law. CLIENT's Board expressly retains authority over (a) the day-to-day operations of its facilities, (b) the hiring and firing employees; (c) the maintenance and control of its

**Error! Unknown document property name.**

### Section 21.19 Staff Health Requirements.

At OUTSOURCER's sole cost and expense, OUTSOURCER shall ensure that each of its staff who provides services on-site at CLIENT's facilities shall: (i) have the requisite physical examinations and immunizations as required by New York State Department of Health regulations for CLIENT's staff prior to each staff member's provision of Services hereunder; and (ii) comply with all inservice and occupational health requirements of CLIENT.

### Section 21.20 Security at OUSOURCER Facilities.

OUTSOURCER will adopt and implement security procedures and policies at any OUTSOURCER facility to the extent any Services are performed by OUTSOURCER for CLIENT at such sites. Such procedures and policies shall be commercially reasonable and consistent with applicable law and the security procedures and policies other billing service providers serving large institutional health care clients.

### Section 21.21 Severance Costs.

In the event that, pursuant to Section 2.1 above, CLIENT elects not to renew this Agreement at the end of the first renewal term and this Agreement expires at the end of thirty-six (36) months after the Go Live Date, then CLIENT agrees to reimburse OUTSOURCER for up to $96,000 in severance costs for OUTSOURCER's staff allocated to CLIENT's account during the term of this Agreement. The reimbursement payment shall be made in one (1) lump sum payment within sixty (60) days of the end of the term of this Agreement. No reimbursement of severance costs shall be required hereunder, if CLIENT renews this Agreement for two (2) one (1) year renewal terms after the initial Term.

IN WITNESS WHEREOF, CLIENT and OUTSOURCER have each caused this Agreement to be executed and delivered by its duly authorized representative.

OUTSOURCER

By: _____
Name: H. Berenblum
Title: Executive Vice President
Date:

CLIENT

By: _____
Name: FRANCIS J. MEGAN
Title: SR VP, CFO
Date: FEBRUARY 9, 2006

411343.07                                        34

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

## EXHIBIT A

## REQUIRED OUTSOURCER SERVICES FOR ONGOING AND BACKLOG ACCOUNTS

1) Billing:

    a)    For all Ongoing Accounts, OUTSOURCER shall invoice the appropriate Third Party Payers and/or Patients on CLIENT's behalf in accordance with CLIENT policies and payer-specific requirements, including any additional required documentation. OUTSOURCER shall submit completed claims under the appropriate provider number of CLIENT or its individual physicians and health care practitioners, as designated by CLIENT. Consistent with applicable laws, rules, regulations and payor requirements, OUTSOURCER will submit claims to CLIENT's payors electronically or in writing, at CLIENT's sole discretion, provided that OUTSOURCER shall utilize the CLIENT's HIS System for electronically billing Accounts.

2) Analyze and correct, where deficient, each Patient Account by reviewing the following:

    a)    Services provided

    b)    Payments to date

    c)    Collection notes

    d)    Patient demographic information

    e)    Procedure coding (provided that any issues with procedure coding will be referred to CLIENT. OUTSOURCER will not make procedure code corrections.)

    f)    Primary and secondary insurance information

    g)    Explanation of benefits (EOB)

    h)    Explanation of payments (EOP)

    i)    Compliance with CLIENT's managed care contracts

    j)    Timely filing guidelines (Medicare, Medicaid, managed care contracts, etc.)

3) Update demographic/insurance information:

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

  a)   Whenever necessary and possible, OUTSOURCER shall contact the
        Patient and/or the Third Party Payer to obtain additional
        demographic/insurance information.

  b)   OUTSOURCER shall contact CLIENT's employees and/or Agents,
        whenever there is insufficient Patient demographic/insurance information
        to be able to submit an invoice to a Third Party Payer and/or to the Patient.

4)   Update clinical information:

  a)   OUTSOURCER shall contact CLIENT's employees and/or Agents to
        obtain or correct diagnosis, procedure or product code information.

5)   Re-bill when appropriate (including first time bills for secondary insurance Third
Party Payers) denied invoices with all Third Party Payers. Electronic re-bills should be
performed using CLIENT's HIS System. Hard copy re-bills can be printed from the
CLIENT's or the OUTSOURCER's System. CLIENT will be solely responsible for
appeals of denied bills with OUTSOURCER's assistance. OUTSOURCER shall bear all
costs of printing and mailing hard copy invoices to Patients and Third Party Payers.

6)   Follow-up on all Open Third Party Payer Accounts

  a)   OUTSOURCER shall, at a minimum, adhere to this follow-up schedule
        for unpaid or partially paid Accounts

     i)    Medicare and Medicaid: 30 calendar days after bill date,
            OUTSOURCER shall contact the payer (or check the payer's
            website, if available) to determine why the Account has not been
            paid. OUTSOURCER shall promptly correct any errors or
            deficiencies identified and resubmit the Invoice to the Payer.

     ii)   All other Third Party Payers: 40 calendar days after bill date,
            OUTSOURCER shall contact the payer to determine why the
            Account has not been paid. OUTSOURCER shall promptly correct
            any errors or deficiencies identified and resubmit the Invoice to the
            payer.

     iii)  For the purposes of i. and ii. above, OUTSOURCER shall not
            rebill any Account prior to 31 calendar days for Medicare and
            Medicaid and 46 calendar days for all other Third Party Payers

  b)   OUTSOURCER will continue to follow-up on every Third Party Payer
        Account until it is paid, transferred to a Self Pay category or becomes a
        Delinquent Account.

  c)   To the extent problems are identified during its
        discussions/correspondence with Third Party Payers, OUTSOURCER

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

shall correct such problems and be responsible for resubmitting a completed/amended bill to the appropriate party.

d)   OUTSOURCER may update the above referenced schedule upon written agreement by CLIENT.

7)   Subject to applicable CLIENT policies, bill and follow-up on all Open Self Pay Accounts:

a)   For Self Pay balances greater than $150 but less than or equal to $250, OUTSOURCER shall, until payment is received, mail to Patient one statement and two letters on CLIENT's letterhead plus three letters on OUTSOURCER's Collection Agency letterhead, and make one phone call to Patient. OUTSOURCER's use of an OUTSOURCER Collection Agency shall not result in additional fees to CLIENT.

b)   For Self Pay balances over $250, OUTSOURCER shall, until payment is received, place two phone calls and mail up to four letters to Patient, on CLIENT letterhead, plus mail three letters on OUTSOURCER Collection Agency letterhead.

c)   For Self Pay balances which are less than or equal to $150, OUTSOURCER shall, until payment is received, mail one statement and one letter on CLIENT's letterhead plus two letters on OUTSOURCER's collection agency letterhead.

d)   OUTSOURCER shall develop and review with CLIENT Contract Executive for approval, a schedule with the timing of statement submission, letter submission and placement of phone calls contemplated in 5a through 5c above by the Effective Date.

e)   The letters shall provide Patients with the phone number for OUTSOURCER's customer service center, where the caller shall be greeted as if they had called CLIENT directly. Any Patient complaints shall be promptly reported to CLIENT in accordance with applicable policies of CLIENT.

f)   Accounts that remain in a Self Pay status and are unpaid 30 calendar days after the conclusion of steps 5a through 5c above shall be returned to CLIENT for approval and subsequent referral by OUTSOURCER to a CLIENT Collection Agency and be written-off to zero in the Systems.

8)   OUTSOURCER shall instruct Patient and Third Party Payers to remit payments to CLIENT's designated bank accounts.

9)   OUTSOURCER staff shall keep notes to record key interactions and changes to each Account. These notes as well as the payment history and other pertinent information shall be available electronically for referral to a CLIENT Collection Agency.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

10)     OUTSOURCER shall submit refund requests to CLIENT at least bi-weekly with proper supporting documentation

11)     OUTSOURCER shall submit write-off requests to CLIENT at least bi-weekly with proper supporting documentation. OUTSOURCER will not process a write off whose amount exceeds the limits imposed in Section 11.5 without CLIENT's prior written approval. CLIENT shall write-off the Accounts balance on the HIS System.

12)     Information Technology:

    a)      OUTSOURCER shall utilize the CLIENT's HIS System for billing Accounts.

    b)      OUTSOURCER shall maintain all relevant licenses for its Systems.

    c)      CLIENT shall maintain all relevant licenses for its Systems.

    d)      OUTSOURCER shall provide CLIENT with online, real time unlimited view capabilities into the OUTSOURCER System (if such system is utilized). CLIENT shall be able to view Account level information for every Open and Closed Account. OUTSOURCER shall train CLIENT's personnel in a manner consistent with the terms and conditions of the Agreement.

13)     Communications:

    a)      OUTSOURCER shall, at its own cost, provide the communications links and dedicated data lines between CLIENT and OUTSOURCER Service Locations and toll free number required to provide customer service to Patients.

14)     Reporting:

    a)      OUTSOURCER shall keep and maintain a standard reporting system to regularly inform CLIENT of the current status of Accounts. Without limiting the foregoing sentence, OUTSOURCER shall provide CLIENT with a monthly report which shows in detail the number of Claims submitted for the month as well as a summary of billings, tracking, recordkeeping, adjustments, collections, and outstanding accounts receivables. In addition, CLIENT shall determine any additional reports required to effectively manage its business (such reports, the "Custom Reports"), and there shall be no additional charge for Custom Reports. To the extent Custom Reports are required, OUTSOURCER shall provide Custom Reports at no charge to CLIENT in the manner set forth in this Section.

    b)      OUTSOURCER and CLIENT shall jointly determine the release schedule for each Custom Report, based on the level of effort required to build such

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

report, the total number of such reports and their business importance to CLIENT, provided that (i) the initial Custom Reports requested by CLIENT shall be available within thirty (30) days of the Go-Live Date, and (ii) thereafter, all additional Custom Reports shall be available within thirty (30) days of CLIENT's request.

15)   OUTSOURCER shall provide and train the project staff required to perform the Services.

16)   OUTSOURCER shall provide the staff, at CLIENT's Service Location, required to gather the documentation (e.g., medical records) needed to support OUTSOURCER's collection activities.

17)   Continuous Process Improvement: OUTSOURCER will conduct root cause analyses on all process deficiencies to aid in continuous process improvement efforts.

18)   CLIENT Collection Agency efforts:

    a)   OUTSOURCER will refer Delinquent Accounts, after review by CLIENT, to CLIENT Collection Agency.

    b)   Accounts referred to a CLIENT Collection Agency will be written-off in CLIENT's and OUTSOURCER's Systems at the time of referral.

    c)   OUTSOURCER will provide an electronic file with the Account's information (e.g. notes, payment history) to the CLIENT Collection Agency.

    d)   CLIENT will be responsible for all fees paid to the CLIENT Collection Agency.

19)   OUTSOURCER's Fees shall cover such costs as staffing, telecommunications, space, office equipment, data storage, outbound postage and travel for the management and staff needed to perform the Services.

20)   In addition to the foregoing billing services, OUTSOURCER shall provide assistance to CLIENT and its advisors in connection with any Medicare, Medicaid, or other reimbursement related audits regarding CLIENT. OUTSOURCER shall provide CLIENT with prompt written notice of any threatened or pending audits regarding CLIENT as soon as OUTSOURCER becomes aware of them. CLIENT reserves the right to direct CLIENT's response to any such audits, and OUTSOURCER shall promptly provide CLIENT with a copy of all correspondence with governmental regulators and an opportunity to participate in all proceedings or discussions.

21)   Attached hereto as Schedule 1 to this Exhibit A is a transition schedule for when each Party will begin providing Services under the Agreement.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

Schedule 1

[Attach Transition Schedule]

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

**EXHIBIT B**

**SERVICE LEVELS**

**A.    Financial**

1)    Days Revenue Outstanding (DRO)

    a)    Commencing on the date that is ten months after the Go Live Date, and monthly thereafter, OUTSOURCER shall maintain CLIENT outpatient DRO, defined as Accounts Receivable, times 360, divided by 4 times the aggregate gross revenue for the preceding three months, at 60 days or less. For example, if the gross outpatient Accounts Receivable was $ 20 Million and outpatient gross revenue for preceding 3 months was $ 10 million, $ 12 million and $ 11 million respectively, then the DRO calculation would be: $(20*360)/((10+12+11)*4) = 54.55$ days

    b)    The Parties shall, during the first three months after the Go Live Date work together to define a write-off policy for partially paid and/or aged Accounts, which policy shall be subject to CLIENT approval. The Parties' agreement as to the write-off criteria and methodology will be required prior to the computation of Service Level credits and bonuses discussed in Sections A(1)(c) and A(1)(d) below as well as for the evaluation of Service Level performance as discussed in Sections A(1)(a), 2 and 3 below and in Section E.

    c)    Monthly after the first twelve (12) months from the Agreement Date, CLIENT shall calculate DRO and notify OUTSOURCER of DRO results. If DRO is greater than 70 days for any three consecutive months, OUTSOURCER shall:

        i)    initiate a root-cause analysis to investigate the decline in performance and identify its cause.

        ii)    provide CLIENT Contract Executive with a report detailing the cause of and procedure for improving DRO with an action plan and implementation schedule within 5 business days of DRO notification. The action plan and implementation schedule shall be subject to CLIENT's approval.

        iv)    Implement action plan within 7 business days of DRO notification.

        v)    Satisfactorily resolve the root cause for the decline in performance and provide CLIENT with satisfactory assurance that such decline will not recur after the procedure has been completed.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

OUTSOURCER shall have 30 days to cure Service Level deficiencies.

vi)     At CLIENT's option, OUTSOURCER shall pay CLIENT a Service Level credit of .70% (seventy hundreds of one percent) of the average daily sales (computed as total Net Revenue for the preceding twelve months, divided by 365 working days per year) times the number of days in excess of 70 in the DRO calculation, for each month in which the DRO exceeds 70 days (e.g., monthly Service Level credits are computed as: .007 times (Net Revenue/365), times (DRO, in days, minus 70)). Service Level credits shall be applied as a credit against outstanding amounts due to OUTSOURCER under this Agreement. Regardless of CLIENT's acceptance of Service Level credits, CLIENT reserves all of its available rights and remedies at law or in equity with regard to a failure by OUTSOURCER to meet the Service Levels. The Parties agree that, if OUTSOURCER fails to meet the Service Levels, the losses, expenses and measure of damages suffered by CLIENT would be uncertain and difficult to calculate. Therefore, the Parties agree that the Service Level credits are their best estimate of such losses, expenses and damages and are not a penalty. The Parties recognize that the Service Level credits described in this Exhibit are liquidated damages, not penalties, which are intended to compensate CLIENT for OUTSOURCER's failure to meet the Service Levels.

d)     <u>DRO Bonus Calculation</u>.  Whenever the DRO, computed as indicated in Section A(1)(c) above, is less than 50 days, CLIENT will pay OUTSOURCER a bonus equal to 0.05% (fifty hundredths of one percent) of the average daily sales (computed as total Net Revenue for the preceding twelve months, divided by 365 working days per year) times the number of days for which the DRO calculation is less than 50 days, for each month in which the DRO is less than 50 days (e.g., the monthly bonus is computed as: .005 times (Net Revenue/365), times (50-DRO, in days)).

2)     Percent of Accounts Receivable (A/R) distribution by aging category (from Date of Entry)

Commencing on the date which is ten months after the Go Live Date, OUTSOURCER shall maintain the gross value of the outpatient A/R aged greater than 120 days from Date of Service (excluding Delinquent Accounts referred to a CLIENT Collection Agency) less than or equal to 20% of the total A/R outstanding, measured monthly during the last day of each month.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

3)    Speed to Collect

    a)    Collections of the Backlog A/R shall be completed within 300 days from the Go Live Date

    b)    Collections of each Ongoing Account shall be completed within the following schedule:

        i)    Self Pay: 120 days counted from the date OUTSOURCER first received the Account. If OUTSOURCER works the Account, finds relevant Third Party Payer insurance coverage and changes the Account's financial class on the HIS System, the deadline shall be extended by an additional 120 days from the date of the change in financial class.

        i)    Third Party Payer: 120 days counted from the date OUTSOURCER first received the Account. If OUTSOURCER works the Account, finds relevant secondary insurance coverage and changes the Account's financial class on the HIS System, the deadline shall be extended by an additional 120 days from the date of the change in financial class. If OUTSOURCER works the Account, collects from the primary and/or secondary payer source and there remains a Self Pay balance, the Account shall be worked within the parameters outlines in 3b.i. above.

**B.**    **Customer Service**

1)    Call center metrics:

    a)    ASA (average speed to answer):

        i)    OUTSOURCER average speed to answer all Patient calls may not exceed thirty seconds during any one-week period (during Hours of Operation).

    b)    Abandonment Rate/Blocked Calls Rate:

        i)    OUTSOURCER Call Center Abandonment Rate (Abandoned Calls/Total Calls) may not exceed 5% during any one-week period (during Hours of Operation).

        ii)    OUTSOURCER Call Center Blocked Call Rate may not exceed 5% during any one-week period (during Hours of Operation).

**C.**    **Information Technology**

1)    System Uptime

    a)    The OUTSOURCER Systems and call center phone systems shall be available an average of 95% of any one-month period during the Hours of Operation set forth in 2) below.

**Error! Unknown document property name.**

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

    i)    System Outage Notification

        (1)    OUTSOURCER shall notify CLIENT of any system outages, during Hours of Operation, which last more than one hour

        (2)    During system outage OUTSOURCER shall provide to CLIENT periodic status updates.

            (a)    Updates shall include action plan to recover system and estimated time to recover.

        (3)    If system outage is discovered by CLIENT, CLIENT shall use the following escalation plan to notify OUTSOURCER of the downtime:

            (a)    Call to OUTSOURCER help desk at 866-671-3955

            (b)    Call to Brian Snedeker at 201-247-8644

            (c)    Call to Adrienne Hurtt at 215-531-3301 or to such other numbers as designated in writing by OUTSOURCER Contract Executive from time to time.

2)    Hours of Operation

    a)    The OUTSOURCER Systems shall be available to CLIENT users from 9 a.m. – 6 p.m. EST Monday through Friday.

    b)    OUTSOURCER shall maintain and accept full responsibility for all software license requirements for its systems utilized or contemplated for executing the operations of this Agreement.

    c)    In addition, OUTSOURCER will make all reasonable efforts to provide CLIENT with uninterrupted access (conceptually intended to mean 24 hours, Monday through Friday) to data repository/reporting facilities. Such access excludes scheduled nightly backup and weekly regular maintenance efforts, the schedule of which OUTSOURCER will provide to CLIENT and may change at any time, or emergency maintenance as may be required from time to time.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

## EXHIBIT C

### FEES

1)      Fee for collection of Backlog Accounts

    a)      15.1 % of Cash Receipts

    b)      Cash Receipts received during the first 7 days after Go Live Date, will be excluded from 1(a) above.

2)      Fee for collection of Ongoing Accounts

    a)      5.65 % of Cash Receipts

    b)      Cash Receipts received during the first 7 days after Go Live Date, will be excluded from 2(a) above

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

## EXHIBIT D

## CLIENT REQUIRED SERVICES

1)    Registration:

    a)    CLIENT shall provide the physical facilities to allow Patients to be registered into the HIS System.

    b)    CLIENT shall collect all relevant Patient insurance, demographic and other pertinent information required to perform the necessary clinical and patient care services and for OUTSOURCER to bill and get paid (on CLIENT'S behalf) for these services

2)    Order Entry:

    a)    The following are CLIENT's responsibilities regarding Registration

        i)    Reviewing the Patient's information prior to entering the data and identify missing, incomplete or incorrect information.

        ii)    Entering the Patients information into the HIS System.

3)    Verification of Insurance Coverage:

    a)    As required by the Third Party Payer and based on the type of and charge for the service provided to Patients, CLIENT shall use its reasonable efforts to contact all Third Party Payers to ascertain whether the Patient is covered for the services they have or shall receive.

    b)    CLIENT shall provide OUTSOURCER with copies of Patients' insurance cards.

4)    Pre-Authorization of Insurance Coverage:

    a)    As required by CLIENT's managed care agreements, Medicare and Medicaid regulations, and/or the requirements indicated on each Patient's insurance card, CLIENT will obtain insurance pre-authorization for all services which require such pre-authorization.

    b)    When requested, CLIENT shall provide OUTSOURCER with copies of Patients' pre-authorization documentation.

5)    Medical Records Coding and Documentation

    a)    CLIENT shall be responsible for determining the appropriate procedure code for each service it provided to the Patients.

**Error! Unknown document property name.**

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

b)    The time elapsed from Date of Service to Bill Date shall not exceed 5 days for any Ongoing Account with a Date of Service on or after the Go Live Date

c)    At OUTSOURCER's request, CLIENT shall provide, within five business days from receipt of such request, access to the clinical documentation needed to justify the services provided and/or the billing issued for an Account or group of Accounts

6)    Cash Posting:

a)    CLIENT shall open a credit card payment lock-box with a financial institution of its choice.

b)    CLIENT shall post all Cash Receipts into the HIS system no later than 5 days from receipt date

c)    OUTSOURCER will promptly endorse and deposit in CLIENT's name and designated accounts all Cash Receipts received for Services performed by CLIENT, but made payable to or sent to OUTSOURCER or its Affiliates in connection with this Agreement.

d)    CLIENT shall promptly provide OUTSOURCER with copies of all outpatient Third Party Payer explanation of benefits or of payments, correspondence, denials and any other relevant documentation received by CLIENT.

7)    Information Download

CLIENT shall make available to OUTSOURCER a daily Referral File.

8)    Account Write offs and Credit Balances

CLIENT shall update the HIS System to reflect Account write offs and credit balances, recommended by OUTSOURCER and approved by CLIENT, within 2 weeks from receipt of such OUTSOURCER's request

9)    Information Technology

a)    CLIENT shall bear all costs for licensing, hosting and maintaining its HBOC HIS and NDC billing systems.

b)    CLIENT shall bear the electronic billing costs for Outpatient Accounts.

**Error! Unknown document property name.**

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

## EXHIBIT E

## EVENTS OF DEFAULT AND CURE PERIODS

Each of the following constitutes an OUTSOURCER Event of Default with respect to the subject matter covered by such Event of Default. Upon the occurrence of a below mentioned Event of Default and upon receipt of Default Notice from CLIENT, OUTSOURCER shall cure (or, in the case of 1) below, mitigate) such OUTSOURCER Event of Default within the time periods set forth below:

1)    An Event of Default has occurred if OUTSOURCER knowingly engages in corporate malfeasance. There shall be no cure period for such Event of Default.

2)    An Event of Default shall have occurred with respect to the Service Level requirements set forth below if OUTSOURCER fails to satisfy the specific parameters described below:

     a)    DRO: An Event of Default has occurred with respect to OUTSOURCER's DRO obligation in Exhibit B if the average DRO computed monthly for 3 consecutive months is greater than 80 days. OUTSOURCER shall have 90 days after its receipt of Default Notice to cure such Event of Default.

     b)    Distribution of Account Receivable Aging: An Event of Default has occurred with respect to Exhibit B, Part A, Item 2 if the percent of outpatient A/R older than 120 days from Date of Service exceeds 25% for any two consecutive months. OUTSOURCER shall have 90 days after its receipt of Default Notice to cure such Event of Default.

     c)    System Uptime/Access: An Event of Default has occurred with respect to OUTSOURCER's System Uptime/Access obligations in Exhibit B if its Systems are inaccessible for reporting and analysis more than 5% for any one month during the Hours of Operation set forth on Exhibit B. OUTSOURCER shall have 30 days after its receipt of Default Notice to cure such Event of Default.

     d)    Customer Service Levels: An Event of Default has occurred with respect to OUTSOURCER's Customer Service obligations in Exhibit B, Part B, as set forth in Exhibit B, Part B, Section 1(a)(i)and 1(b)(i) and (ii). OUTSOURCER shall have 30 days after its receipt of Default Notice to cure such Event of Default.

3)    Other Events of Default covering subject matters not covered in this Exhibit E shall be cured by OUTSOURCER within 30 days after OUTSOURCER's receipt of the Default Notice.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

# EXHIBIT F

## SIGNIFICANT ASSUMPTIONS

## Information Provided by CLIENT

North General Hospital
Accounts Receivable month end balance (by discharge date)
As of August 31, 2005

| FINANCIAL CLASS | CURRENT | 31-60 | 61-90 | 91-120 | 121-150 | 151-180 | 181-210 | 211-240 | 241-999 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| **INPATIENT** | | | | | | | | | | |
| Blue Cross | 18,413 | 24,622 | 37,380 | 45,052 | 5,800 | 4,397 | 1,000 | 300 | 8,704 | 145,667 |
| COMMERCIAL | 84,663 | 144,246 | 100,205 | 24,822 | 41,889 | 30,972 | 98,479 | 22,798 | 179,270 | 727,344 |
| COMPENSATION | 17,090 | 18,191 | - | - | - | 12,299 | - | - | 68,983 | 114,551 |
| HMO | 24,690 | 10,344 | 11,150 | - | 8,308 | 863 | 655 | 750 | 3,739 | 60,499 |
| MEDICAID | 1,192,610 | 1,166,407 | 280,331 | 676,817 | 633,449 | 405,188 | 510,829 | 284,723 | 4,116,113 | 9,246,467 |
| MEDICARE | 2,287,941 | 909,353 | 488,529 | 198,985 | 104,049 | 190,486 | 126,570 | 189,742 | 1,735,532 | 6,191,185 |
| NO FAULT | - | - | - | - | - | - | 8,008 | - | - | 8,008 |
| SELF PAY | 21,256 | 8,393 | 52,151 | 5,873 | 8,393 | 13,052 | - | 15,415 | 333,467 | 458,000 |
| | 3,626,684 | 2,281,854 | 929,746 | 949,548 | 801,887 | 657,256 | 747,541 | 513,728 | 6,443,808 | 16,951,731 |
| **OUTPATIENT** | | | | | | | | | | |
| Blue Cross | 71,503 | 31,536 | 28,985 | 19,920 | 26,703 | 14,696 | 17,701 | 13,184 | 71,698 | 293,905 |
| COMMERCIAL | 226,094 | 275,822 | 198,658 | 223,579 | 111,052 | 129,408 | 87,020 | 74,211 | 446,183 | 1,771,026 |
| COMPENSATION | 29,176 | 63,033 | 20,334 | 31,792 | 15,776 | 19,801 | 8,989 | 15,174 | 84,240 | 288,316 |
| HMO | 61,687 | 48,021 | 38,053 | 44,660 | 38,168 | 35,733 | 25,616 | 24,852 | 109,301 | 426,290 |
| MEDICAID | 1,383,993 | 1,238,483 | 669,745 | 668,233 | 528,055 | 472,346 | 378,885 | 425,521 | 1,608,281 | 7,273,525 |
| MEDICARE | 467,147 | 462,546 | 307,676 | 328,330 | 245,561 | 165,139 | 132,870 | 117,662 | 765,043 | 2,981,977 |
| NO FAULT | 42,414 | 16,094 | 30,761 | 23,311 | 3,132 | 21,992 | 3,605 | 21,516 | 93,620 | 255,346 |
| SELF PAY | 991,761 | 961,353 | 1,125,419 | 382,938 | 162,926 | 121,901 | 86,186 | 80,634 | 563,333 | 4,476,439 |
| | 3,272,964 | 3,085,888 | 2,417,613 | 1,622,763 | 1,131,376 | 981,016 | 740,873 | 772,754 | 3,741,579 | 17,766,825 |

INPATIENT
Accounts Receivable # of accounts

| FINANCIAL CLASS | CURRENT | 31-60 | 61-90 | 91-120 | 121-150 | 151-180 | 181-210 | 211-240 | 241-999 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| Blue Cross | 7 | 10 | 8 | 8 | 8 | 9 | 4 | 1 | 7 | 60 |
| COMMERCIAL | 12 | 16 | 13 | 9 | 7 | 11 | 11 | 4 | 26 | 109 |
| COMPENSATION | 1 | 2 | - | - | - | 1 | - | - | 2 | 6 |
| HMO | 9 | 7 | 3 | - | 4 | 4 | 3 | 1 | 3 | 34 |
| MEDICAID | 313 | 324 | 258 | 223 | 178 | 143 | 103 | 43 | 575 | 2,160 |
| MEDICARE | 189 | 134 | 84 | 88 | 75 | 67 | 63 | 50 | 409 | 1,159 |
| NO FAULT | - | - | - | - | - | - | 1 | - | - | 1 |
| SELF PAY | 3 | 1 | 3 | 1 | 2 | 2 | - | 2 | 54 | 68 |
| | 534 | 494 | 369 | 327 | 274 | 237 | 185 | 101 | 1,076 | 3,597 |
| **OUTPATIENT** | | | | | | | | | | |
| Blue Cross | 126 | 96 | 134 | 95 | 92 | 78 | 75 | 42 | 408 | 1,146 |
| COMMERCIAL | 350 | 399 | 387 | 401 | 310 | 266 | 238 | 260 | 2,870 | 5,283 |
| COMPENSATION | 30 | 49 | 30 | 27 | 37 | 35 | 26 | 31 | 410 | 675 |
| HMO | 123 | 145 | 148 | 146 | 134 | 120 | 99 | 82 | 721 | 1,718 |
| MEDICAID | 6,074 | 5,808 | 3,299 | 2,343 | 2,850 | 2,416 | 1,987 | 2,518 | 16,157 | 42,231 |
| MEDICARE | 1,486 | 1,258 | 1,344 | 1,091 | 1,144 | 1,124 | 1,200 | 1,004 | 8,415 | 19,066 |
| NO FAULT | 10 | 12 | 9 | 14 | 6 | 8 | 7 | 16 | 206 | 288 |
| SELF PAY | 1,198 | 1,259 | 1,464 | 541 | 210 | 169 | 94 | 134 | 1,029 | 6,098 |
| | 9,396 | 8,826 | 6,915 | 4,658 | 4,783 | 4,217 | 3,706 | 4,087 | 30,016 | 76,604 |

**Error! Unknown document property name.**

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

## OUTSOURCER'S Assumptions

| FINANCIAL CLASS | CURRENT | 31-60 | 61-90 | 91-120 | 121-150 | 151-180 | 181-210 | 211-240 | 241-999 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| **OUTPATIENT** | | | | | | | | | | |
| Blue Cross | 71,503 | 31,538 | 26,985 | 19,920 | 26,703 | 14,696 | 17,701 | 13,184 | 71,698 | 293,905 |
| COMMERCIAL | 225,094 | 275,822 | 198,658 | 223,579 | 111,052 | 129,408 | 87,020 | 448,183 | 1,771,026 |
| COMPENSATION | 29,176 | 63,033 | 20,334 | 31,792 | 15,778 | 19,801 | 8,989 | 15,174 | 84,240 | 266,316 |
| HMO | 61,867 | 48,021 | 38,053 | 44,660 | 36,168 | 35,733 | 25,616 | 24,652 | 109,301 | 426,290 |
| MEDICAID | 1,383,993 | 1,238,463 | 669,745 | 568,233 | 528,055 | 472,346 | 378,886 | 425,521 | 1,608,261 | 7,273,525 |
| MEDICARE | 467,147 | 452,546 | 307,678 | 328,330 | 245,661 | 165,139 | 132,870 | 117,662 | 765,043 | 2,981,977 |
| NO FAULT | 42,414 | 15,094 | 30,761 | 23,311 | 3,132 | 21,992 | 3,605 | 21,516 | 93,520 | 255,346 |
| SELF PAY | 991,751 | 961,353 | 1,125,419 | 382,938 | 162,926 | 121,901 | 86,186 | 80,634 | 563,333 | 4,476,439 |
| | 3,272,964 | 3,085,868 | 2,417,613 | 1,622,783 | 1,131,376 | 981,018 | 740,873 | 772,754 | 3,741,578 | 17,766,825 |
| | | | | | | | | | | |
| **Recoveries** | | | | | | | | | | |
| Medicare/Medicaid | | 98% | 95% | 95% | 90% | 80% | 75% | 75% | 45% | |
| Self pay | | 20% | 20% | 20% | 20% | 20% | 15% | 15% | .15% | |
| Other | | 98% | 95% | 90% | 75% | 65% | 55% | .45% | 30% | |
| Net to charge care/caid | | 68% | 68% | 68% | 68% | 68% | 68% | 68% | 68% | |
| Net to charge other | | 68% | 68% | 68% | 68% | 68% | 68% | 68% | 68% | |
| Anticipated recoveries | $ | 1,601,614 | $ 1,056,169 | $ 862,362 | $ 602,876 | $ 467,171 | $ 325,992 | $ 333,270 | $ 971,011 | 6,220,655 |

Number of patient visits/year: 118,000
Net Outpatient revenue/yr: $ 25.7 MM
Gross Outpatient revenue/yr: $ 41.2 MM

Error! Unknown document property name.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

EXHIBIT G

BUSINESS ASSOCIATE ADDENDUM

This Addendum, dated as of _____, 2006 ("Addendum"), supplements and is made a part of the Services Agreement (as defined below) by and between North General Hospital ("Covered Entity") and Creditek LLC ("Business Associate").

WHEREAS, Covered Entity and Business Associate are parties to the Services Agreement pursuant to which Business Associate provides certain services to Covered Entity. In connection with Business Associate's services, Business Associate creates or receives Protected Health Information from or on behalf of Covered Entity, which information is subject to protection under the Federal Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191 and related regulations promulgated by the Secretary (collectively, "HIPAA").

WHEREAS, in light of the foregoing and the requirements of HIPAA, Business Associate and Covered Entity agree to be bound by the following terms and conditions:

1)   Definitions.

   a)   General.  Terms used, but not otherwise defined, in this Addendum shall have the same meaning as those terms in the Privacy Rule and the Security Rule.

   b)   Specific.

      i)   Electronic Protected Health Information.  "Electronic Protected Health Information" shall have the same meaning as the term "electronic protected health information" in 45 CFR 160.103, limited to the information that Business Associate creates, receives, maintains, or transmits from or on behalf of Covered Entity.

      ii)   Individual.  "Individual" shall have the same meaning as the term "individual" in 45 CFR 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR 164.502(g).

      iii)   Privacy Rule.  "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR parts 160 and 164.

      iv)   Protected Health Information.  "Protected Health Information" shall have the same meaning as the term "protected health information" in 45 CFR 160.103, limited to the information created or received by Business Associate from or on behalf of Covered Entity.

      v)   Required By Law.  "Required by Law" shall have the same meaning as the term "required by law" in 45 CFR 164.103.

Error! Unknown document property name.

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

vi)    Secretary. "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

vii)    Security Rule. "Security Rule" shall mean the Security Standards at 45 CFR parts 160 and 164.

viii)    Services Agreement. "Services Agreement" shall mean any present or future agreements, either written or oral, between Covered Entity and Business Associate under which Business Associate provides services to Covered Entity which involve the use or disclosure of Protected Health Information.

2)    Obligations and Activities of Business Associate.

a)    Use and Disclosure. Business Associate agrees to not use or disclose Protected Health Information other than as permitted or required by the Services Agreement or as Required By Law.

b)    Appropriate Safeguards. Business Associate agrees to use appropriate safeguards to prevent use or disclosure of the Protected Health Information other than as provided for by the Services Agreement. Without limiting the generality of the foregoing sentence, Business Associate will:

i)    Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of Electronic Protected Health Information as required by the Security Rule;

ii)    Ensure that any agent, including a subcontractor, to whom Business Associate provides Electronic Protected Health Information agrees to implement reasonable and appropriate safeguards to protect Electronic Protected Health Information; and

iii)    Report to Covered Entity any security incident (as defined by the Security Rule) of which Business Associate becomes aware.

c)    Mitigation. Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Addendum.

d)    Reporting. Business Associate agrees to report to Covered Entity any use or disclosure of the Protected Health Information not provided for by the Services Agreement of which it becomes aware.

e)    Agents. Business Associate agrees to ensure that any agent, including a subcontractor, to whom it provides Protected Health Information received from, or created or received by Business Associate on behalf of Covered

**Error! Unknown document property name.**

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

Entity agrees to the same restrictions and conditions that apply through this Addendum to Business Associate with respect to such information.

f)    Access to Designated Record Sets. To the extent that Business Associate possesses or maintains Protected Health Information in a Designated Record Set, Business Associate agrees to provide access, at the request of Covered Entity, and in the time and manner designated by the Covered Entity, to Protected Health Information in a Designated Record Set, to Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under 45 CFR 164.524.

g)    Amendments to Designated Record Sets. To the extent that Business Associate possesses or maintains Protected Health Information in a Designated Record Set, Business Associate agrees to make any amendment(s) to Protected Health Information in a Designated Record Set that the Covered Entity directs or agrees to pursuant to 45 CFR 164.526 at the request of Covered Entity or an Individual, and in the time and manner designated by the Covered Entity.

h)    Access to Books and Records. Business Associate agrees to make internal practices, books, and records, including policies and procedures and Protected Health Information, relating to the use and disclosure of Protected Health Information received from, or created or received by Business Associate on behalf of, Covered Entity available to the Covered Entity, or to the Secretary, in a time and manner designated by the Covered Entity or designated by the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule.

i)    Accountings. Business Associate agrees to document such disclosures of Protected Health Information and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528.

j)    Requests for Accountings. Business Associate agrees to provide to Covered Entity or an Individual, in the time and manner designated by the Covered Entity, information collected in accordance with Section 2(i) of this Addendum, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528.

3)    Permitted Uses and Disclosures by Business Associate.

a)    Services Agreement. Except as otherwise limited in this Addendum, Business Associate may use or disclose Protected Health Information to perform functions, activities, or services for, or on behalf of, Covered Entity as specified in the Services Agreement, provided that such use or

**Error! Unknown document property name.**

disclosure would not violate the Privacy Rule if done by Covered Entity or the minimum necessary policies and procedures of the Covered Entity.

b)   <u>Use for Administration of Business Associate</u>. Except as otherwise limited in this Addendum, Business Associate may use Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

c)   <u>Disclosure for Administration of Business Associate</u>. Except as otherwise limited in this Addendum, Business Associate may disclose Protected Health Information for the proper management and administration of the Business Associate, provided that disclosures are Required by Law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

4)   <u>Permissible Requests by Covered Entity</u>. Except as set forth in Section 3 of this Addendum, Covered Entity shall not request Business Associate to use or disclose Protected Health Information in any manner that would not be permissible under the Privacy Rule if done by Covered Entity.

5)   <u>Term and Termination</u>.

a)   <u>Term</u>. This Addendum shall be effective as of the date of this Addendum, and shall terminate when all of the Protected Health Information provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this Section.

b)   <u>Termination for Cause</u>. Upon Covered Entity's knowledge of a material breach of this Addendum by Business Associate, Covered Entity shall either:

i)   Provide an opportunity for Business Associate to cure the breach or end the violation. If Business Associate does not cure the breach or end the violation within the time specified by Covered Entity, Covered Entity shall terminate: (A) this Addendum; (B) all of the provisions of the Services Agreement that involve the use or disclosure of Protected Health Information; and (C) such other provisions, if any, of the Services Agreement as Covered Entity designates in its sole discretion;

ii)   Immediately terminate: (A) this Addendum; (B) all of the provisions of the Services Agreement that involve the use or disclosure of Protected

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

Health Information; and (C) such other provisions, if any, of the Services Agreement as Covered Entity designates in its sole discretion if Business Associate has breached a material term of this Addendum and cure is not possible; or

   iii) If neither termination nor cure are feasible, Covered Entity shall report the violation to the Secretary.

  c) <u>Effect of Termination</u>.

   i) Except as provided in paragraph (ii) of this Section 5(c), upon termination of this Addendum, for any reason, Business Associate shall return or destroy all Protected Health Information received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to Protected Health Information that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the Protected Health Information.

   ii) In the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon mutual agreement of the Parties that return or destruction of Protected Health Information is infeasible, Business Associate shall extend the protections of this Addendum to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Health Information.

 6) <u>Miscellaneous</u>.

  a) <u>Regulatory References</u>. A reference in this Addendum to a section in HIPAA means the section as in effect or as amended.

  b) <u>Amendment</u>. The Parties agree to take such action as is necessary to amend the Services Agreement from time to time as is necessary for Covered Entity to comply with the requirements of the HIPAA.

  c) <u>Survival</u>. The respective rights and obligations of Business Associate under Section 5(c) of this Addendum shall survive the termination of the Services Agreement.

  d) <u>Interpretation</u>. Any ambiguity in this Addendum shall be resolved to permit Covered Entity to comply with HIPAA.

  e) <u>Miscellaneous</u>. The terms of this Addendum are hereby incorporated into the Services Agreement. Except as otherwise set forth in Section 6(d) of this Addendum, in the event of a conflict between the terms of this Addendum and the terms of the Services Agreement, the terms of this Addendum shall prevail. The terms of the Services Agreement which are not modified by this Addendum shall remain in full force and effect in

Exhibits to North General Hospital Outpatient Collections Outsourcing Agreement

accordance with the terms thereof.  The Services Agreement together with this Addendum constitutes the entire agreement between the parties with respect to the subject matter contained herein. This Addendum may be executed in counterparts, each of which when taken together shall constitute one original.

**IN WITNESS WHEREOF,** the parties have executed this Addendum as of the date set forth above.

**NORTH GENERAL HOSPITAL**          **CREDITEK LLC**

By: _____          By: _____

    Name:                                      Name:
    Title:                                     Title:

**Error! Unknown document property name.**

# EXHIBIT

# 2



1251 Avenue of the Americas
Suite 4100
New York, New York 10020
646.624.5929

<u>By Overnight Mail</u>

August 1, 2007

North General Hospital
1879 Madison Avenue, 6th Floor
New York, New York 10035
Attention: John P. Maher

Re: <u>Collection of Past Due Account for Services Rendered - Amount Due: $1,050,164.32</u>

Dear Sir,

North General Hospital ("North General") owes Creditek LLC ("Creditek"), a subsidiary of Genpact Limited ("Genpact"), the amount of $1,050,164.32 for services rendered by Creditek under the Outsourcing Agreement between North General and Creditek dated February 9, 2006 (the "Agreement"). This amount includes interest on such unpaid fees as provided for in Section 12.4 of the Agreement. Also enclosed for your reference is a copy of Creditek's invoices for the applicable months of unpaid fees. As you are aware the unpaid balance has been in arrears for some time and other payments have been frequently delinquent, including those under agreements we have reached to liquidate the outstanding balance owed. Capitalized terms used but not defined in this letter shall have the meanings ascribed to them in the Agreement.

This matter has been forwarded to my office to take action against North General Hospital for the collection of this past due account. Notice is hereby provided to North General Hospital pursuant to Section 21.2 ("Notices") and Section 17.1 (a) (ii) ("Conditions of Termination, Termination for Cause by OUTSOURCER") of our Agreement. Before any legal action is initiated, I am writing to ask for your cooperation and to request that North General pay Creditek, by wire transfer of immediately available funds, the amount of $1,050,164.32 within ten (10) days of your receipt of this letter.

If Creditek does not receive payment in full within 10 days, Creditek and Genpact will have to consider their available options under the Agreement, including legal action

against North General to seek all available remedies at law and equity, including damages and costs that may be recoverable.

North General's non payment of invoices in accordance with Sections 12.1 and 12.2 of the Agreement constitutes an Event of Default under the terms of Section 17.1 (a.)(ii) of the Agreement which was not cured by North General within the timeframe provided for under the Agreement. On February 5, 2007, Creditek provided North General with a Default Notice and requested that this Client Event of Default for non payment be cured within the 45 days provided for in the Agreement. North General failed to cure this Event of Default within the required timeframe and Creditek's right to terminate the Agreement and cease all operations became effective on March 22, 2007.

Creditek and Genpact are in receipt of your letter to Ed Berenblum of Creditek dated April, 10 2007. Your letter references the Default Notice and formally disputes certain amounts invoiced by Creditek and stated as unpaid and past due by Creditek in the Default Notice. Section 16.4 of the Agreement requires that any dispute arising out of a Default Notice must be commenced and completed within the 45 day Default Cure Period. Given that North General did not send the dispute letter until after the 45 day cure period, North General's rights to dispute the Default Notice expired on March 22, 2007.

Please let us resolve this matter amicably and expeditiously, and preserve our business relationship. Creditek and Genpact remain committed to working with North General to resolve these delinquencies and further improve and strengthen our relationship. Your cooperation is very much appreciated.

Sincerely,

Victor Guaglianone
Senior Vice President and General Counsel

CC: Ed Berenblum

# EXHIBIT

# 3

Jennifer,

Can you do me a favor and review this with Frank ASAP. Without the download we are not able to produce the results that we both expect from this project. We have resources scheduled to be brought on based on receiving the download in 30 days, but we have to postpone that if the file is not ready.

Thanks

Brian

Brian D. Snedeker
Vice President
Creditek Healthcare, a Genpact Company
201-247-8644

The information transmitted is intended only for the person or entity to which it is addressed and may contain material that is confidential, privileged and exempt from disclosure under applicable law. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material in a secure receptacle or by shredding the document.

----- Forwarded by Brian Snedeker/CTK on 06/23/2006 02:14 PM -----

| "Genie Santana" <Genie.Santana@NGSC.ORG> 06/23/2006 01:59 PM | To:<BSnedeker@creditek.com> cc:"Jennifer Palmer" <Jennifer.Palmer@NGSC.ORG>, "Michele Prisco" <Michele.Prisco@NGSC.ORG> Subject: RE: HBOC file |
| --- | --- |

Hello Brian,

The paperwork has been forwarded to Jennifer Palmer for review and final approval. Frank Hagan's signature is pending. Once that is received and submitted, McKessson will begin working on your request. I will advise

Regards,
Genie

-----Original Message-----
From: BSnedeker@creditek.com [mailto:BSnedeker@creditek.com]
Sent: Friday, June 23, 2006 12:17 PM
To: Genie Santana
Subject: HBOC file

Good afternoon Genie,

Just wanted to follow-up with you on the HBOC file.   Do you have an estimated completion date from them?  It would help us a lot in planning IT and operational resources if they could provide an estimated

completion date.

Thanks

Regards,

Brian


Brian D. Snedeker
Vice President
Creditek Healthcare, a Genpact Company
201-247-8644

The information transmitted is intended only for the person or entity to
which it is addressed and may contain material that is confidential,
privileged and exempt from disclosure under applicable law.  Any review,
re-transmission, dissemination or other use of, or taking of any action
in reliance upon, this information by persons or entities other than the
intended recipient is prohibited.  If you received this in error, please
contact the sender and delete the material in a secure receptacle or by
shredding the document.

# EXHIBIT

# 4

From: Genie Santana
Sent: Friday, July 07, 2006 9:43 AM
To: Jennifer Palmer
Cc: 'BSnedeker@creditek.com'
Subject: FW: SQL WORK ORDER 76402

Please respond to email from McKesson.


From: Elizabeth
Sent: Thursday, July 06, 2006 8:28 AM
To: Genie Santana
Subject: SQL WORK ORDER 76402

Good morning.
I have finished writing the queries and am ready to start testing. I
know we exchanged many emails about what to select. After going thru
these I think I need verification on what I am selecting. Also, I do
have a few questions/clarifications on some data elements.


What Accounts are currently being selected:
OP and ER accounts that had a charge or transaction (adj,payment,refund,
transfer) within the last week ( 7 days).
I know the last email you sent, you asked if the days could be increased
to 8, but if you run this every Sunday, won't going back 8 days give you


some accounts that were sent the previous week? I put all of these
accounts into a user defined table. This user defined table is used for
ALL


**Creditek comment:  Please include transactions for all 8 days so that
there is overlap to insure that there are no missing accts or
transactions


4 download files. In the emails we exchanged there were many different
account selection criteria mentioned:
    1) OP and ER accounts discharged w/ specified date range
    2) All AR accounts form last week
    3) OP and ER accts with a acct balance and OP and ER accts that had a
transaction posted last two weeks I can Select accounts anyway that you
all want. Just let me know.


**Creditek comment: Please select all open OP and ER accounts with an
open balance, as WELL as all OP and ER accounts where a transaction
(pymt, adj, refund, transfer) was posted in the last 8 days


Charge File:
For Charge Type , we will send 0 or 2  (0=Time of Charge, 2=Auto Daily)

Do you need the department for the charge. Currently I am sending the charge code(sim code) and description.

**Creditek comment: If available we would like the department code

Transaction File:
I am sending the plan code (payor). Do you need the Carrier code?

**Creditek comment: If available please include both the payer and carrier code

Billing File:
Initial Bill date - I run a subquery and get the bill date for bill_seq=1 Last Bill date - I use the bill date for the last bill seq nbr.

Also,
I have the unix file paths set to
//ngh-data/departments/Finance/star/CrediTek_OP_FMR/filename.txt
Filename = chrgs, trans, billing, and insurance If this is not correct, let me know.

Elizabeth
Mckesson - Information Solutions

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

# EXHIBIT

# 5

**Brian Snedeker**

07/17/2006 04:00 PM

To:"Genie Santana" <Genie.Santana@NGSC.ORG>
cc:"Jennifer Palmer" <Jennifer.Palmer@NGSC.ORG>,
   "Michele Prisco" <Michele.Prisco@NGSC.ORG>
Subject: RE: SQL WORK ORDER 76402

Genie,

No changes were made.  Everything we discussed at the time of the work order is still the same (the 8 days and the account selection process as confirmed on e-mails on 6/6).  I responded to the other two items because she asked a question (whether something should be included or not) and thought it warranted a response.

Regards,

Brian

Brian D. Snedeker
Vice President
Creditek Healthcare, a Genpact Company
201-247-8644

The information transmitted is intended only for the person or entity to which it is addressed and may contain material that is confidential, privileged and exempt from disclosure under applicable law.  Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact the sender and delete the material in a secure receptacle or by shredding the document.

"Genie Santana"
<Genie.Santana@NGS
C.ORG>

07/17/2006 04:02 PM

To:<BSnedeker@creditek.com>
cc:"Jennifer Palmer" <Jennifer.Palmer@NGSC.ORG>,
   "Michele Prisco" <Michele.Prisco@NGSC.ORG>
Subject: RE: SQL WORK ORDER 76402

Brian,

I just needed to confirm the verbage on McKessons email. NO changes will be made to the workorder at this time. It has been signed off on and making a change will incur additional costs. McKesson, will be producing test files as soon as they receive a response to go ahead.

Thanks,
Genie

-----Original Message-----
From: BSnedeker@creditek.com [mailto:BSnedeker@creditek.com]

Sent: Monday, July 17, 2006 3:07 PM
To: Genie Santana
Cc: Jennifer Palmer
Subject: RE: SQL WORK ORDER 76402

Genie,

Please see comments in Dark blue that begin with Creditek comment

Brian D. Snedeker
Vice President
Creditek Healthcare, a Genpact Company
201-247-8644

The information transmitted is intended only for the person or entity to which it is addressed and may contain material that is confidential, privileged and exempt from disclosure under applicable law. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material in a secure receptacle or by shredding the document.

                    "Genie   Santana"

                    <Genie.Santana@NG          To:       "Jennifer
Palmer" <Jennifer.Palmer@NGSC.ORG>
                    SC.ORG>                    cc:
<BSnedeker@creditek.com>

                                              Subject:   RE: SQL WORK
ORDER 76402
                    07/11/2006 02:25

                    PM




Please advise on the status of this request.

Thanks,
Genie

From: Genie Santana
Sent: Friday, July 07, 2006 9:43 AM
To: Jennifer Palmer
Cc: 'BSnedeker@creditek.com'
Subject: FW: SQL WORK ORDER 76402

Please respond to email from McKesson.


From: Elizabeth
Sent: Thursday, July 06, 2006 8:28 AM
To: Genie Santana
Subject: SQL WORK ORDER 76402

Good morning.
I have finished writing the queries and am ready to start testing. I
know we exchanged many emails about what to select. After going thru
these I think I need verification on what I am selecting. Also, I do
have a few questions/clarifications on some data elements.


What Accounts are currently being selected:
OP and ER accounts that had a charge or transaction (adj,payment,refund,
transfer) within the last week ( 7 days).
I know the last email you sent, you asked if the days could be increased
to 8, but if you run this every Sunday, won't going back 8 days give you


some accounts that were sent the previous week? I put all of these
accounts into a user defined table. This user defined table is used for
ALL


**Creditek comment:  Please include transactions for all 8 days so that
there is overlap to insure that there are no missing accts or
transactions


4 download files. In the emails we exchanged there were many different
account selection criteria mentioned:
     1) OP and ER accounts discharged w/ specified date range
     2) All AR accounts form last week
     3) OP and ER accts with a acct balance and OP and ER accts that had a
transaction posted last two weeks I can Select accounts anyway that you
all want. Just let me know.


**Creditek comment: Please select all open OP and ER accounts with an
open balance, as WELL as all OP and ER accounts where a transaction
(pymt, adj, refund, transfer) was posted in the last 8 days


Charge File:
For Charge Type , we will send 0 or 2   (0=Time of Charge, 2=Auto Daily)

Do you need the department for the charge. Currently I am sending the charge code(sim code) and description.


**Creditek comment: If available we would like the department code


Transaction File:
I am sending the plan code (payor). Do you need the Carrier code?


**Creditek comment: If available please include both the payer and carrier code


Billing File:
Initial Bill date - I run a subquery and get the bill date for bill_seq=1 Last Bill date - I use the bill date for the last bill seq nbr.


Also,
I have the unix file paths set to
//ngh-data/departments/Finance/star/CrediTek_OP_FMR/filename.txt
Filename = chrgs, trans, billing, and insurance If this is not correct, let me know.


Elizabeth
Mckesson - Information Solutions


Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

# EXHIBIT

# 6

**From:** Samuel Daniel [mailto:Samuel.Daniel@NGSC.ORG]
**Sent:** Tuesday, March 13, 2007 10:40 AM
**To:** Berenblum, Ed
**Cc:** Chaneta Glenn
**Subject:** RE: North General Hospital contract termination

YES.

---

**From:** Berenblum, Ed [mailto:ed.berenblum@genpact.com]
**Sent:** Monday, March 12, 2007 8:20 PM
**To:** Samuel Daniel
**Cc:** Frank Hagan
**Subject:** RE: North General Hospital contract termination

Sam:

Can you do Friday morning?

Ed Berenblum

General Manager,

Creditek Healthcare, a Genpact Company

9 Sylvan Way, Suite 165, Parsippany NJ 07054

973-355-2946 office, 631-431-1707 cell ed.berenblum@genpact.com

www.genpact.com

The information transmitted is intended only for the person or entity to which it is addressed and may contain material that is confidential, privileged and exempt from disclosure under applicable law. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material in a secure receptacle or by shredding the document (s).

---

**From:** Samuel Daniel [mailto:Samuel.Daniel@NGSC.ORG]
**Sent:** Monday, March 12, 2007 4:52 PM
**To:** Berenblum, Ed
**Cc:** Frank Hagan
**Subject:** RE: North General Hospital contract termination

Ed, I am sorry to hear that we are so far down the road before I heard from you . But I would like to work with you to resolve the present situation. If and when NGH makes a change in Vendor I would agree a transition period would be the way to go. Unfortunately the hospital would not be able to make a lump sum payment of a $1million at this time and suugest we structure a payment plan ASAP to prevent an abrupt termination. Let us arrange to meet and discuss this situation .

---

**From:** Berenblum, Ed [mailto:ed.berenblum@genpact.com]
**Sent:** Sunday, March 11, 2007 10:21 PM
**To:** Gene Norman; james.perkins@bowne.com; patrick.burke@mutualofamerica.com; gordon.bell@citigroup.com; eedjr@aol.com; rweaddy500@aol.com; lsfrancis@worldnet.att.net; egiscombe@giscombehenderson.net; kim.green@willis.com; aburit@aol.com; M_Jezlorski@yahoo.com;

penmed@aol.com; emccabe@africanart.org; Frank Hagan; sam.daniels@NGSC.org;
APerez@bmcc.cuny.edu
**Cc:** Paolillo, Regina; Ferrara, Juan; White, Linda; White, Heather; Clauss, Jr., Thomas F.; Miller, William;
Specht, Bill; Snedeker, Brian
**Subject:** North General Hospital contract termination

To the Board of Directors and CEO of North General Hospital:

For three years I had the honor of being a fellow member of the Board and of the Finance Committee. In
2005 the Hospital invited my company, Creditek, to bid on a project to bill and collect outpatient
receivables on the Hospital's behalf. We won this project through competitive bidding against several
other companies and at a rate which was much lower than that of the incumbent vendor. Immediately
after we were notified of the Hospital's decision to consider Creditek, I regrettably renounced my position
with the Board, as it seemed incompatible with this new project.

Our contract states that North General should provide a daily electronic file summarizing all transactions
impacting outpatient accounts. This file would have been loaded into our automated collections system
for processing. Our staff, using the information from this file, would have analyzed and efficiently
corrected and rebilled unpaid or rejected claims. Unfortunately, the Hospital was never able to produce an
acceptable file. My experience as a former Finance Committee member provided us insight into how
critical this project was to the Hospital's cash flow. We knew that the prior outsourcing contract terminated
on 2/28/07, that the Hospital needed to quickly replace the over $ 1 million collected monthly, and that
there was limited access to credit. To jump start the project, Creditek developed a costly manual
workaround and added staff over and above the initial budget to keep cash coming until the file could be
produced. Under these circumstances, Creditek started operations in March 2006 and within three
months was able to substantially recover the drop in cash flow created by the prior outsourcing company.
However, what we expected to be a one to two month expensive manual workaround turned into a costly
(for Creditek) permanent solution, as an acceptable transaction file never materialized.

Compounding the added costs and complexity caused by these manual processes, the Hospital was,
since the beginning, an inconsistent payer. My many meetings with Frank always ended in promises of a
big catch-up payment soon to come and an initial partial payment. Over time, partial and
skipped payments accumulated to the current outstanding balance of almost $ 1 million in unpaid invoices
(equivalent to approximately eight month billings at the average invoice amount). No longer able to
tolerate this situation, on February 5, 2007 we notified the Hospital of its Default under the terms of our
Agreement (copy attached) and requested that this Default be cured within the 45 days provided in the
Agreement. As we never heard back from the Hospital, on March 5, 2007 we sent a Notice of Default and
Potential Termination which states that, unless we hear back from North General Hospital, we will cease
all operations on or about March 22nd, 2007 (copy attached).

I am sending this communication to you hoping to remedy this situation before the Termination date. If the
Hospital plans to replace Creditek with another contractor, we will be happy to work with them to execute
an orderly transition. The Agreement provides approximately $ 90,000 in compensation for early
termination and this could partially cover the costs incurred during that period. If instead the hospital
intends to perform these services internally, please be advised that you will need at least 25 people to
keep up with the number of defective invoices that need to be corrected daily (approximately 90% of
everything billed) as well as with the substantial number of payer denials caused by North General's
incomplete order entry, incorrect coding, and lack of adequate insurance verification at the time of
service. Again, we will be happy to work with you during this transition. In either case, we still expect to
get paid in full under the terms of the Agreement (which include but are not limited to such costs as the
early termination penalty discussed above and interest penalties on all unpaid amounts).

I think this is a regrettable situation that neither one of us desired. Let's get together and resolve it as the
friends we used to be.

Thank you


Ed Berenblum

General Manager,

Creditek Healthcare, a Genpact Company

9 Sylvan Way, Suite 165, Parsippany NJ 07054

973-355-2946 office, 631-431-1707 cell ed.berenblum@genpact.com

www.genpact.com


The information transmitted is intended only for the person or entity to which it is addressed and may contain material that is confidential, privileged and exempt from disclosure under applicable law. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material in a secure receptacle or by shredding the document (s).